696 F.2d 804
 Alvin Bernard FORD, Petitioner,
v.
Charles G. STRICKLAND, Jr., Warden Fla. State Prison, Louie
L. Wainwright, Secretary, Department of Offender
Rehabilitation, State of Fla., Jim
Smith, Attorney General, State
of Florida, Respondents.
 No. 81-6200.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 7, 1983.
 
 Richard H. Burr, III, West Palm Beach, Fla., Marvin E. Frankel, New York City, for petitioner.
 Joy B. Shearer, Asst. Atty. Gen., West Palm Beach, Fla., Charles Corces, Jr., Asst. Atty. Gen., Tampa, Fla., for respondents.
 Appeal from the United States District Court for the Southern District of Florida.
 Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, ANDERSON and CLARK, Circuit Judges.*
 PER CURIAM:
 
 
 1
 This cause, after a decision by a panel, 11th Cir., 676 F.2d 434, was taken en banc for the purpose of resolving for this Circuit several important issues that repeatedly arise in capital cases. After full briefing, extended oral argument, and several months of deliberation during which the judges of the Court sought to resolve and reconcile the various issues involved, a communication was received purporting to be a request by defendant Ford that all appellate proceedings cease and that the state judgment be carried out.
 
 
 2
 The Court determines that, considering Ford's communication as a motion to dismiss his appeal, the motion is untimely. Fed.R.App.P. 42(b).
 
 
 3
 The United States Supreme Court has accepted certiorari of Barclay v. Florida, 411 So.2d 1310 (Fla.1982), cert. granted, --- U.S. ----, 103 S.Ct. 340, 74 L.Ed.2d ---- (1982) which may involve an issue in this case. Although this Court affirms the denial of habeas corpus relief on all grounds, we remand the case to the district court to consider the effect that Barclay may have on the denial of habeas corpus relief in this case, and the procedure that should be followed in the district court while the Barclay case is pending in the Supreme Court. If a stay of execution is requested pending consideration of the Barclay issue, the district court shall entertain such request.
 
 
 4
 The court sua sponte stays issuance of the mandate to and including March 1, 1983, to permit the filing of a petition for writ of certiorari to the United States Supreme Court, if either party wishes to do so, the stay to continue in force until the final disposition of this case by the Supreme Court, provided that within the period above mentioned there shall be filed with the Clerk of this Court the certificate of the Clerk of the Supreme Court that the certiorari petition has been filed. The Clerk shall issue the mandate on the filing of a copy of an order of the Supreme Court denying the writ, or on the expiration of the stay granted herein, unless the above mentioned certificate shall be filed with the Clerk of this Court within that time. The mandate will affirm the judgment of the district court but remand the case for further proceedings consistent with this opinion.
 
 
 5
 Since various judges comprise the majority for affirmance on the separate issues decided by this Court, we set forth the following table for easier consideration of the following opinions:ISSUE I: The Brown Issue
 
 
 6
 Affirm: Roney, Tjoflat (by separate opinion), Hill, Fay, Vance and Henderson.
 
 
 7
 Dissent: Godbold, Kravitch, Johnson, Anderson and Clark.
 
 
 8
 ISSUE II: Instructions on Mitigating Circumstances
 
 
 9
 Affirm: Godbold (by separate opinion, with which Clark concurs), Roney, Tjoflat (by separate opinion), Hill, Fay, Vance, Johnson, Henderson and Anderson.
 
 
 10
 Dissent: Kravitch.
 
 
 11
 ISSUE III: Failure to Require Resentencing When Evidence Insufficient on Some Aggravating Circumstances
 
 
 12
 Affirm: Godbold (by separate opinion, with which Clark concurs), Roney, Hill, Fay, Vance and Henderson.
 
 
 13
 Dissent: Kravitch and Johnson.
 
 
 14
 Tjoflat and Anderson would certify a question of state law to the Florida Supreme Court before ruling on this issue.
 
 ISSUE IV: Admission of Ford's Oral Confession
 
 15
 Affirm: The Court is unanimous to affirm on this issue.
 
 
 16
 ISSUE V: Standard by Which Aggravating Circumstances Must Outweigh Mitigating Factors
 
 
 17
 Affirm: Godbold, Roney, Tjoflat (by separate opinion), Hill, Fay, Vance, Kravitch (by separate opinion), Johnson and Henderson.
 
 
 18
 Dissent: Anderson and Clark.
 
 
 19
 ISSUE VI: Florida Supreme Court's Standard of Review
 
 
 20
 Affirm: The Court is unanimous to affirm on this issue.
 
 
 21
 ISSUE VII: Assistance of Counsel at Sentencing
 
 
 22
 Affirm: The Court is unanimous to affirm on this issue.
 
 
 23
 AFFIRMED AND REMANDED.
 
 
 24
 RONEY, Circuit Judge, with whom JAMES C. HILL, FAY, VANCE and ALBERT J. HENDERSON, Circuit Judges, join, and other judges join in part as shown by their separate opinions:
 
 
 25
 Alvin Bernard Ford, convicted in Florida of murdering a Fort Lauderdale policeman, petitioned the federal district court for a writ of habeas corpus pursuant to 28 U.S.C.A. Sec. 2254. A panel of this Court affirmed the district court's denial of relief, rejecting all seven grounds raised by petitioner on appeal. Ford v. Strickland, 676 F.2d 434 (11th Cir.1982).[1] A rehearing en banc was granted to examine several important recurring issues in habeas corpus petitions filed by Florida death row inmates. We now affirm the denial of habeas corpus relief but remand the case to the district court for further proceedings as set forth in the per curiam opinion of the Court.
 
 
 26
 Briefly, the facts which gave rise to petitioner's conviction and sentence are as follows. On the morning of July 21, 1974, Ford and three accomplices entered a Red Lobster Restaurant in Fort Lauderdale, Florida, to commit an armed robbery. During the course of the robbery, two people escaped from the restaurant. Fearing police would soon arrive, petitioner's accomplices fled. Ford remained to complete the theft of approximately $7,000 from the restaurant's vault.
 
 
 27
 Officer Dimitri Walter Ilyankoff arrived on the scene. Petitioner allegedly shot him twice in the abdomen and, apparently realizing his accomplices had abandoned him, ran to the parked police car. Because there were no keys in the car, Ford ran back to the struggling, wounded officer. Petitioner asked Officer Ilyankoff for the keys and then allegedly shot him in the back of the head at close range. Ford took the keys and made a high speed escape.
 
 
 28
 Petitioner was convicted in Circuit Court, Broward County, Florida, of first degree murder. In accordance with the jury's recommendation, the trial judge sentenced him to death. On direct appeal both the conviction and sentence were affirmed. Ford v. State, 374 So.2d 496 (Fla.1979). The United States Supreme Court denied Ford's petition for writ of certiorari. Ford v. Florida, 445 U.S. 972, 100 S.Ct. 1666, 64 L.Ed.2d 249 (1980).
 
 
 29
 Petitioner thereafter joined with 122 other death row inmates in filing an application for extraordinary relief and petition for writ of habeas corpus in the Florida Supreme Court. The petitioners challenged the court's alleged practice of receiving nonrecord information in connection with review of capital cases. The Florida Supreme Court denied the petition, Brown v. Wainwright, 392 So.2d 1327 (Fla.1981), and the United States Supreme Court denied certiorari, Brown v. Wainwright, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981).
 
 
 30
 Ford then filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure and applied for a stay of execution. Relief was denied. Ford v. State, 407 So.2d 907 (Fla.1981).
 
 
 31
 Finally, petitioner filed a petition for writ of habeas corpus under 28 U.S.C.A. Sec. 2254 in the United States District Court for the Southern District of Florida. The district court denied relief, and the panel affirmed. Ford v. Strickland, 676 F.2d 434 (11th Cir.1982). We granted en banc consideration which vacates the panel's opinion.
 
 I.
 
 32
 The Brown Issue: Nonrecord Material Before The Florida
 
 Supreme Court
 
 33
 In Brown v. Wainwright, 392 So.2d 1327 (Fla.), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981), the Florida Supreme Court with a full opinion denied Ford and 122 other Florida death row inmates class relief on a direct petition for writ of habeas corpus alleging the Supreme Court of Florida had unconstitutionally received nonrecord materials concerning death row inmates during the pendency of the appeals of capital cases.
 
 
 34
 Ford asserts that same issue here, specifically claiming that in his case the Florida Supreme Court reviewed ex parte psychiatric evaluations or contact notes, psychological screening reports, post-sentence investigation reports and state prison classification and admission summaries. This practice, he contends, violated the Constitution because it precluded adversarial testing of the information in violation of his rights to due process of law, effective assistance of counsel, confrontation, and reliability and proportionality of capital sentencing. He argues the court's receipt of results of psychiatric examinations which were conducted without first informing him of his Fifth Amendment rights violated his privilege against self-incrimination and his right to confer with his attorney before determining whether to submit to them.
 
 
 35
 The crux of Ford's assertion is that somehow the nonrecord materials were used in connection with the review of his sentence. The use of such materials would, it is argued, run afoul of the principles of Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), which held that a death sentence may not be imposed to any extent on nonrecord, unchallengeable information. A collateral argument would fault the use of such materials in other capital cases, even if not used in Ford's case, on the ground that such use in any case would upset the proportionality requirement that every case be considered on review in relationship to all other death cases. See Proffitt v. Florida, 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976); State v. Dixon, 283 So.2d 1, 10 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).
 
 
 36
 For the determination of this issue, we assume without deciding a point of law and a point of fact. As to the law we assume without deciding that the use by the appellate court of the type of nonrecord material alleged here would be unconstitutional. The judges who join this opinion have mixed tendencies as to the correct law on this point. In order to decide this case, however, we find it unnecessary as judges or as a court to determine the law in this regard.[2]
 
 
 37
 As to a point of fact, we assume without deciding the Florida Supreme Court received such information, and that it was available to the members of the court. The court itself assumed as much in its consideration of the allegations in Brown v. Wainwright, 392 So.2d at 1331 ("Even if petitioners' most serious charges were accepted as true..."). Such assumption by us eliminates the necessity for any kind of an evidentiary hearing or other fact-determining inquiry of the Florida court to determine the truth of the allegations.
 
 
 38
 With these assumptions, the inquiry from a constitutional standpoint is first, whether state law permits the use of such materials; second, if not, was the material nevertheless used in contravention of state law; and third, if not intentionally used in the review of capital cases, did the reading of such information somehow affect the judgment of the members of the Florida Supreme Court so that a federal court should treat the case as if the information had in fact been used. Only if one of these three questions is answered in the affirmative, would we be faced with the question of whether the Constitution was violated.
 
 
 39
 Does Florida state law permit the use of such nonrecord material in the review of Ford's sentence, or any other capital sentence? The ultimate source of any state's law is found in the decisions of its highest court. See Tennon v. Ricketts, 574 F.2d 1243 (5th Cir.1978), cert. denied, 439 U.S. 1091, 99 S.Ct. 874, 59 L.Ed.2d 57 (1979).[3] There are times when a state's supreme court has not yet decided a point of law so that the decisions of lower courts, statutes and other sources must suffice. There are other times when decisions by the state's court of last resort, not being clearly on point, must themselves be interpreted for a federal court to determine what the state court would decide on the precise point. The task is easy here because the Supreme Court of Florida has decided the "case on all fours" with this one in Brown v. Wainwright, 392 So.2d 1327 (Fla.), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 71 L.Ed.2d 407 (1981). In Brown, the court held that state law does not permit the use of such nonrecord material in the appellate review of a capital sentence.
 
 
 40
 [A]s a matter of law our view of the non-record information petitioners have identified is totally irrelevant either to our appellate function in capital cases as it bears on the operation of the statute, or to the validity of any individual death sentence.
 
 
 41
 392 So.2d at 1331.
 
 
 42
 The record of each proceeding, and precedent, necessarily frame our determinations in sentence review.... Factors or information outside the record play no part in our sentence review role.
 
 
 43
 Id. at 1332.
 
 
 44
 For a federal court, regardless of the reasons relied on and whether the law announced is good or bad law, the decision by the Florida court concludes the point.
 
 
 45
 Was the material used in contravention of state law? The federal court must be content with the answer that it was not so used for these reasons. First, there is a presumption of regularity in state proceedings, which would seem to rise to its highest level in considering the work of the highest court of the state. See 28 U.S.C.A. Sec. 2254(d); Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). We presume the state supreme court follows its own law and procedures. Second, Ford was a class petitioner for writ of habeas corpus to the Florida Supreme Court in Brown, where the court effectively stated that nonrecord material was not used in the review of petitioners' cases.[4] Third, there has been no specific allegation that Ford's case was treated differently from all others. See Ford v. Strickland, 676 F.2d at 444. Fourth, it is obnoxious both to the traditional role and procedures of the appellate process and to current notions of comity and federalism to suggest that a state appellate judge should be required to respond in a federal court to questions concerning what was or was not considered by him in the review of a state case. Petitioner virtually admits his argument would eventually carry that far if all else failed in obtaining the proof of what he asserts. Any principle that supports the start of that journey would support a conclusion which is not now a part of American law.
 
 
 46
 Would reading the nonrecord material so affect the Florida judges that the federal court should, for constitutional review purposes, treat the case as if the information had been used by them? The Florida court has given the answer to that question in the Brown decision.
 
 
 47
 A remaining question is whether the reading of non-record documents would so affect members of this Court that they could not properly perform their assigned appellate functions. Plainly, it would not. Just as trial judges are aware of matters they do not consider in sentencing, Alford v. State, 355 So.2d 108 (Fla.), cert. denied, 436 U.S. 935, 98 S.Ct. 2835, 56 L.Ed.2d 778 (1978), so appellate judges are cognizant of information that they disregard in the performance of their judicial tasks.
 
 
 48
 Id. at 1333. That judges are capable of disregarding that which should be disregarded is a well accepted precept in our judicial system. Harris v. Rivera, 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530, 536 (1981).
 
 
 49
 The Florida Supreme Court has left unanswered the perplexing question asked in Justice Marshall's dissent to the denial of certiorari in the Brown case, 454 U.S. 1000, 1001, 102 S.Ct. 542, 543, 70 L.Ed.2d 407, 408, to-wit:
 
 
 50
 If the court does not use the disputed non-record information in performing its appellate function, why has it systematically sought the information?
 
 
 51
 A candid answer would have been better than the veiled suggestion in footnote 17 of the Brown opinion, 392 So.2d at 1333. ("The 'tainted' information we are charged with reviewing was, as counsel concedes, in every instance obtained to deal with newly-articulated procedural standards.") But even if members of the court solicited the material with the thought it should, would or might be used in the review of capital sentences, the decision of the Florida court that it should not be so used, the statement that it was not used, and the rejection of the notion that it affected the judgment of the reviewing judges of the court ends the matter when addressed at the constitutional level.
 
 II.
 Instructions on Mitigating Circumstances
 
 52
 Instructing the jury on aggravating circumstances, the trial judge stated, "[y]ou shall consider only the following ...," and read the statutory language. With regard to mitigating circumstances, he said, "[y]ou shall consider the following ...," omitting the word "only" and again reading the appropriate statutory language. Ford neither objected to the instruction at trial nor raised it on direct appeal.
 
 
 53
 Relying primarily on Washington v. Watkins, 655 F.2d 1346 (5th Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982), petitioner argues the above instructions limited the jury's consideration to statutory mitigating factors, precluding consideration of nonstatutory mitigating factors contrary to Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Lockett held "the sentencer ... [must] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 98 S.Ct. at 2964.
 
 
 54
 Petitioner concedes procedural default on this issue, admitting that it was raised neither at trial nor on direct appeal. The panel noted the fact that "Ford neither objected to the instruction at trial nor raised it on appeal," but did not decide whether the objection had been waived. 676 F.2d at 440.
 
 
 55
 The proper inquiry as to waiver of the objection should be whether Ford comes within the cause and prejudice exception to Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Ford contends he cannot be faulted for failing to raise the issue, arguing the grounds for objecting were unknown at trial because Florida Supreme Court decisions decided prior to trial indicated only statutory mitigating circumstances could be considered. The court ruled explicitly to this effect two years after trial in Cooper v. State, 336 So.2d 1133, 1139 & n. 7 (Fla.1976), cert. denied, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977). Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a direct reversal of this view, was not decided until two years later (four years after trial) and hence was unavailable as a basis for objection. In light of our determination that Ford has not met the prejudice prong of Sykes, we need not determine whether the cause prong has been met. See United States v. Frady, --- U.S. ----, ----, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982).
 
 
 56
 The Sykes issue becomes blurred in this case, however, because of two principles which mesh to deny Ford relief on this point. First, the Supreme Court has held that an erroneous jury instruction satisfies Sykes' prejudice prong only if actual, not possible, prejudice is shown so that there is "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, --- U.S. ----, ----, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816, 832 (1982).
 
 
 57
 Second, in evaluating a trial court's instructions, we must determine the interpretation a reasonable juror might give the words of the instruction in question. Sandstrom v. Montana, 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979). The entire charge must be examined as a whole to discern whether the issues and law presented to the jury were adequate. Davis v. McAllister, 631 F.2d 1256, 1260 (5th Cir.1980), cert. denied, 452 U.S. 907, 101 S.Ct. 3035, 69 L.Ed.2d 409 (1981).
 
 
 58
 The fundamental issue then is whether Ford has carried his burden in establishing that his jury perceived that in deciding whether to recommend life or death, it was denied the use of any nonstatutory mitigating factors. We think not for the following reasons. First, the trial court read the statute as written, setting forth the entire list of statutory mitigating circumstances, which statute omits the word "only." The Supreme Court has recognized the Florida statute does not limit a jury's consideration of mitigating circumstances to those listed in the statute. Proffitt v. Florida, 428 U.S. at 250 n. 8, 96 S.Ct. at 2965 n. 8.
 
 
 59
 Second, the instruction here was different from Washington v. Watkins, 655 F.2d 1346 (5th Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982), where the state trial judge concluded the charge with these words:
 
 
 60
 If you unanimously find from the testimony that one or more of the preceding elements of mitigation exist[s], then you must consider whether it outweighs the aggravating circumstances you previously found and you must return one of the following verdicts....
 
 
 61
 Id. at 1368 (emphasis added). Here the jury was not confined to two "preceding elements of mitigation," as in Washington.
 
 
 62
 Third, that petitioner was not limited in the introduction of evidence which might be considered mitigating and that the jury arguments encompassed all evidence introduced in the case explains counsel's perception that the jury was not denied the use of any evidence in weighing sentences. Thus had petitioner known of Lockett, he would still have no reason to object because the jury was not in fact being limited to what it could consider.
 
 
 63
 Fourth, the sentencing judge's order stated: "There are no mitigating circumstances existing--either statutory or otherwise--which outweigh any aggravating circumstances." This order reflects the trial judge's perception that there was no restriction against the use of any nonstatutory mitigating evidence offered by Ford. It is reasonable to conclude that the state judge's perception of what could be considered was conveyed to the jury.
 
 
 64
 Under these circumstances, a rational conclusion is that the jury did not perceive a restriction on the use of any mitigating evidence.
 
 
 65
 As an alternative ground we have no problem in concurring with Chief Judge Godbold's assessment of lack of prejudice. The nonstatutory mitigating evidence consisted of testimony by Ford's mother and girlfriend about his family life, education, and work history and testimony by a psychiatrist portraying him as a bright young man frustrated by dyslexia. We agree with Chief Judge Godbold that failure to consider this testimony would not create a substantial likelihood that there was actual and substantial disadvantage to the defendant.
 
 III.
 
 66
 Failure to Require Resentencing When Evidence Insufficient
 
 
 67
 on Some Aggravating Circumstances
 
 
 68
 After receiving instructions on all eight aggravating circumstances provided in Fla.Stat. Sec. 921.141, Ford's jury recommended the death penalty. The jury gave a general verdict without an indication as to what factors it thought were supported by the evidence or controlling in its deliberations. The state trial judge then recited evidentiary support for all eight statutory aggravating circumstances and sentenced petitioner to death. On direct appeal the Florida Supreme Court ruled three of the eight did not apply because two lacked evidentiary support and one was based on the same aspect of the crime as another circumstance. Ford v. State, 374 So.2d at 501-03. Upholding the other five aggravating circumstances, the Supreme Court specifically found the killing "especially heinous, atrocious, or cruel." Id. at 503. In the absence of any mitigating circumstances, death was presumed the appropriate penalty and the sentence was affirmed. Id.
 
 
 69
 Petitioner argues that resentencing under the above circumstances is required under Henry v. Wainwright, 661 F.2d 56 (5th Cir.1981), vacated and remanded on other grounds, --- U.S. ----, 102 S.Ct. 2922, 73 L.Ed.2d 1326, judgment reinstated, 686 F.2d 311 (5th Cir.1982), and Stephens v. Zant, 631 F.2d 397 (5th Cir.1980), reh. denied and modified, 648 F.2d 446 (5th Cir.1981), certified to the Supreme Court of Georgia, --- U.S. ----, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982).
 
 
 70
 In Stephens the Georgia Supreme Court had ruled that one of the statutory aggravating circumstances presented to the jury was unconstitutionally vague. We held that the death sentence must be set aside because it was impossible to tell from the record the extent to which the Georgia jury had relied on an unconstitutional statutory aggravating factor in imposing the death penalty. Stephens v. Zant, 631 F.2d at 406. The United States Supreme Court has now certified to the Georgia Supreme Court the question of what state law premises support the conclusion that the death sentence should stand in the face of the jury's finding an invalid statutory aggravating circumstance. Zant v. Stephens, --- U.S. ----, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982). The Supreme Court thus indicated that the state law rationale of a rule like Florida's, under which a death penalty can be upheld even in the face of some difficulty with the precise grounds relied on by the sentencer, is important to the constitutional decision. In Henry, which was adhered to by the panel, 686 F.2d 311 (5th Cir.1982), after vacation and remand by the United States Supreme Court to consider a state procedural default, --- U.S. ----, 102 S.Ct. 2922, 73 L.Ed.2d 1326 (1982), we held the trial court committed constitutional error in admitting into evidence and permitting the jury to consider evidence of nonstatutory aggravating circumstances. Henry v. Wainwright, 661 F.2d at 60.
 
 
 71
 While the precise impact of the Supreme Court's recent actions in Stephens cannot be known at this juncture, the Court's ruling gives no direct support to Ford's position in this case. Indeed, Stephens leaves open the possibility that when there are proper state law premises, a death sentence may be sustained by a reviewing court so long as at least one of a plurality of statutory aggravating circumstances is valid and supported by the evidence. Williams v. Maggio, 679 F.2d 381, 386-90 (5th Cir.1982) (en banc) (upholding death sentence where Louisiana Supreme Court reviewed only one of three aggravating circumstances).[5]
 
 
 72
 In any event, we think that Stephens and Henry are inapposite to the case at bar. This case involves consideration of neither unconstitutional nor nonstatutory aggravating evidence. That the evidence was insufficient to support two circumstances and one circumstance was based on the same aspect of the crime as another does not suggest that the sentencing court considered any extraneous or improper evidence. The sentencing jury and judge considered only evidence of factors which could properly be considered by them. This case is appreciably different from Stephens because there the jury may have considered evidence that it could not constitutionally consider. In this case, no evidence considered was inappropriate for consideration. The sentencing judge's erroneous classification of that evidence as the aggravating circumstances permitted by statute should not constitutionally infect the sentence. On all of the evidence before him, he reached the determination that the death sentence was appropriate.
 
 
 73
 The state law premise was clearly set forth by the Florida Supreme Court in the opinion on the direct appeal, after it found that the killing was "especially heinous, atrocious, or cruel."
 
 
 74
 Consequently, even though there was error in assessment of some of the statutory aggravating factors, there being no mitigating factors present death is presumed to be the appropriate penalty. Elledge v. State, 346 So.2d 998 (Fla.1977); State v. Dixon, supra.
 
 
 75
 Ford v. State, 374 So.2d at 503. In Elledge the Florida Supreme Court set out its rationale for the rule. The court reasoned that in the absence of mitigating circumstances "so long as there are some statutory aggravating circumstances, there is no danger that nonstatutory circumstances have served to overcome the mitigating circumstances in the weighing process which is indicated by our statute." Elledge v. State, 346 So.2d at 1003 (emphasis in original). Consistent with its interpretation of the sentencer's role as "a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present," id. at 1003, (quoting Dixon v. State, 283 So.2d 1, 10 (Fla.1973)), the court questioned whether the weighing process would have been different had the impermissible aggravating factor not been present. 346 So.2d at 1003. In Elledge the court declined to uphold the sentence because the sentencing judge had considered the impermissible aggravating circumstances and had found some mitigating circumstances. Id.
 
 
 76
 In Ford, however, no mitigating circumstances were found, and five of the statutory aggravating circumstances relied on by the sentencing judge were upheld. The court logically presumed the weighing process would have reached the same outcome even had the sentencing court not added to the scales those aggravating circumstances found impermissible. Ford v. State, 374 So.2d at 503. The Florida Supreme Court's review has achieved the goals of rationality, consistency and fairness enunciated in Proffitt v. Florida, 428 U.S. at 258-60, 96 S.Ct. at 2969-70, 49 L.Ed.2d at 926-27, and Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
 
 
 77
 Nor did the trial court commit constitutional error in instructing the jury as to all aggravating and mitigating circumstances permitted by the statute. To ensure that the jury understands the structure of the law as required by Proffitt, it seems appropriate that they be charged fully on the Florida statute and provided proper instructions on the burden of proof and the standard of evidence required to prove the factors given, as they were here.
 
 
 78
 In setting out the state law premise for the presumption that Ford's death sentence should be affirmed due to the existence of five statutory aggravating circumstances and no mitigating circumstances, we noted that the Florida Supreme Court considered whether the sentence would have been different had the sentencing judge found only the five aggravating circumstances upheld on appeal. The effect of such an evaluation seems very like the application of a harmless error rule. Therefore, we adopt Chief Judge Godbold's opinion as an alternative ground insofar as it is consistent with the reasoning set forth above.
 
 IV.
 Admission of Ford's Oral Confession
 
 79
 Ford was arrested in Gainesville, Florida on the day of the murder. He refused to talk with Gainesville police officers, indicating he first wanted to consult a lawyer. He was given an opportunity to talk to a public defender but refused to accept that representation. He was unable to reach his private attorney.
 
 
 80
 Fort Lauderdale police officers came to return Ford to Fort Lauderdale. The Miranda warnings were given and petitioner "wanted" to talk but would not give a written statement until he had contacted his lawyer. Petitioner's only statement at the time was "I didn't shoot that cop." On a small plane from Gainesville to Fort Lauderdale, another officer gave Ford Miranda warnings. Ford said he was willing to talk but would give no written statement until he had talked with his lawyer. After informing a Fort Lauderdale officer of his earlier unsuccessful effort to contact his attorney and his refusal of representation by the public defender, petitioner admitted participating in the Red Lobster robbery. Although denying participation in the killing, he admitted being left behind at the Red Lobster by his accomplices, seeing a police officer lying on the ground as he left the restaurant, and escaping in the police car which he abandoned for a green Volkswagen.
 
 
 81
 Ford claims admission of the above statement in his trial violated the Fifth, Sixth and Fourteenth Amendments and was contrary to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny, including United States v. Priest, 409 F.2d 491 (5th Cir.1969), and Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). He argues that having invoked without waiving his right to counsel, his responses to subsequent police-initiated custodial interrogation without an attorney should not have been admitted into evidence. Additionally, petitioner contends he received ineffective assistance of counsel in that he did not present the confession issue as a Miranda violation in the trial court and failed to raise it on appeal.
 
 
 82
 Petitioner moved to suppress his confession but failed to appeal the trial court's denial of his motion on direct appeal to the Florida Supreme Court. Based on Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the federal district court held Ford's failure to raise the issue on direct state appeal foreclosed its consideration in this habeas corpus proceeding.
 
 A. Ineffective Assistance of Counsel
 
 83
 First we examine briefly petitioner's claim of ineffective assistance of counsel. Petitioner's attorney attempted to win the suppression of Ford's statement, and on the totality of circumstances in the entire record, rendered reasonably effective assistance in so doing. Washington v. Watkins, 655 F.2d at 1355. As the Supreme Court of Florida recognized in discussing this same claim, the statement admitted only presence and participation in the robbery; it denied participation in the shooting. "There was abundant evidence, apart from the confession, some by eye witnesses, to place him at the scene as a participant. Even disregarding petitioner's confession there was overwhelming evidence of guilt." Ford v. State, 407 So.2d at 909. In this circumstance, Ford was in no way prejudiced by any action or inaction of his attorney, even if his representation had fallen short of the dictates of the Sixth and Fourteenth Amendments. Washington v. Watkins, 655 F.2d at 1362-63.
 
 B. Wainwright v. Sykes
 
 84
 With regard to Ford's procedural default, the Florida law is clear. A criminal defendant's failure to raise an issue which could be asserted on direct appeal precludes consideration of the issue on a motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850. Hargrave v. State, 396 So.2d 1127 (Fla.1981). Accordingly, the state courts refused to consider Ford's contention in the collateral proceeding concerning the confession.
 
 
 85
 In Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), the Supreme Court held a state prisoner who knowingly and deliberately bypasses state procedures intentionally relinquishes known rights and can be denied habeas corpus relief on that basis. Recognizing Fay left open the possibility of "sandbagging" by defense lawyers, the Supreme Court narrowed its sweeping rule in Wainwright v. Sykes, 433 U.S. 72, 89, 97 S.Ct. 2497, 2507, 53 L.Ed.2d 594 (1977). The Court held that absent a showing of both cause for noncompliance and actual prejudice, habeas corpus relief is barred where a state prisoner has failed to comply with a state contemporaneous objection rule. 433 U.S. at 87, 97 S.Ct. at 2506.
 
 
 86
 While Sykes arose in the context of a procedural default at the trial level, we have applied its rationale in cases involving a procedural default during the course of a direct appeal from a state court conviction. See Huffman v. Wainwright, 651 F.2d 347 (5th Cir.1981); Evans v. Maggio, 557 F.2d 430, 433-34 (5th Cir.1977). Other circuits have applied Sykes in the same fashion. See Forman v. Smith, 633 F.2d 634, 640 (2d Cir.1980), cert. denied, 450 U.S. 1001, 101 S.Ct. 1710, 68 L.Ed.2d 204 (1981); Cole v. Stevenson, 620 F.2d 1055 (4th Cir.), cert. denied, 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980); Gibson v. Spalding, 665 F.2d 863, 866 (9th Cir.1981), vacated and remanded, --- U.S. ----, 102 S.Ct. 2229, 72 L.Ed.2d 842 (1982). Applying Sykes in this setting accrues the dual advantage of discouraging defense attorneys from omitting arguments in preparing appeals with the intent of saving issues for federal habeas corpus consideration and encouraging state appellate courts to enforce procedural rules strictly, thereby reducing the possibility the federal court will decide the constitutional issue without the benefit of the state's views. Gibson v. Spalding, 665 F.2d at 866; Wainwright v. Sykes, 433 U.S. at 90, 97 S.Ct. at 2508. Additionally, application of Sykes to the forfeiture of specific claims on appeal promotes the goals of comity and accuracy identified by the Sykes Court. Forman v. Smith, 633 F.2d at 639.
 
 
 87
 Thus, in this Circuit a state prisoner can forego the opportunity to raise constitutional issues in habeas corpus proceedings by deliberately bypassing state appellate procedural rules or by merely failing to follow them without showing both cause for the default and prejudice resulting from it. Because this record does not reveal Ford's procedural default was the result of an intentional bypass within the meaning of Fay, we turn to the cause and prejudice exception of Sykes.
 
 
 88
 Cause and prejudice are sometimes interrelated, Huffman v. Wainwright, 651 F.2d at 351. While the Supreme Court has not explicitly defined cause and prejudice, our precedents have defined "cause" sufficient to excuse a procedural default in light of the determination to avoid "a miscarriage of justice." Id. Prejudice means "actual prejudice" which in this case must result from the failure to appeal the trial court's admission of petitioner's statement. See Francis v. Henderson, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); Buckelew v. United States, 575 F.2d 515, 519 (5th Cir.1978).
 
 
 89
 A careful review of the record reveals the Sykes exception does not apply in this case. Ford's argument that the procedural default is excused because of the position of Florida courts at the time on the issue must fail. The claim was perceived and asserted in the trial court and therefore could have been asserted on appeal. Engle v. Isaac, --- U.S. ----, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).
 
 
 90
 If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid. Allowing criminal defendants to deprive the state courts of this opportunity would contradict the principles supporting Sykes.
 
 
 91
 --- U.S. at ----, 102 S.Ct. at 1572, 71 L.Ed.2d at 802 (footnotes omitted).
 
 
 92
 Even addressed in terms of manifest injustice, see Huffman v. Wainwright, 651 F.2d 347 (5th Cir.1981), under the circumstances of this case, imposition of the Sykes forfeiture rule does not constitute a miscarriage of justice. Petitioner does not contest the accuracy of the statement made to the Fort Lauderdale police and, as noted in the discussion of petitioner's ineffective assistance of counsel claim, he was not prejudiced by admission of the statement.
 
 V.
 
 93
 Standard by Which Aggravating Circumstances Must Outweigh
 
 Mitigating Factors
 
 94
 Florida Statute Sec. 921.141(3)(b) requires the sentencing court, in imposing the death penalty, to state in writing its finding "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances." Petitioner contends that because the statute, case law and jury instructions do not require the state to prove that aggravating factors outweigh mitigating factors "beyond a reasonable doubt," Florida's death penalty statute, on its face and as applied in this case, denies convicted capital defendants due process. Ford argues that the crime of capital murder in Florida includes the element of mitigating circumstances not outweighing aggravating circumstances and that the capital sentencing proceeding in Florida involves new findings of fact significantly affecting punishment. Since the element is part of the crime, he asserts that the beyond a reasonable doubt standard is required by In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and its progeny. Similarly, Ford presents his "subsidiary argument," which he claims the panel failed to consider, that the sentence should be reversed because neither the jury instructions nor the Florida statute require proof of the existence of aggravating circumstances beyond a reasonable doubt. We reject these arguments for several reasons.
 
 
 95
 First, that the aggravating factors must outweigh the mitigating factors for imposition of the death penalty under the Florida Statute is not an element of the crime of capital murder in Florida. Under the Florida bifurcated death penalty statute, the sentencing proceeding is entirely separate from trial on the capital offense. Indeed, in certain circumstances the state judge can summon different jurors for the latter phase. Fla.Stat. Sec. 921.141(1). Guilt of the capital offense having already been decided, the sentencing jury's sole function is to render an advisory sentence aiding the state judge in determining whether the defendant should be sentenced to death or life imprisonment. Id. Thus, that the Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," In re Winship, 397 U.S. at 364, 90 S.Ct. at 1072 (emphasis added), is irrelevant to deciding under the Florida statute whether there are insufficient mitigating circumstances. The aggravating and mitigating circumstances are not facts or elements of the crime. Rather, they channel and restrict the sentencer's discretion in a structured way after guilt has been fixed. As the Supreme Court explained:
 
 
 96
 While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of Furman are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.
 
 
 97
 Proffitt v. Florida, 428 U.S. at 258, 96 S.Ct. at 2969, 49 L.Ed.2d at 926.
 
 
 98
 Second, the United States Supreme Court has declared constitutional on its face Florida's capital sentencing procedure, including its weighing of aggravating and mitigating circumstances. The Supreme Court stated:
 
 
 99
 The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed.
 
 
 100
 Id. 428 U.S. at 258, 96 S.Ct. at 2969. The statute, facially constitutional, was strictly followed according to its terms.
 
 
 101
 Third, Ford's argument under In re Winship seriously confuses proof of facts and the weighing of facts in sentencing. While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, see State v. Dixon, 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974), and State v. Johnson, 298 N.C. 47, 257 S.E.2d 597, 617-18 (1979), the relative weight is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party. Petitioner's contrary suggestion is based on a misunderstanding of the weighing process, the statute and the guiding and channeling function identified in Proffitt v. Florida, 428 U.S. at 258, 96 S.Ct. at 2969. Indeed, it appears no case has applied In re Winship in the manner Ford urges. The North Carolina and Utah cases cited by him which imposed a reasonable doubt standard in this situation turned on construction of state statutes rather than the due process rationale of In re Winship. See State v. Johnson, 298 N.C. at 74, 257 S.E.2d at 617; State v. Woods, 648 P.2d 71 (1981).
 
 
 102
 Ford's alternate argument, raised for the first time in his reply brief, is that the Florida capital sentencing proceeding involves new findings of fact significantly affecting punishment to which the full panoply of due process rights should be extended, including the requirement that the state prove beyond a reasonable doubt that aggravating factors outweigh mitigating factors. Again petitioner confuses proof of facts with the weighing process undertaken by the sentencing jury and judge. Because the latter process is not a fact susceptible of proof under any standard, we reject this contention.
 
 
 103
 Finally, Ford contends his death sentence is unconstitutional for failure to require proof of the existence of aggravating circumstances beyond a reasonable doubt. Because this claim was never specifically briefed or raised before the panel, it is not now properly before this Court en banc. The requirement that the existence of aggravating circumstances be proved beyond a reasonable doubt is, however, a settled principle of Florida law. See Jent v. State, 408 So.2d 1024, 1032 (Fla.1981); State v. Dixon, 283 So.2d at 9. We note that in this case, as in nearly all cases, there is no dispute as to the facts on which the existence of the aggravating circumstances is based.
 
 VI.
 Florida Supreme Court's Standard of Review
 
 104
 Ford claims the Florida Supreme Court, in reviewing the evidence of aggravating and mitigating circumstances, violated the Eighth Amendment by failing to apply in his case the same standard of review applied in other capital cases. Specifically, he contends that under Florida case law, the court should have set aside two aggravating circumstances, collapsed two aggravating circumstances into one, and found the existence of one statutory mitigating circumstance and of nonstatutory mitigating circumstances.
 
 
 105
 While petitioner characterizes this contention as the Florida Supreme Court's failure to apply a consistent standard of review in violation of Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the district court correctly discerned that he is simply "quarreling" with the state court. Where in a capital punishment case the state courts have acted through a properly drawn statute with appropriate standards to guide discretion, Proffitt v. Florida, 428 U.S. at 258-59, 96 S.Ct. at 2969, federal courts will not undertake a case-by-case comparison of the facts in a given case with the decisions of the state supreme court. Spinkellink v. Wainwright, 578 F.2d 582, 604-05 (5th Cir.1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). This rule stands even though were we to retry the aggravating and mitigating circumstances in these cases, "we may at times reach results different from those reached in the Florida state courts." Id. at 605.
 
 
 106
 The Supreme Court of Florida is the ultimate authority on Florida law and we do not sit to question its interpretation of that State's statutes. See Tennon v. Ricketts, 574 F.2d 1243, 1245 (5th Cir.1978), cert. denied, 439 U.S. 1091, 99 S.Ct. 874, 59 L.Ed.2d 57 (1979). Ford has not cited and we have not found any habeas corpus decision in which this Court has reversed a death sentence due to the state court's incorrect decision as to the existence or absence of aggravating and mitigating circumstances.
 
 
 107
 Moreover, examination of the relevant Florida Supreme Court decisions reveals that its review of petitioner's death sentence was not arbitrary, capricious or in disaccord with constitutional principles relating to sentencing in capital cases. The Florida Supreme Court reviewed the circumstances of Ford's case consistently with its principles governing the aggravating and mitigating circumstances at issue in this case, and no deficiency under Godfrey is stated. Under 28 U.S.C.A. Sec. 2254(d), we presume correct the facts properly found by the state courts. Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), after remand, --- U.S. ----, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). There is nothing in this record to show the Florida Supreme Court failed to apply the standard of review mandated by Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its progeny.
 
 VII.
 Assistance of Counsel at Sentencing
 
 108
 Petitioner contends he received ineffective assistance of counsel at sentencing. Specifically, he claims that although counsel called character witnesses and a psychiatrist to testify in mitigation, he "failed to focus the trial judge's and jury's attention on the critical factors relevant to the sentence determination." Careful review of the record and Ford's specific arguments reveals this contention is nothing more than an attack on the reasoned tactics and strategy of experienced trial counsel.
 
 
 109
 In reviewing ineffective assistance of counsel claims, we do not sit to second guess considered professional judgments with the benefit of 20/20 hindsight. Washington v. Watkins, 655 F.2d at 1355; Easter v. Estelle, 609 F.2d 756 (5th Cir.1980). We have consistently held that counsel will not be regarded constitutionally deficient merely because of tactical decisions. See United States v. Guerra, 628 F.2d 410 (5th Cir.1980), cert. denied, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981); Buckelew v. United States, 575 F.2d 515 (5th Cir.1978); United States v. Beasley, 479 F.2d 1124, 1129 (5th Cir.), cert. denied, 414 U.S. 924, 94 S.Ct. 252, 38 L.Ed.2d 158 (1973); Williams v. Beto, 354 F.2d 698 (5th Cir.1965). Even where an attorney's strategy may appear wrong in retrospect, a finding of constitutionally ineffective representation is not automatically mandated. Baty v. Balkcom, 661 F.2d 391, 395 n. 8 (5th Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982); Baldwin v. Blackburn, 653 F.2d 942, 946 (5th Cir.1981).
 
 
 110
 That counsel for a criminal defendant has not pursued every conceivable line of inquiry in a case does not constitute ineffective assistance of counsel. Lovett v. Florida, 627 F.2d 706, 708 (5th Cir.1980). This is not a case in which counsel allegedly failed to prepare and investigate adequately. Ford's counsel was reasonably likely to render and did render reasonably effective assistance. See Herring v. Estelle, 491 F.2d 125, 127 (5th Cir.1974). Because the record reveals Ford received constitutionally adequate representation and no prejudice resulted to him by any action or inaction of counsel, see Washington v. Watkins, 655 F.2d at 1362, Ford has not carried his burden of proving ineffective assistance of counsel. See United States v. Killian, 639 F.2d 206, 210 (5th Cir.), cert. denied, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981).
 
 
 111
 The judgment denying habeas corpus relief is AFFIRMED, but the case is REMANDED to the district court for further proceedings as set forth in the per curiam opinion of the Court.
 
 
 112
 GODBOLD, Chief Judge, joined by CLARK, Circuit Judge, except as to the concurrence in Part V of the majority opinion, dissenting in part and specially concurring in part:
 
 
 113
 I concur in Parts IV, V, VI and VII of the majority's opinion. I write to indicate my separate views on the remaining issues.[1]
 
 I.
 
 114
 I dissent from the majority's holding and treatment of the Brown issue, Part I of its opinion. The rationale, if not the narrow holding, of Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality decision), prohibits an appellate court from relying on, that is, using as a factor in its decision, nonrecord information.[2]
 
 
 115
 In concluding that the Florida Supreme Court did not violate the assumed applicability of Gardner the majority understands the Florida Supreme Court to state that it did not rely on nonrecord material.[3] I read the Brown opinion differently. It seems to me that the Florida Supreme Court, adopting the subjunctive mode in its opinion, has not directly stated that it did not actually rely on nonrecord information:
 
 
 116
 A remaining question is whether the reading of non-record documents would so affect members of this Court that they could not properly perform their assigned functions. Plainly, it would not.
 
 
 117
 Brown v. Wainwright, 392 So.2d 1327, 1333 (Fla.1981) (emphasis added). Of course, the extrinsic material should not be used and would not be used by the court in the proper performance of its review function. But this definition of correct function simply begs the question whether in this particular set of circumstances, accidentally or otherwise, the extrinsic material actually was relied upon. I cannot find in the Florida Supreme Court's opinion what the majority, see n. 3, supra, describe as "the statement that it [extrinsic material] was not used." The disparate views that the judges of this court have expressed about the import of Brown convincingly demonstrate the intractable ambiguity of the Florida Supreme Court's opinion. The majority read the Florida Supreme Court to state in Brown that it did not use extrinsic material, but Judge Johnson reads Brown to say that the Florida Supreme Court actually did consider such material (Judge Johnson's dissent at 872: "It is clear, therefore, from the Brown opinion that the Florida Supreme Court has considered nonrecord material"), and Judge Kravitch's opinion maintains that Brown raises a presumption that the Florida Supreme Court used nonrecord material (Judge Kravitch's dissent at 853).
 
 
 118
 The Florida Supreme Court, I believe, should address and squarely rule on whether it relied on nonrecord material in reviewing Ford's sentence. I would accept, without further inquiry, a direct statement by the Florida Court that it did not rely.[4] Of course, if the Florida Supreme Court did rely on nonrecord information, Gardner was violated and the defendant must have a fresh appellate review of his sentence.
 
 II.
 
 119
 While I concur in the majority's ultimate conclusion that the jury instructions regarding mitigating circumstances do not require a grant of habeas, I find the majority's reasoning unacceptable.[5]
 
 
 120
 As the majority correctly notes, we can decide the adequacy of the contested jury instructions only if the defendant demonstrates that he had cause for and was prejudiced by his conceded failure to raise the issue at trial. Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). In the context of jury instructions the Supreme Court has recently decided that prejudice means "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage." U.S. v. Frady, --- U.S. ----, ----, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816, 832 (1982) (emphasis in original). Even though the jury probably did not consider the proffered evidence of nonstatutory mitigating factors, (see Judge Kravitch's dissenting opinion at 835, for a summary of the proffered evidence) that evidence is unpersuasive. Using the Frady test, I cannot conclude that there is "a substantial likelihood that the erroneous ... instructions prejudiced [the defendant's] chances with the jury." --- U.S. at ----, 102 S.Ct. at 1597-1598, 71 L.Ed.2d at 834.
 
 III.
 
 121
 In Part III of its opinion, the majority wrestles with the difficult issue of whether the Florida Supreme Court, after finding that three of the eight aggravating circumstances relied on by the trial judge were improper, must order that the defendant be resentenced. Like the majority, I believe that the constitution does not compel resentencing, but my reasons differ.
 
 
 122
 As Zant v. Stephens, --- U.S. ----, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982),[6] suggests, we must initially ask what the Florida Supreme Court's actions mean as a matter of state law. I interpret the Florida Supreme Court to apply a harmless error rule in refusing to order resentencing. The presumption, cited by the Florida court here, that death is appropriate where some aggravating and no mitigating circumstances are present cannot constitute a hard and fast rule of law. The Florida Supreme Court permits the trial judge and jury to forego the death sentence in just such circumstances. See Williams v. State, 386 So.2d 538, 543 (Fla.1980). The presumption must therefore constitute a harmless error rule that operates only where the initial sentencer has misapplied the sentencing statute. See Henry v. Wainwright, 661 F.2d 56, 58 (5th Cir.1981) (Unit B) (State interpreted Florida Supreme Court to apply a harmless error rule where death statute was misapplied below), vacated on other grounds, --- U.S. ----, 102 S.Ct. 2922, 73 L.Ed.2d 1326 (1982).
 
 
 123
 The Florida Supreme Court's actions, so interpreted, pass constitutional muster in this case. See Zant v. Stephens, --- U.S. ----, ----, 102 S.Ct. 1856, 1865, 72 L.Ed.2d 222, 235 (1982) (Powell, J., dissenting) ("I would leave open--also for the Supreme Court of Georgia to decide--whether it has authority to find that the instruction was harmless error beyond a reasonable doubt"); Drake v. Zant, 449 U.S. 999, 101 S.Ct. 541, 66 L.Ed.2d 297 (1981) (White, J., dissenting to denial of cert.) ("Nor do I believe that the Constitution requires the Georgia Supreme Court to vacate the sentences if it fails to sustain the Godfrey aggravating circumstance. The cases now before us involve only sentencing, not guilt or innocence, and there is no constitutional right to jury sentencing."). As a matter of general constitutional policy I think it essential that appellate courts be able to employ a harmless error rule where the initial sentencer has found aggravating circumstances to outweigh mitigating circumstances by such a definitive margin. Otherwise the resultant procedural maze can be expected to subvert the judicial process in cases where the death sentence is imposed.
 
 
 124
 In Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Court held that the sentencer must be permitted to consider mitigating evidence relating to "any aspect of a defendant's character or record and any of the circumstances of the offense ...." 455 U.S. at 110, 102 S.Ct. at 874, 71 L.Ed.2d at 8 (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (plurality opinion)). At some point the relevance of the defendant's proffered evidence becomes so attenuated that the trial judge will justifiably exclude it. But because it is not clear exactly where the line should be drawn, one can expect that the appellate court will, in many cases, find that the trial judge erred in excluding such evidence. Absent a harmless error rule, the death sentencing process will become so time-consuming and cumbersome that the death sentence will be imposed rarely and freakishly, in violation of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). I believe that the Supreme Court did not intend such a result.
 
 
 125
 General policy aside, existing precedent does not justify ordering resentencing here. While the defendant has a constitutional right to be convicted by a jury, see Street v. New York, 394 U.S. 576, 585-87, 89 S.Ct. 1354, 1362-1363, 22 L.Ed.2d 572 (1969) (reversal required where jury considered improper legal theory in convicting defendant), he has no right to jury sentencing. Thus, use of the harmless error rule in this case violates the constitution only if it runs afoul of the principles established by the Court's death cases.[7] Some have interpreted the requirements that the jury's discretion be channeled by adequate standards and that the sentence be rationally reviewed to imply that the trial judge and jury in every case must properly apply the statutory standards. See Zant v. Stephens, supra --- U.S. at ----, 102 S.Ct. at 1859, 72 L.Ed.2d at 228 (Brennan & Marshall, JJ., dissenting); Westbrook v. Balkcom, 449 U.S. 999, 101 S.Ct. 541, 66 L.Ed.2d 297 (1981) (Stewart, J., dissenting to denial of cert.); Judge Kravitch's dissenting op. at 840-841; Judge Johnson's dissenting op. at 875-876. I cannot agree. The requirements of adequate standards and rational review do not possess an immutable meaning that judges can immediately discern; they must be interpreted in light of their dual purposes of insuring reliable and consistent application of the death penalty. Use of a harmless error rule here frustrates neither purpose. Greater inconsistency is not a danger because the Florida Supreme Court's affirmance is based on the same discretion channeling standards that the jury and judge would use in resentencing the defendant. Presumably the Florida Supreme Court will apply its harmless error rule with an eye towards consistency. Use of a harmless error rule does not risk greater unreliability because the Florida Supreme Court bases its harmless error decision on the same evidence that the trial judge and jury would use on remand.
 
 
 126
 Henry v. Wainwright, 661 F.2d 56 (5th Cir.1981), vacated on other grounds, --- U.S. ----, 102 S.Ct. 2922, 73 L.Ed.2d 1326 (1982) and Stephens v. Zant, 631 F.2d 397 (5th Cir.1980), reh. denied and modified, 648 F.2d 446 (5th Cir.1981), certified to Supreme Court of Georgia, --- U.S. ----, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982), do not stand in the way of my conclusion that resentencing is not constitutionally required here. In both of those cases the standards used by the jury were held to violate the federal constitution. Here, in contrast, there is no suggestion that the judge's errors are of constitutional dimensions. I believe that the constitution does not prohibit use of a harmless error rule to correct mere errors of state law.
 
 
 127
 TJOFLAT, Circuit Judge, concurring in part and dissenting in part:
 
 I.
 
 128
 The petitioner presents to this en banc court the following constitutional claims: (1) petitioner's oral confession should not have been admitted into evidence during his state court trial; (2) the state sentencing court improperly limited the advisory jury to considering only statutory mitigating factors in violation of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (I will refer to this claim as the "Lockett claim"); (3) the sentencing court, in instructing the advisory jury and in making its own findings, failed to require that the existence of aggravating circumstances, and the finding that aggravating circumstances outweigh mitigating circumstances, be proved beyond a reasonable doubt; (4) petitioner's counsel was ineffective during the sentencing phase of petitioner's trial; (5) the Florida Supreme Court, in reviewing petitioner's capital sentence on direct appeal from the state trial court, violated the rule of Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), by considering nonrecord material (I will refer to this claim as the "Brown claim," see Brown v. Wainwright, 392 So.2d 1327 (Fla.), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981)); (6) the Florida Supreme Court's direct review of petitioner's sentence was inconsistent with its review of other capital sentences; and (7) the Florida Supreme Court impermissibly allowed petitioner's capital sentence to stand on direct appeal despite the sentencing court's reliance on three improper aggravating circumstances (I will refer to this claim as the "Stephens claim," see Zant v. Stephens, --- U.S. ----, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982)).
 
 
 129
 This court should address these claims in the following order: first, those challenging the validity of petitioner's conviction; second, those challenging the validity only of petitioner's sentence; and third, those challenging the validity only of the Florida Supreme Court's review of petitioner's sentence. I adhere to this procedure because if petitioner were to prevail on any claims in the first category, it would be unnecessary for us to address those in the latter two categories, because he would be entitled to a new trial. Similarly, if petitioner were to prevail on any claims in the second category, we would not have to address those in the third category because resentencing would be required.
 
 
 130
 Thus, petitioner's claim regarding the inadmissibility of his oral confession must be decided first because a holding in his favor would require a new trial on the issue of guilt. Next, if necessary, we must consider those claims that attack the validity of petitioner's sentence: the Lockett claim, the burden of proof claims, and the ineffective assistance of counsel claim. Finally, if necessary, we must consider those claims that attack the validity of the Florida Supreme Court's review of petitioner's sentence: the Brown claim, the inconsistency claim, and the Stephens claim.
 
 
 131
 I resolve these claims as follows: (1) There is no disagreement among the members of this court on the issue of the admissibility of petitioner's oral confession; therefore, I adopt the conclusion and the reasoning of the panel opinion, Ford v. Strickland, 676 F.2d 434, 437-39 (11th Cir.1982). Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), bars this claim; (2) Sykes bars petitioner's Lockett claim; (3) Sykes bars petitioner's claims that the existence of aggravating circumstances, and the finding that aggravating circumstances outweigh mitigating circumstances, must be proved beyond a reasonable doubt; (4) there is no disagreement among the members of this court over the disposition of petitioner's claim that his counsel was ineffective at the sentencing phase of his trial; therefore, I adopt the panel decision that petitioner failed to prove this claim, 676 F.2d at 443;[1] (5) I reach the merits of the Brown claim and hold that the Florida Supreme Court committed no constitutional error; (6) there is no disagreement among the members of this court regarding petitioner's proportionality claim; therefore, I adopt the panel opinion rejecting this claim on the merits, id. at 442-43;[2] (7) concerning petitioner's claim that the Florida Supreme Court should not have allowed his sentence to stand in light of the sentencing court's reliance on three improper aggravating circumstances, I find this case indistinguishable from Zant v. Stephens, --- U.S. ----, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982), and, therefore, I find it necessary to invoke the Florida certification procedure to obtain a clarification of Florida law.
 
 
 132
 I make no further mention of claims 1, 4, and 6 above because the panel decided them correctly. In order to decide the remaining claims, it is necessary to examine the procedural history of this case, particularly the stages at which petitioner raised his claims.
 
 II.
 
 133
 Petitioner was convicted in the Circuit Court for Broward County, Florida, of first-degree murder. At the sentencing phase of petitioner's trial, the jury recommended the death penalty.[3] The trial judge found eight aggravating circumstances and no mitigating circumstances, accepted the jury's recommendation, and sentenced petitioner to death. Petitioner alleges that the sentencing court committed two constitutional violations: first, it impermissibly restricted the jury to considering only statutory mitigating factors in violation of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and second, it failed to require that both the existence of aggravating circumstances and the finding that aggravating circumstances outweigh mitigating circumstances be proved beyond a reasonable doubt. Petitioner did not call either of these alleged violations to the attention of the trial court.
 
 
 134
 On direct appeal, petitioner presented neither alleged constitutional violation to the Florida Supreme Court. Petitioner raised three other claims, none of which are before this court. The Florida Supreme Court affirmed petitioner's conviction and sentence, although it held that the sentencing court relied on three improper aggravating circumstances in imposing the death penalty.[4] Ford v. State, 374 So.2d 496 (Fla.1979). The United States Supreme Court denied certiorari. Ford v. Florida, 445 U.S. 972, 100 S.Ct. 1666, 64 L.Ed.2d 249 (1980).
 
 
 135
 Petitioner alleges that the Florida Supreme Court committed two constitutional violations on direct review of his conviction and sentence: first, it impermissibly considered nonrecord material; and second, it impermissibly affirmed petitioner's sentence despite holding that three of the eight aggravating circumstances the sentencing court relied on were invalid. Petitioner brought to the Florida Supreme Court's attention the first of these alleged constitutional errors when he joined with one hundred and twenty-two other persons in filing a petition for a writ of habeas corpus in the Florida Supreme Court. The petitioners challenged the court's alleged practice of considering nonrecord material in reviewing capital sentences. Brown v. Wainwright, 392 So.2d 1327 (Fla.), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981). The Florida Supreme Court denied the writs, holding that no constitutional violation had occurred. Id. at 1330-33.
 
 
 136
 Petitioner next filed a motion in state circuit court for post-conviction relief under Florida Rule of Criminal Procedure 3.850. In support of this motion, petitioner argued for the first time, inter alia, the Lockett claim, and the burden of proof claims.[5] The circuit court held that petitioner could not raise these claims on collateral attack of his conviction and sentence.
 
 
 137
 Petitioner appealed the circuit court's denial of his motion for post-conviction relief to the Florida Supreme Court. Ford v. State, 407 So.2d 907 (Fla.1981). He sought to have the Florida Supreme Court decide the merits of the Lockett claim and the burden of proof claims by also filing a petition for a writ of habeas corpus. Id. at 908. In support of this petition, petitioner alleged that his appellate counsel was ineffective in failing to raise these claims before the Florida Supreme Court on direct appeal. He asked the court to grant him belated appellate review of these claims. The court rejected the ineffective assistance of appellate counsel claim,[6] and affirmed the circuit court's determination that petitioner could not raise the Lockett claim or the burden of proof claims on a motion for post-conviction relief: "[These claims] were all matters known at the conclusion of the trial which could have been, but were not, raised on direct appeal. Accordingly, collateral attack ... was properly determined by the trial court not to be an appropriate remedy ...." Id. Thus, the petitioner's failure to raise these claims either before the circuit court, during the criminal prosecution, or on direct appeal constituted a procedural default.
 
 
 138
 Next, petitioner filed this application for a writ of habeas corpus in federal district court. Before the district court, the petitioner raised all of the claims that now concern the en banc court: the Lockett claim, the burden of proof claims, the Brown claim, and the Stephens claim. Petitioner raised the first two claims despite his procedural default before the state courts.[7]
 
 
 139
 The district court ruled that because petitioner had made no showing of cause and prejudice to satisfy the standard of Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), he was barred from challenging in federal court on a petition for a writ of habeas corpus the state court's instructions to the jury at the sentencing phase of the trial. Therefore, Sykes barred consideration of the Lockett claim and the claim that aggravating circumstances must be proved beyond a reasonable doubt. The district court denied on the merits petitioner's claim that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt,[8] his Brown claim, and his Stephens claim.[9]
 
 
 140
 The petitioner then appealed to this court. A panel of this court rejected on the merits each of petitioner's claims now under consideration.[10] The panel reached the merits of the Lockett claim despite the district court's holding that Sykes was dispositive of this claim and despite the state's reliance on Sykes in its brief. Answer Brief of Respondents/Appellees at 27-31. The case now comes before this en banc court.
 
 III.
 
 141
 Having recounted the procedural history of the case, I turn to the issues raised by petitioner's claims. Petitioner's first claim is that the following jury instruction violated Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978): "As to aggravating circumstances ... you shall consider only the following: [the court then recited the statutory factors]. As to mitigating circumstances ... you shall consider the following [the court then recited the statutory factors]."[11] State Trial Transcript at 1347-49. Petitioner complains that although the court omitted the word "only" in connection with reciting the mitigating factors, the instruction was ambiguous enough that a reasonable juror could have thought he was precluded from considering nonstatutory mitigating factors.
 
 
 142
 Because petitioner never objected to the above instruction at trial or on direct appeal, the cause and prejudice standard of Sykes applies. The question of cause is a factual inquiry on which petitioner has the burden of proof. Petitioner never introduced any evidence, other than the record of the state court prosecution, to prove cause before the district court. Petitioner's belated attempt to argue cause before this court is no substitute for the introduction of evidence at the district court level. Our appellate function is not to determine legal issues in the abstract or to find facts, but to decide whether the trial court erred. Because the trial court was faced with no direct evidence that would explain why petitioner's attorney failed to object to the challenged instruction, it cannot be seriously contended that the trial court erred in holding that Sykes bars petitioner's claim.
 
 
 143
 Petitioner's argument that "reasonably effective counsel" would not have foreseen his Lockett claim at the time of his state court trial, Brief for Petitioner-Appellant at 36-37, misses the mark. The relevant question is not what "reasonably effective counsel" would have foreseen, but whether petitioner's attorney had cause not to object to the challenged instruction. This question cannot be answered in the abstract, but must be based on what counsel actually knew and his reasons for not objecting at trial. The possibility the state raises, Answer Brief of Respondents-Appellees at 29-30, that counsel's choice not to object was based on strategic considerations, cannot be lightly dismissed.
 
 
 144
 Petitioner admits that he was not precluded from introducing evidence on nonstatutory mitigating factors during the sentencing phase of his trial. Furthermore, petitioner admits that he introduced such evidence.[12] Supplemental Brief for Petitioner-Appellant on Rehearing En Banc at 19 n. 7. The introduction of such evidence, coupled with counsel's request that the jury not be instructed at all on aggravating and mitigating factors, State Trial Transcript at 1309, strongly suggests that counsel's strategy was to direct the jury's attention away from the instruction and toward the evidence presented, in order to allow himself the widest possible latitude in arguing his case to the jury. Thus, counsel sought to ensure that the jury would receive the issues as he had framed them, rather than as framed by the court in the form of an instruction.
 
 
 145
 The court declined counsel's request that the jury not be instructed on such factors. Counsel then asked that the jury not receive a written instruction on such factors, and the court acceded to this request. Thus, counsel was still able to focus the jury's attention on nonstatutory mitigating evidence. Counsel's request that the jury not receive a written instruction reinforces the conclusion that counsel's failure to object to the instruction was a carefully chosen trial stratagem.[13]
 
 
 146
 Counsel no doubt thought that had he objected to the instruction, his objection would have been overruled, and the court may have then prevented him from introducing evidence on nonstatutory mitigating factors or from arguing them to the jury. Counsel was faced with the choice of foregoing a favorable jury instruction but being allowed to introduce favorable evidence and to exploit such evidence to the fullest extent before the jury, or of attempting to procure a favorable instruction but, by alerting his opponent and the court to the issue, risk an adverse ruling not only on the instruction, but also on the evidence. Counsel chose the first alternative. This is precisely the type of deliberate tactical choice the Sykes standard is meant to address.
 
 
 147
 In conclusion, analysis of the state court trial record demonstrates clearly that petitioner's failure to object was a matter of trial strategy. The petitioner has come forward with no evidence to the contrary. I conclude that, because he has failed to satisfy the "cause" prong of the "cause" and "prejudice" test of Wainwright v. Sykes, his Lockett claim is barred. I concur, therefore, in the result the majority reaches on this issue.[14]
 
 IV.
 
 148
 Next, petitioner claims that both the existence of aggravating circumstances and the finding that aggravating circumstances outweigh mitigating circumstances must be proved beyond a reasonable doubt. He raises these claims now as an attack on the trial court's failure either to instruct the jury on the proper burden of proof or to apply the proper burden of proof, later, in making its own findings.[15] I hold that Sykes bars these claims.
 
 
 149
 Petitioner failed to raise any of the above attacks at trial or on direct appeal. Aside from that fact, petitioner has been totally inconsistent in raising these claims on state and federal collateral attack of his conviction and sentence. As discussed in Part II supra, petitioner raised his attack on the jury instructions on his motion for state post-conviction relief. The Florida Supreme Court barred this attack because of petitioner's failure to raise it on direct appeal. Ford v. State, 407 So.2d at 908. The federal district court held that Sykes barred this attack. I would affirm this holding.
 
 
 150
 In federal district court, petitioner attacked for the first time the trial court's failure to apply the proper burden of proof in making its own findings. Clearly, this was a "matter known at the conclusion of the trial," Ford v. State, 407 So.2d at 908, and, therefore, it also should have been raised on direct appeal. Petitioner's failure to do so is just as clearly a procedural default as is his failure to contest the jury instructions either at trial or on direct appeal. I believe the district court erred in reaching the merits of this claim.
 
 
 151
 This court is, therefore, faced with a clear state procedural default on these attacks. In reaching the merits of them, the majority adopts the practice, with which I vehemently disagree, of picking and choosing when to apply the Sykes standard.[16] It is totally inconsistent for the majority to bar petitioner's Lockett claim on Sykes grounds but to reach the merits of petitioner's burden of proof claims, without even acknowledging that a Sykes problem exists as to the latter claims.
 
 
 152
 Although I concur with the result the court reaches on this issue, I do not adopt its reasoning.[17]V.
 
 
 153
 Petitioner's next claim is that the Florida Supreme Court violated his constitutional rights by considering nonrecord material in reviewing his capital sentence.[18] The petitioner argues that such consideration denied him the opportunity to attack the credibility of such materials in an adversarial manner. He bases this argument on Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), which held invalid on due process grounds the imposition of a capital sentence based in part on material that the petitioner had no opportunity to challenge. Because I believe Brown v. Wainwright, 392 So.2d 1327 (Fla.), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981) is dispositive, I concur in the majority's disposition of this claim.
 
 
 154
 Before addressing petitioner's constitutional claim, this court must first determine whether the Florida Supreme Court relied on nonrecord material in affirming petitioner's sentence. The crucial distinction, which I believe is never articulated clearly enough in the majority opinion, is whether the Florida Supreme Court relied on the material or merely read it. If only the latter is true, then I believe this court is faced with no constitutional question. I can fathom no constitutional rule, from Gardner or any other authority, that would preclude an appellate court from merely reviewing nonrecord material without relying on such material in the performance of its appellate function. Because the Brown opinion makes clear that the court indeed did not rely on nonrecord material in reviewing petitioner's sentence, I find it unnecessary, as does the majority, to address the claimed constitutional violation.
 
 
 155
 In Brown, the Florida Supreme Court considered the contention of one hundred and twenty-two persons, including petitioner in this case, that the court's practice of considering nonrecord information in reviewing capital sentences was unconstitutional. For purposes of addressing the claimed violation, the court assumed that it had engaged in the practice of requesting and receiving nonrecord information and that it had reviewed such information. Nevertheless, the court held: "[O]ur view of the nonrecord information petitioners have identified is totally irrelevant either to our appellate function in capital cases as it bears on the operation of the statute, or to the validity of any individual death sentence." 392 So.2d at 1331.
 
 
 156
 The court then described its two functions in reviewing capital sentences: "First, we determine if the jury and judge acted with procedural rectitude in applying section 921.141 [the Florida capital punishment statute] and our case law .... The second aspect of our review process is to ensure relative proportionality among death sentences which have been approved statewide." Id. The court then stated: "The record of each proceeding, and precedent, necessarily frame our determinations in sentence review. Our opinions, of course, then expound our analysis. Factors or information outside the record play no part in our sentence review role." Id. at 1332. Finally, after discussing Gardner,[19] the court stated: "It is evident, once our dual roles in the capital punishment scheme are fully appreciated, that non-record information we may have seen, even though never presented to or considered by the judge, the jury, or counsel, plays no role in capital sentence 'review.' "[20] Id. at 1332-33.
 
 
 157
 Not only is the foregoing language a clear statement of state law, as the majority recognizes, but it is also a clear statement of the procedure the court used in reviewing petitioner's claim. First, Ford was a party in Brown. Second, although the Florida Supreme Court stated that in the future it would deny class status to habeas claims similar to the one before it, id. at 1330, the court considered the claims of all petitioners, not just Brown, and, in explicating a rule of law, effectively stated that it did not rely on nonrecord material in reviewing the sentences of any of the petitioners. The court speaks of petitioners in the plural throughout the Brown opinion. The Florida Supreme Court has thus made clear that it did not rely on nonrecord material in reviewing petitioner's sentence.
 
 
 158
 In the face of this clear holding, the petitioner nevertheless argues that the court did rely on such material. The petitioner states: "To conclude that in a judgmental process [of the sort in which the court engages] the intrusion of extra-record psychiatric and psychological assessments of the petitioner and similar materials, especially when solicited by the court from the Department of Corrections in connection with the appeal, 'play no part in our sentence review role,' [quoting Brown ] is to misconceive reality." Brief for Petitioner-Appellant at 67-68. Petitioner's argument is that although the members of the Florida Supreme Court may not have consciously relied on nonrecord material in reviewing his sentence, such information could not have been disregarded by the judges in this case. Petitioner argues: "It simply is not part of human nature to ignore what we have asked to see." Supplemental Brief for Petitioner-Appellant on Rehearing En Banc at 13. Although petitioner recognizes that the premise that judges can disregard that which they must disregard is one of the most basic of our system of justice, petitioner still attacks this premise by asking this court to carve out an exception when judges have requested, rather than passively received, nonrecord materials.
 
 
 159
 My response to this argument is twofold. First, I see no logical basis for distinguishing between the two situations. If one accepts that judges are capable of disregarding nonrecord information, as this court must, such capability logically does not depend on how this information is obtained. Second, assuming that petitioner's distinction is conceptually valid, adoption of such a distinction would be totally unworkable. Considering the frequency with which judges view nonrecord information, countless claims would arise that the judge viewed information that he could not disregard. Under petitioner's analysis, these claims would turn on the factual issue whether the judge requested the information or passively received it. The burden of such a rule on the administration of justice would be staggering. Therefore, petitioner's argument must be rejected.
 
 
 160
 Although the premise that judges can and do disregard that which they must disregard is a basic and, indeed, an absolute notion in our system of justice, this premise may in some instances be overridden by the equally fundamental notion that "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954). There are circumstances in which the appearance of impropriety arising from the court's consideration of prejudicial evidence is so great that the judge must step down. The judge steps down not because the judicial system assumes he is incapable of performing but because the appearance of impropriety to society at large is too detrimental to the judicial system.
 
 
 161
 Petitioner has never made this latter argument, however; rather, he has merely attacked the premise that judges can disregard nonrecord materials. Because petitioner makes no assertion that as a matter of federal constitutional law, members of the Florida Supreme Court should be forced to step down in this situation on the ground of appearance of impropriety, I intimate no view on this claim.
 
 
 162
 Based on the preceding analysis, I concur in the result the majority reaches on this claim.
 
 VI.
 
 163
 The final question petitioner presents to this court is the constitutionality of the Florida Supreme Court's decision, on direct appeal, to uphold petitioner's sentence despite holding first, that two of the aggravating circumstances on which the sentencer relied were not supported by the evidence, and second, that two other aggravating circumstances the sentencer found should have been considered as being only one such circumstance. Ford v. State, 374 So.2d at 501-03.[21] The court upheld the sentence because there still existed five proper aggravating circumstances and no mitigating circumstances.[22] The court stated: "[E]ven though there was error in assessment of some of the statutory aggravating factors, there being no mitigating factors present death is presumed to be the appropriate penalty." Id. at 503. Because I believe Zant v. Stephens, --- U.S. ----, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982), controls the disposition of this claim, I respectfully dissent from Part III of the majority opinion.[23]
 
 
 164
 In Zant v. Stephens, Stephens had been convicted of murder in Georgia Superior Court. The sentencing jury found three statutory aggravating circumstances and sentenced Stephens to death. On direct appeal, the Georgia Supreme Court affirmed Stephens' sentence, but held that one of the three aggravating circumstances relied on by the jury was invalid. Stephens v. State, 237 Ga. 259, 227 S.E.2d 261, cert. denied, 429 U.S. 986, 97 S.Ct. 508, 50 L.Ed.2d 599 (1976). After attempting to exhaust his state remedies,[24] Stephens petitioned the federal district court for a writ of habeas corpus. The district court denied the writ, but on appeal this court struck down Stephens' death sentence because: "It cannot be determined with the degree of certainty required in capital cases that the instruction [which included the improper aggravating circumstance] did not make a critical difference in the jury's decision to impose the death penalty." Stephens v. Zant, 631 F.2d 397, 406 (5th Cir.1980), modified, 648 F.2d 446 (5th Cir.1981).
 
 
 165
 On certiorari to the Supreme Court, the Court stated the issue before it as follows: "Today, we are asked to decide whether a reviewing court constitutionally may sustain a death sentence as long as at least one of a plurality of statutory aggravating circumstances found by the jury is valid and supported by the evidence." Zant v. Stephens, --- U.S. at ----, 102 S.Ct. at 1857. In deciding this issue, the Court first identified the state law rule on which the Georgia Supreme Court relied in affirming Stephens' sentence: " 'Where two or more statutory aggravating circumstances are found by the jury, the failure of one circumstance does not so taint the proceedings as to invalidate the other aggravating circumstance found and the sentence of death based thereon.' " Id. at ----, 102 S.Ct. at 1858, quoting Gates v. State, 244 Ga. 587, 599, 261 S.E.2d 349, 358 (1979), cert. denied, 445 U.S. 938, 100 S.Ct. 1332, 63 L.Ed.2d 772 (1980). The Court then stated: "Despite the clarity of the state rule we are asked to review, there is considerable uncertainty about the state law premises of that rule." Id. at ----, 102 S.Ct. at 1858 (footnote omitted). Because the Court could not decide the question before it without first determining the state law premises of the rule under consideration, the Court invoked the Georgia certification procedure to obtain clarification on this state law point. Id. at ----, 102 S.Ct. at 1859. As of the date of this opinion, the United States Supreme Court has not ruled further on Zant v. Stephens.
 
 
 166
 The majority attempts to distinguish Stephens by stating: "This case is appreciably different from Stephens because there the jury may have considered evidence that it could not constitutionally consider. In this case, no evidence considered was inappropriate for consideration." Majority Opinion at 814. This distinction is totally unpersuasive for several reasons. First, it is abundantly clear that this court did not rely on the admission of improper evidence in finding a constitutional violation in Stephens. The court initially did rely on the admission of improper evidence in finding such a violation, Stephens v. Zant, 631 F.2d at 406, but later modified the opinion to delete any reference to the introduction of improper evidence, Stephens v. Zant, 648 F.2d at 446, although leaving the remainder of the opinion intact. This court's express disclaimer in Stephens of any reliance on the introduction of improper evidence demonstrates that the majority is merely groping for a basis to distinguish Stephens.
 
 
 167
 Moreover, a careful reading of the Supreme Court's opinion in Zant v. Stephens reveals that the Court itself makes no reference to the introduction of improper evidence. Indeed, the Court's statement of the issue before it demonstrates that the Court was not concerned with improper evidence: "Today we are asked to decide whether a reviewing court constitutionally may sustain a death sentence as long as at least one of a plurality of statutory aggravating circumstances found by the jury is valid and supported by the evidence." --- U.S. at ----, 102 S.Ct. at 1857.[25] This statement makes clear that there is no logical basis for distinguishing the issue presented to the Court in Stephens from the issue presented to this court today.[26]
 
 
 168
 The majority's attempt to distinguish Stephens from this case on the basis whether improper evidence was admitted evinces the majority's failure to grasp the fundamental problem with both the Georgia Supreme Court's review in Stephens and the Florida Supreme Court's review in this case. What concerned this court and the United States Supreme Court in Stephens, and what should concern this court today is how can a reviewing court apply a state law rule, which is, in effect, a conclusive presumption that death is the appropriate penalty in certain situations,[27] to affirm a sentence when it cannot tell whether the trial sentencing court would have imposed the same sentence absent the error found on review.[28] It is this question which the United States Supreme Court asked the Georgia Supreme Court in Stephens.
 
 
 169
 By certifying the above question in Stephens, the Court was telling the Georgia Court that unless we misperceive that your role in capital cases is that of a pure reviewing court, the use of a conclusive presumption to affirm a death sentence when you cannot tell whether the same sentence would have been imposed absent the error you found on review, raises serious constitutional problems of arbitrary review. The Court did not, however, exclude the possibility that the Georgia Supreme Court has some resentencing power and that it, therefore, may have acted as a resentencing court. Therefore, the Court invoked the Georgia certification procedure to allow the Georgia Court to explain its sentence-review function.
 
 
 170
 The notion that an appellate court may act as a resentencing court is by no means foreign to the law, especially in capital cases. The Supreme Court has recognized that state supreme courts have the ultimate state authority to determine sentencing policy by noting, and indeed, requiring, that they ensure relative proportionality in capital sentencing. See Proffitt v. Florida, 428 U.S. 242, 253, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976). In using this ultimate authority, conferred on it by the legislature, to promulgate state sentencing policy by establishing sentencing norms, see note 17 supra, the state supreme court may, in effect, act as a resentencer.
 
 
 171
 I use the following examples to illustrate the resentencing power of state supreme courts. To the extent such a court takes into account sentencing decisions occurring between the trial court's original sentence and its review of that sentence in ensuring proportionality, the court must be acting as a resentencer because it is considering sentencing standards about which the original sentencer could not have known. In addition, a state supreme court may act as a resentencer when it reverses a sentence of death even though the record fully supports the trial court's imposition of such sentence. In doing so, the court is promulgating a new sentencing norm which is contrary to the norm the trial court applied. Finally, such a court may act as a resentencer in cases like Ford. In such cases, the court reimposes the death penalty in circumstances different from, and less egregious than, those on which the trial sentencer relied. The court does this by applying a sentencing norm that the trial sentencer did not need to consider. Having stated these possible examples, I need express no opinion on the constitutional limitations of this resentencing power.
 
 
 172
 The Supreme Court in Stephens was asking the Georgia Court, therefore, whether it affirmed Stephens' sentence in its capacity merely as a reviewing court or whether it used its resentencing power first to promulgate a sentencing standard controlling Stephens' case, and then to resentence Stephens to death. Without knowing which of the above was true, the Supreme Court could not decipher, as I discuss at 842-843 infra, Stephens' constitutional claim because the nature of his claim depended on what the state law premises, i.e., the rationale, for the conclusive presumption rule at issue were.
 
 
 173
 This case is identical to Stephens in that this court also cannot decipher petitioner's constitutional claim. Although the state law rule on which the Florida Supreme Court relied in affirming petitioner's sentence is clear, the state law premises of that rule are unclear. In Ford v. State, the Florida Court stated: "[E]ven though there was error in assessment of some of the statutory aggravating factors, there being no mitigating factors present death is presumed to be the appropriate penalty." 374 So.2d at 503. Despite the clarity of this conclusive presumption rule, the Florida Supreme Court, like the Georgia Supreme Court in Stephens, has never explained the rationale for this rule.[29] Therefore, this court must adhere to Stephens and invoke the Florida certification procedure to seek clarification from the Florida Supreme Court on its sentence-review function in Ford.[30]
 
 
 174
 The majority appears to believe that there is no need for certification because the Florida Supreme Court has explained the rationale for its conclusive presumption in two cases cited in Ford: Elledge v. State, 346 So.2d 998 (Fla.1977), and State v. Dixon, 283 So.2d 1 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974). In deciding that we need not certify the state law question at issue, the majority errs in the following respects. First, it is impossible to discern from Elledge and Dixon the rationale for the rule invoked in Ford that death was presumed to be the appropriate penalty because Elledge is largely inconsistent with Ford, and Dixon provides us with little guidance. As I discuss later, Elledge, Dixon, and Ford provide at least four possibilities for the rationale for the rule. Second, I believe the majority fails to understand clearly that until we can determine the state law premises for the rule in question, we cannot frame petitioner's constitutional claim. In fact, the majority does not frame petitioner's constitutional claim in explicit terms because it is not really sure what that claim is. This court accomplishes nothing in attempting to adjudicate a claim the nature of which we cannot know. The majority's decision is, therefore, a futile exercise in provisional decision making. It is provisional because the Florida Supreme Court, as the ultimate interpreter of state law, would always be free to reject the rationale that the majority imputes to that court for the Ford presumption. Third, the majority fails to perceive that the rationale it discerns, out of the many possible rationales, is the one that frames petitioner's constitutional claim in the light most favorable to him. Under the majority's interpretation of the Florida Supreme Court's rationale, petitioner presents a serious constitutional claim which the majority fails to address adequately. I now discuss the majority's three failures in greater detail.
 
 
 175
 To understand the possible rationales presented by Dixon, Elledge, and Ford it is necessary to examine those cases. Dixon was a case in which the Florida Supreme Court used four consolidated cases, three of which were before the court on questions certified from circuit courts, to determine the constitutionality of certain aspects of the Florida death penalty statute. The presumption language, which the Florida Court seized on in Ford to state that death is presumed to be the appropriate penalty when there are some statutory aggravating circumstances and no mitigating circumstances, began in Dixon when the Florida Supreme Court, in the course of describing the death penalty statute, turned from discussing aggravating circumstances to discussing mitigating circumstances, and stated, by way of transition: "When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances ...." 283 So.2d at 9. This statement was unnecessary to the court's disposition of any of the consolidated cases before it, none of which presented the question this court confronts today, and was, therefore, dicta.
 
 
 176
 The above language may be read in the context in which it was stated in one of two ways, the first of which I consider the much more likely. First, it is almost beyond question that this statement is nothing more than the Florida Court's interpretation of general legislative intent. The court was merely interpreting the language of the Florida statute providing that the judge and jury, if they have found sufficient aggravating circumstances, must determine whether mitigating circumstances outweigh aggravating circumstances. Fla.Stat. Sec. 921.141(2)(b) & (3)(b). See note 3 supra. The court's statement in Dixon amounts probably to nothing more than an abstract reference to the legislature's intent that if the sentencer finds some aggravating circumstances, it will usually impose the death penalty, unless it also finds some mitigating circumstances to balance against the aggravating circumstances.[31] The statement is, therefore, nothing more than the court's recognition that the legislature devised a balancing test for sentencing in capital cases. As such, and because this statement was not applied to any of the cases consolidated in Dixon, the court did not mean to state a rule of law to be applied in cases like Ford. Viewed as such, Dixon provides this court with no positive guidance in determining the rationale in question, and therefore, provides the majority with no basis for imputing a rationale to the Florida Supreme Court.
 
 
 177
 A second, very remote interpretation of this statement is that the court in Dixon was using its supervisory power over circuit courts to send to them the following message: if you have found more than one aggravating circumstance and no mitigating circumstances, and you impose the death penalty, we will presume that you intended to impose the death penalty based on each aggravating circumstance standing alone unless you have stated otherwise in your findings of fact and conclusions of law. This second possibility amounts to the Florida Supreme Court's pronouncement of an instruction to the circuit courts that it will construe their findings and conclusions in the manner prescribed. Although the court may have meant so to instruct the circuit courts, no language in Ford even suggests that they were doing so. Consequently, the statement in Dixon is most likely a mere interpretation of general legislative intent that a balancing test be applied in capital cases. As such, Dixon is of little use to this court because it provides no rationale for the presumption in question.
 
 
 178
 In Elledge the Florida Supreme Court was faced with a case in which there were some proper aggravating circumstances, some improper aggravating circumstances, and, most important in distinguishing Elledge from Ford, some mitigating circumstances.[32] In dicta, the court stated that had there been no mitigating circumstances present, "there [would have been] no danger that nonstatutory [aggravating] circumstances have served to overcome the mitigating circumstances in the weighing process which is dictated by our statute." 346 So.2d at 1003. It is this dicta on which the majority seizes in finding the rationale for the rule invoked in Ford that death was presumed to be the appropriate penalty.
 
 
 179
 The majority makes the mistake of looking no further than this Elledge dicta. Had the majority also considered the Elledge holding, it would have seen that the rationale for the rule of presumption applied in Ford is confused to say the least. After determining that the sentencing court had found some mitigating circumstances, the Elledge court framed the inquiry thus:
 
 
 180
 Would the result of the weighing process by both the jury and the judge have been different had the impermissible aggravating factor not been present? We cannot know. Since we cannot know and since a man's life is at stake, we are compelled to return this case to the trial court for a new sentencing trial at which the [impermissible] factor ... shall not be considered.
 
 
 181
 Id. (citations omitted).
 
 
 182
 The above language is a clear holding, which, as I discuss at 843 infra, is based on federal constitutional grounds, that when the Florida Supreme Court cannot tell from the sentencer's findings and conclusions whether it would have imposed the death sentence absent any invalid aggravating circumstance, it is "compelled to return [the] case to the trial court for a new sentencing trial." This language suggests that the Florida Supreme Court, in reviewing death sentences, acts as a pure reviewing court and does not act as a resentencing court. However, Elledge does not preclude the possibility that the court has some resentencing power, but that it must restrain itself from resentencing when it cannot tell whether the trial court would have imposed the death sentence absent any invalid circumstance.
 
 
 183
 Rather than using the Ford opinion to explain its function in reviewing capital cases, the Florida Supreme Court confused matters further by affirming petitioner's sentence with a brief statement of the rule at issue: "[E]ven though there was error in assessment of some of the statutory aggravating factors, there being no mitigating factors present death is presumed to be the appropriate penalty" (citing Elledge and Dixon ). The affirmance of petitioner's sentence, in conjunction with the Elledge holding, raises at least three possible rationales, in addition to those Dixon raises, for the court's use of the above presumption.
 
 
 184
 The first possible rationale is that the Florida Supreme Court, acting in its capacity as a reviewing court, was able to tell from the trial court's order that the trial court would have imposed the death sentence absent the invalid circumstances. This possibility is consistent with Elledge but it is unlikely for two reasons. First, the Florida Supreme Court, in examining the findings of fact and conclusions of law of the sentencing court, did not, and could not, point to any statement in which the court indicated what it would have done absent the invalid circumstances. It is possible that in such a situation the sentencing court would have given petitioner a life sentence. Without a statement from the sentencer about what it would have done absent the invalid circumstances, we would have to assume that the Florida Supreme Court is able to read the mind of the sentencing judge. Obviously, we cannot make this assumption. Second, the Florida Supreme Court itself has lent support to the proposition that it could not tell in Ford whether the sentencing court would have imposed the same sentence absent the invalid circumstances, because it relied on a presumption that death is the appropriate penalty when there are some aggravating circumstances and no mitigating circumstances. If the Florida Court was able to tell whether the sentencing court would have imposed the death sentence absent the invalid circumstances, it would have had no need to invoke any presumption. The court's presumption logically should come into play only when the court cannot tell what the sentencing court would have done absent the invalid circumstances. The first possibility I pose is, therefore, unlikely.
 
 
 185
 A second possible rationale is that the Florida Supreme Court in Ford could not tell whether the trial court would have imposed the same sentence, but acted in its capacity as a resentencing court, rather than merely as a reviewing court, to resentence petitioner to death.[33] This alternative is not totally inconsistent with Elledge if we interpret the court in Elledge as not precluding the possibility that it may sometimes act as a resentencing court. It is clear, however, that the court in Ford, by affirming the sentence rather than remanding the case for resentencing, did not show the same restraint as did the Elledge court, which, assuming it acted as a resentencer, felt compelled not to resentence because it could not tell whether the original sentencer would have imposed the death penalty absent the invalid circumstance.
 
 
 186
 There is some language in Ford to support this second interpretation. The court stated: "We ... make the specific finding that the killing was 'especially heinous, atrocious, or cruel' under [the Florida statute]" (emphasis added). This statement implies that the court exercises some resentencing power because if it did not exercise such power, it would be irrelevant what it finds. If it was acting purely as a reviewing court, the only relevant inquiry would be what the sentencing court found. Moreover, to the extent the Ford court relied on the dicta in Elledge in affirming petitioner's sentence, it, in effect, acted as a resentencer because Elledge was decided after the trial court imposed petitioner's sentence and, therefore, that court could not have known about Elledge. Nevertheless, we still must seek clarification from the Florida Supreme Court, because the above language is not strong enough to negate a third possibility, which I read the majority opinion as embracing.[34]
 
 
 187
 The third possible rationale is that, although the Florida Court in Ford could not tell whether the sentencer would have imposed the death sentence absent the invalid circumstances, it acted in its capacity as a pure reviewing court, and "logically presumed the weighing process would have reached the same outcome even had the sentencing court not added to the scales those aggravating circumstances found impermissible." Majority Opinion at 815. This possibility requires this court to conclude that the Florida Supreme Court in Ford overruled sub silentio Elledge, the holding of which is based on federal constitutional grounds, as I discuss at 843 infra, and which holding compels the court to return for resentencing cases in which it cannot tell whether the trial court would have imposed the death sentence absent any invalid circumstances. Although the Florida Supreme Court is free to overrule its own interpretation of the Federal Constitution, the likelihood that the court overruled sub silentio the federal constitutional holding of a case the dicta of which--that when there are some aggravating circumstances and no mitigating circumstances there is no danger that invalid aggravating circumstances have skewed the weighing process in favor of death--it cited in direct support of its holding appears unlikely. The majority fails to address this problem.
 
 
 188
 Nevertheless, for purposes of argument, I concede that the third possibility is, in fact, a valid possibility. It is arbitrary, however, for this court to choose this possible rationale out of the variety of rationales previously discussed, not to mention any other rationales that the Florida Supreme Court may explicate, especially in light of the confusion engendered by the interplay of Dixon, Elledge, and Ford. The majority's failure to allow the Florida Supreme Court the chance to alleviate this confusion reflects its lack of understanding of the various possible rationales for the rule in question.
 
 
 189
 Having described the majority's first major failure, that it does not perceive the numerous possible rationales for the presumption rule in question, I now turn to the majority's failure to perceive clearly that until this court knows the rationale for the presumption, we cannot frame petitioner's constitutional claim. Indeed, petitioner cannot frame his own claim at this point for his claim takes a different form depending on which of the possible rationales is the true one.
 
 
 190
 The United States Supreme Court certified the state law question in Zant v. Stephens because it could not frame petitioner's constitutional claim without knowing the role of the Georgia Supreme Court in reviewing death sentences. We are in the same posture in this case. For example, if the Florida Supreme Court acted in Ford only as a reviewing court, petitioner's claim is that it is unconstitutional for a reviewing court arbitrarily to affirm sentence when it cannot tell whether the sentencing court would have imposed the same sentence absent the error found on review. However, if the Florida Court acted also as a resentencing court, petitioner would have to rely on a claim, for example, that the Florida Supreme Court unconstitutionally overstepped its power as a resentencing court by affirming sentence in this case. We cannot know exactly what petitioner's claim is, and therefore we obviously cannot decide this case, until we know exactly what the Florida Supreme Court did in Ford.
 
 
 191
 The majority's attempt to decide a claim the basis for which we cannot decipher is an exercise in total futility. In fact, the majority never describes petitioner's claim in explicit terms. At the outset, it is important to note that we are dealing with an unexhausted claim, the significance of which escapes the majority. Had petitioner properly exhausted his claim in state court, the Florida Supreme Court would have had a chance to explain the rationale for the rule in question, and this court would not now be in the position of being asked to adjudicate a claim whose form cannot be determined. Unfortunately, we must do the best we can with this claim because Zant v. Stephens also involved an unexhausted claim and the Supreme Court, instead of dismissing the claim for want of exhaustion, attempted to determine the merits of the claim. Reluctantly, this court must do the same.[35]
 
 
 192
 The best this court can do in this case, however, is to seek clarification from the Florida Supreme Court. By rejecting petitioner's amorphous claim on the merits and denying the writ, the majority accomplishes nothing. The petitioner will merely petition the Florida Supreme Court for a writ of habeas corpus[36] and require the Florida Supreme Court to explain its presumption rule by presenting the same constitutional challenge to that court he now presents to this court. The Florida Supreme Court will then have to address squarely the constitutionality of its challenged practice, and in doing so explain the rationale for the rule. Assuming that court holds against petitioner, he would be free to come back to federal court with a properly crystallized constitutional claim. If the state suggests that the federal courts have already rejected petitioner's claim by this court's decision today, the petitioner will assert merely that this court could not have rejected petitioner's claim, because at this point no one knows what that claim is. Therefore, the majority's premature attempt to rid this court of petitioner's claim will only come back to haunt this court at some future time. The circuitous path the majority takes in deciding this claim is totally at odds with the notion of finality, which notion is of utmost importance in the area of federal habeas review. We can avoid the needless litigation described above merely by asking the Florida Supreme Court directly to explain its use of the Ford presumption.[37]
 
 
 193
 Finally, the majority fails to recognize that the rationale it imputes to the Florida Supreme Court, which rationale the Florida Court is free to reject, presents petitioner with his strongest constitutional claim. In fact, Justice Sundberg of the Florida Supreme Court held in favor of such a claim in Elledge. Under the majority's interpretation of the proper rationale, petitioner's claim is that it is unconstitutional in a capital case for a reviewing court that finds error and that cannot tell from the findings of fact and conclusions of law of the sentencing court whether that court would have imposed the death penalty absent the error, to affirm the death sentence by invoking an arbitrary presumption that death is the "proper" penalty when there are some statutory aggravating circumstances and no mitigating circumstances. Certainly, this claim is not to be taken lightly. I need go no further than to quote the following language of Justice Sundberg in support of the Florida Court's holding in Elledge that it was constitutionally "compelled" to return a case for resentencing when it could not tell what the sentencer would have done absent the invalid circumstance:
 
 
 194
 This result is dictated because, in order to satisfy the requirements of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the sentencing authority's discretion must be "guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." (Emphasis supplied) Proffitt v. Florida, 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913.
 
 
 195
 346 So.2d at 1003. The majority is, of course, free to reject Justice Sundberg's interpretation of the Federal Constitution. I quote from Justice Sundberg only to emphasize the seriousness of petitioner's constitutional claim. The majority handles this claim in three brief paragraphs which simply do not deal with petitioner's claim.
 
 
 196
 In sum, the majority opinion is deficient in the three important respects enumerated above. First, it fails to realize that it is arbitrary for us to choose one possible rationale for the presumption in question from among the various possibilities. Second, and most important for purposes of the result in this case, it fails to recognize that because there exists numerous possible rationales for the Ford presumption, and because each rationale provides petitioner with a different constitutional claim, we cannot decide the amorphous claim with which we are now presented. Finally, the majority fails to realize that the rationale it imputes to the Florida Supreme Court provides petitioner with a serious constitutional claim, the merit of which the majority does not address.
 
 
 197
 Because the state law premises for the presumption in question are unclear, Stephens, which involved a similar and indistinguishable rule of presumption, compels this court to certify to the Florida Supreme Court almost the identical question the United States Supreme Court certified to the Georgia Supreme Court: "What are the premises of state law that support the conclusion that the death sentence in this case is not impaired by the invalidity of [three] of the statutory aggravating circumstances found by the [sentencing judge]?" --- U.S. at ----, 102 S.Ct. at 1859.
 
 
 198
 Based on the preceding analysis, I respectfully dissent from Part III of the majority opinion.
 
 VII.
 
 199
 In conclusion, I adopt the decision of the panel on issues 1, 4, and 6, as those issues are stated in this opinion, supra at 824. I concur in the result this court reaches on issues 2, 3, and 5. My disposition of the Stephens issue, issue 7, is that this court must await the resolution of a state law question by the Florida Supreme Court before ruling on petitioner's application for a writ of habeas corpus.
 
 
 200
 KRAVITCH, Circuit Judge, concurring in part and dissenting in part:
 
 
 201
 I do not agree with the majority's per curiam disposition of this case. In my view it is the responsibility of this court to defer issuance of the opinion pending the Supreme Court's final disposition in Stephens v. Zant, 631 F.2d 397 (5th Cir.1980), reh. denied and modified, 648 F.2d 446 (5th Cir.1981), certified to Supreme Court of Georgia, --- U.S. ----, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982) and Barclay v. Florida, 411 So.2d 1310 (Fla.1982), cert. granted, --- U.S. ----, 103 S.Ct. 340, 74 L.Ed.2d ---- (1982).[1]
 
 
 202
 Because, however, the majority has adopted the procedure outlined in the per curiam, I proceed to the merits of Ford's appeal.
 
 
 203
 Although I concur in Parts IV, VI,1a and VII of the majority's opinion and its conclusion in Part V,[2] I write separately because I disagree with the majority's resolution of the sentencing issues in Parts I, II, and III. In my view, Supreme Court and former Fifth Circuit precedents[3] compel reversal on the claim that the state court considered extra-record information in reviewing petitioner's sentence and on the aggravating and mitigating circumstances claims.
 
 I.
 
 204
 Brown Issue: Florida Supreme Court's Consideration of
 
 Extra-Record Materials
 
 205
 Petitioner claims the Florida Supreme Court violated his constitutional rights by reviewing reports, evaluations, and other materials relevant to his character that he was unaware were being used and was afforded neither access to nor an opportunity to rebut. Petitioner initially raised this claim with 122 other capital defendants in a habeas action in the Florida Supreme Court. Brown v. Wainwright, 392 So.2d 1327 (Fla.), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981). The Florida court accepted arguendo the "petitioners' most serious charges," id. at 1331, but held that as a matter of law petitioners were not entitled to relief, id. at 1331-33. Its reasoning in rejecting the claim was twofold. First, it declared that extra-record materials are "irrelevant" to, and "play no part in," its review of capital sentences. Id. at 1331, 1332. Second, it held that the rule in Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), on which petitioners relied was inapplicable to situations where extra-record information was considered only at the review stage and not during the initial sentencing proceeding. Id. at 1331-33.
 
 
 206
 A. Was the Challenged Practice Constitutional?
 
 
 207
 The state adopts the Florida Supreme Court's argument that Gardner, which reversed a death sentence imposed by a trial judge after reviewing nonrecord evidence, is inapplicable to an appellate tribunal's review of nonrecord materials. The majority--although ultimately declining to decide the merits of petitioner's Gardner claim--alludes to the above argument in an attempt to trivialize petitioner's constitutional claim.[4] The principles the Supreme Court articulated in Gardner, however, which are at the core of its recent constitutional precedents on capital sentencing, condemn with equal force the review of nonrecord information by appellate and trial courts.
 
 
 208
 1. Constitutional Underpinnings of Gardner.
 
 
 209
 Despite a long jurisprudential tradition of relaxed procedural requirements and largely discretionary decisionmaking at the sentencing stage, see, e.g., United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); McGautha v. Maryland, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971); Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); see generally Note, The Constitutionality of Statutes Permitting Increased Sentences for Habitual or Dangerous Criminals, 89 Harv.L.Rev. 356, 359-73 (1975), the last decade has seen substantial change in the constitutional law governing sentencing in capital cases. In Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) several members of the Supreme Court first articulated the view, now espoused by a majority of the Court,[5] that the significance of the sentencing process and its effect on the defendant are greater in cases involving the death penalty, which "differs from all other forms of criminal punishment, not in degree but in kind." Id. at 306, 92 S.Ct. at 2760 (Stewart, J., concurring). See id. at 286-91, 92 S.Ct. at 2750-53 (Brennan, J., concurring); id. at 314-71, 92 S.Ct. at 2764-93 (Marshall, J., concurring). Furman thus held that imposition of the death penalty violates the eighth amendment where the process by which it is imposed is standardless and arbitrary. Furman's 1976 progeny[6] reaffirmed this principle, emphasizing that capital sentencing procedures must not create "a substantial risk that the death penalty [will] be inflicted in an arbitrary and capricious manner." Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (opinion of Powell, Stewart & Stevens, JJ.); id. at 207, 220-22, 96 S.Ct. at 2941, 2947-48 (White & Rehnquist, JJ. & Burger, C.J., concurring); Jurek v. Texas, 428 U.S. 262, 274, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976) (opinion of Powell, Stewart & Stevens, JJ.); id. at 277, 279, 96 S.Ct. at 2958, 2959 (White & Rehnquist, JJ. & Burger, C.J., concurring); Proffitt v. Florida, 428 U.S. 242, 252-53, 258, 96 S.Ct. 2960, 2966-67, 2969, 49 L.Ed.2d 913 (1976) (opinion of Powell, Stewart & Stevens, JJ.); id. at 260-61, 96 S.Ct. at 2970 (White & Rehnquist, JJ. & Burger, C.J., concurring). In these cases a majority of the Court held that sentencer discretion in capital cases must be "directed and limited" to provide consistent and rational imposition of the death penalty, Gregg v. Georgia, 428 U.S. at 189, 96 S.Ct. at 2932-33 (opinion of Powell, Stewart & Stevens, JJ.); id. at 220-22, 96 S.Ct. at 2947 (White & Rehnquist, JJ. & Burger, C.J., concurring); Proffitt v. Florida, 428 U.S. at 255-58, 96 S.Ct. at 2968-69 (opinion of Powell, Stewart & Stevens, JJ.); id. 260-61, 96 S.Ct. at 2970 (White & Rehnquist, JJ. & Burger, C.J., concurring); Jurek v. Texas, 428 U.S. at 270-74, 276, 96 S.Ct. at 2955-57, 2958 (opinion of Powell, Stewart & Stevens, JJ.); id. at 279, 96 S.Ct. at 2959-60 (White & Rehnquist, JJ. & Burger, C.J., concurring), and to ensure "reliability in the determination that death is the appropriate punishment in a specific case," Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (opinion of Powell, Stewart & Stevens, JJ.); see also Gardner v. Florida, 430 U.S. 349, 359, 97 S.Ct. 1197, 1205, 51 L.Ed.2d 393 (plurality opinion); id. at 362, 363-64, 97 S.Ct. at 1206, 1207-08 (White, J., concurring).
 
 
 210
 The Court's most recent capital sentencing decisions have continued to focus on minimizing the risk of arbitrary decisionmaking. See, e.g., Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 874-875, 71 L.Ed.2d 1, 8-9 (1982); id. at 118, 102 S.Ct. at 878, 71 L.Ed.2d at 13 (O'Connor, J., concurring); Godfrey v. Georgia, 446 U.S. 420, 427-28, 100 S.Ct. 1759, 1764-65, 64 L.Ed.2d 398 (1980) (plurality opinion); id. at 433, 438-42, 100 S.Ct. at 1767, 1769-72 (Marshall & Brennan, JJ., concurring); Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (plurality opinion); Gardner v. Florida, 430 U.S. at 358, 97 S.Ct. at 1204-05; id. at 363-64, 97 S.Ct. at 1207-08 (White, J., concurring). Whereas earlier cases focused on the quantity of information before the sentencing tribunal, e.g., Williams v. New York, 337 U.S. at 247, 69 S.Ct. at 1083, recently the Court has shown greater concern for the quality of such information. Gardner v. Florida, 430 U.S. at 359, 97 S.Ct. at 1205; id. at 363-64, 97 S.Ct. at 1207-08 (White, J., concurring). The Court has recognized the defendant's interest both in presenting evidence in his favor, Eddings v. Oklahoma, supra (plurality opinion); Lockett v. Ohio, supra (plurality opinion); id. at 620-21, 98 S.Ct. at 2972-73 (opinion of Marshall, J.), and in being afforded the opportunity to explain or rebut evidence offered against him, Gardner v. Florida, 430 U.S. at 362, 97 S.Ct. at 1206-07; id. at 363-64, 97 S.Ct. at 1207-08 (White, J., concurring). Reliability in the factfinding aspect of sentencing is the cornerstone of the Court's decisions. See, e.g., Lockett v. Ohio, 438 U.S. at 604, 98 S.Ct. at 2964 (plurality opinion); Gardner v. Florida, 430 U.S. at 359-60, 362, 97 S.Ct. at 1205; id. at 363-64, 97 S.Ct. at 1207-08 (White, J., concurring); Woodson v. North Carolina, 428 U.S. at 305, 96 S.Ct. at 2991 (opinion of Powell, Stewart & Stevens, JJ.).
 
 2. Gardner
 
 211
 In Gardner, the Court reversed a death sentence imposed on the basis of material not disclosed to the defendant,[7] holding that procedure unconstitutional under the eighth amendment and the due process clause.[8] The plurality rejected the state's asserted justifications for allowing imposition of the death penalty on the basis of confidential information, reasoning that the risk that such information "may be erroneous, or may be misinterpreted, by the investigator or by the sentencing judge, is manifest," and "the interest in reliability [in capital sentencing] plainly outweighs the State's interest in preserving the availability of [such] information." Id. at 359, 97 S.Ct. at 1205.
 
 3. Application of Gardner
 
 212
 The state's argument that the Constitution does not prohibit consideration of nonrecord information at the appellate level must proceed from one or both of the following premises: that rational appellate review is not an essential component of capital sentencing procedures under the eighth amendment, or that use of nonrecord information without notice to the defendant will not undermine the reliability of appellate review in the same way Gardner recognized it would affect the reliability of initial sentencing. Either premise is erroneous.
 
 
 213
 A meaningful appellate review process is one of the two fundamental requirements of capital sentencing procedures established by the Supreme Court's 1976 death penalty decisions.[9] See Woodson v. North Carolina, 428 U.S. at 303, 96 S.Ct. at 2990 (plurality opinion); Roberts v. Louisiana, 428 U.S. at 335 & n.11, 96 S.Ct. at 3007 & n.11 (plurality opinion). Indeed, the Court relied on the appellate review provision in upholding the Florida statute under which petitioner was sentenced, viewing it as one of the means by which the statute assured that the death penalty would not be imposed on the basis of passion, prejudice, or any other arbitrary factor. Proffitt v. Florida, 428 U.S. at 250-53, 258-59, 96 S.Ct. at 2965-67, 2969-70 (opinion of Powell, Stewart & Stevens, JJ.). Accord Gregg v. Georgia, 28 U.S. at 204-06, 96 S.Ct. at 2939-40 (opinion of Powell, Stewart & Stevens, JJ.); id. at 211-12, 96 S.Ct. at 2942-43 (White & Rehnquist, JJ. & Burger, C.J., concurring) (Georgia statute's appellate review provision ensures that death penalty will not be imposed capriciously). Cf. Gardner v. Florida, 430 U.S. at 360-61, 97 S.Ct. at 1205-06; id. at 363-64, 97 S.Ct. at 1207-08 (White, J., concurring) (trial judge's failure to make available to appellate court information he considered in imposing sentence renders sentencing procedure invalid). The careful consideration given by the Supreme Court to the adequacy of the Florida statute's appellate review procedure belies any suggestion that the Court did not consider appellate review integral to capital sentencing. See Proffitt v. Florida, 428 U.S. at 258-59, 96 S.Ct. at 2969-70.
 
 
 214
 Second, an appellate court's reliance on nonrecord information, without providing notice to the defendant of the substance of that information or an opportunity to contest its accuracy, risks arbitrary imposition of death such as was condemned in Furman. The state insists that there is no such risk involved here because the appellate court merely reviewed, and did not "impose," petitioner's sentence. If in deciding to affirm petitioner's sentence the Florida court reviewed and relied on undisclosed, and possibly inaccurate, information concerning petitioner's character and prison record, however, that court's disregard for the interests of petitioner and society in ensuring that death sentences are predicated on reliable factfinding is no less egregious than the similar actions of the trial judge who imposed the sentence invalidated in Gardner. In both situations the "[a]ssurances of secrecy are conducive to the transmission of confidences which may bear no closer relation to fact than the average rumor or item of gossip"; in both the absence of defense counsel's participation precludes the adversarial debate our system recognizes as "essential to the truthseeking function." See Gardner v. Florida, 430 U.S. at 359, 360, 97 S.Ct. at 1205, 1206.
 
 
 215
 Because the procedure here challenged poses the risk that death sentences may be affirmed on the basis of inaccurate information and because meaningful appellate review that minimizes rather than enhances such risk is constitutionally mandated in capital cases, I cannot conclude, as the majority seems to, that no significant constitutional problem is raised by petitioner's claim.
 
 
 216
 B. Did the Florida Supreme Court Engage in the Practice of Which Petitioner Complains
 
 
 217
 Two allegations form the basis of Ford's Gardner claim: (1) that the Florida Supreme Court received nonrecord information about petitioner and other capital defendants; and (2) that the court considered that information in deciding to affirm petitioner's death sentence. Neither the state court nor the district court has resolved these factual contentions.[10] The majority, following the pattern of the Brown court, "assume[s] without deciding" the truth of the first allegation. It ultimately skirts the merits of the claim, however, in essence by finding that the Florida court did not consider nonrecord information in affirming petitioner's sentence. In lieu of evidence to support this finding, it relies on statements in the Brown opinion and invokes a "presumption of regularity." These factors simply do not substantiate the majority's finding. Its approach can only be characterized as an attempt to evade the difficult questions presented by petitioner's claim. In rendering its finding, the majority relies on three subsidiary "facts": (1) that Florida law does not permit the state supreme court to rely on nonrecord material in affirming capital sentences; (2) that the Florida court would not have relied on such information in contravention of state law; and (3) that the Florida court's reading of nonrecord information would not have affected its decisions because the court would have disregarded that material. The following section examines these premises to determine whether they support the majority's conclusion.
 
 
 218
 The majority interprets the Florida Supreme Court's decision in Brown v. Wainwright, supra, to hold that state law prohibits reliance by the supreme court on nonrecord information in affirming capital sentences. It cites language in the Brown opinion stating that such material is "irrelevant [ ] to [its] appellate function in capital cases" and "play[s] no part in [its] sentence review role." Majority Opinion, supra at 810 (quoting Brown v. Wainwright, 392 So.2d at 1331, 1332). Without examining the analysis underlying the Florida court's conclusion, the majority accepts these remarks as determinative of the matter, which it characterizes as concerned solely with state law. Although federal courts are bound by decisions of the highest state court in deciding issues of state law, the majority's adoption of the Brown court's reasoning raises issues of federal as well as state law. The Florida court's analysis of its role in capital sentence review conflicts with the interpretation of the state's sentencing statute rendered by the United States Supreme Court in upholding the statute against constitutional challenge. When state law, as interpreted by the state courts, runs head on with principles of federal constitutional law, our foremost responsibility is to the latter.
 
 
 219
 In Brown, the Florida court concluded that nonrecord information is "irrelevant" to its decisions by reasoning that its function in reviewing capital sentences is very limited. The court disclaimed performing any evidentiary review function in capital cases.[11] This characterization of the appellate court's role contradicts the Supreme Court's interpretation of Florida's capital sentencing statute in Proffitt v. Florida, supra, as requiring the state supreme court to "review[ ] and reweigh[ ]" the evidence and "determine independently whether the imposition of the ultimate penalty is warranted." Proffitt v. Florida, 428 U.S. at 253, 96 S.Ct. at 2967 (citing Songer v. State, 322 So.2d 481, 484 (Fla.1975); Sullivan v. State, 303 So.2d 632, 637 (Fla.1974)). To be sure, it is fully within the Florida Supreme Court's authority, as the ultimate arbiter of state law, to reject the United States Supreme Court's interpretation of state law and adopt the view it espouses in Brown. In reinterpreting its review function in capital cases to be substantially different from that the state presented and the United States Supreme Court adopted in Proffitt, however, the state court calls into question the continued vitality of the Proffitt holding that capital sentencing as administered under the Florida system meets the requirements of the eighth amendment. Cf. Gardner v. Florida, 430 U.S. 349, 365-70, 97 S.Ct. 1197, 1208-10, 51 L.Ed.2d 393 (1977) (Marshall J., dissenting) (cursory review by Florida Supreme Court undercuts basis for approval of Florida system in Proffitt ). Although the Brown court's interpretation of its role in reviewing sentences is determinative of that question, if such interpretation was operative at the time of petitioner's direct appeal I would hold that his sentence is invalid because he was not accorded the "meaningful appellate review" to which he is entitled under Proffitt v. Florida, 428 U.S. at 251, 96 S.Ct. at 2966. Accord Gregg v. Georgia, 428 U.S. at 204-06, 96 S.Ct. at 2939-40 (Georgia statute's appellate review provision ensures imposition of death penalty will not be capricious).
 
 
 220
 The majority's reading of the Brown decision as proscribing the use of nonrecord materials in sentence review is undermined by the Brown court's emphasis on distinguishing this case from Gardner v. Florida, supra. The Brown court devoted a substantial portion of its opinion to the argument that Gardner "presents no impediment" to consideration of nonrecord information at the appellate review, rather than sentence imposition, stage. See Brown v. Wainwright, 392 So.2d at 1333.[12] The opinion thus indicates that the Florida courts found no federal constitutional deficiency in the process of reviewing nonrecord information at the appellate stage. Moreover, it implies that the court found no state law barrier to such procedure either because, had it held that state law prevented it from considering nonrecord information, it would have had no reason to decide that such procedure was unobjectionable under federal law. In short, the tenor of the Brown opinion suggests the Florida court discerned no defect in the challenged procedure under either state or federal law and that this was the primary basis for its rejection of the petitioner's claim.
 
 
 221
 The majority concludes, however, that Brown holds Florida law precludes the state supreme court from using nonrecord information in reviewing capital cases. The majority next addresses whether the state court may have used nonrecord information despite this proscription. Answering this query in the negative, the majority relies on (1) what it interprets as an affirmative statement by the Brown court that nonrecord information was not used in reviewing capital sentences; and (2) a presumption of regularity in the state court proceedings. In addition, the majority justifies its decision on the ground that probing further into the matter would require questioning of the Florida Supreme Court justices concerning their mental processes, which procedure is abhorrent in our judicial system.
 
 
 222
 I disagree with the majority's view of the Brown opinion as unequivocally denying the use of nonrecord information. The Florida court did not deny that it systematically requested and received nonrecord information concerning capital defendants, see Brown v. Wainwright, 392 So.2d at 1330-31; indeed it expressly stated that it did obtain such information, id. at 1333 n.17. Moreover, the Brown court did not specifically disclaim having used the nonrecord information it admittedly obtained; it said only that such information is "irrelevant" to its decisionmaking in view of the narrow functions it performs in reviewing sentences. Even accepting the limited role the Florida court defined for itself in Brown, it is not inconceivable that in performing that role the court might have taken into consideration nonrecord information that it had before it.[13] The court itself conceded as much by stating that "[t]he 'tainted' information we are charged with reviewing was ... in every instance obtained to deal with newly-articulated procedural standards." Id. (emphasis added).
 
 
 223
 As a second basis for concluding the Florida court did not consider nonrecord information, the majority states that federal courts must accord a "presumption of regularity" to the state court proceedings--that is, presume that "the state supreme court follows its own law and procedures." Majority Opinion, supra at 811. As support for this proposition, the majority cites the federal habeas corpus statute, 28 U.S.C. Sec. 2254(d), and Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)--a decision interpreting that provision. I agree that there are circumstances in which it is appropriate for federal courts to engage in such a presumption of regularity with respect to state court decisions, but in my view this case does not present such circumstances. First, the authorities cited by the majority are inapposite.[14] Second, the Florida court did not acknowledge that the practice of soliciting and reviewing nonrecord information is legally objectionable. It distinguished Gardner as inapplicable to appellate decisionmaking, remarked that petitioners' constitutional claims were "unpersuasive," Brown v. Wainwright, 392 So.2d at 1331, and throughout the opinion maintained the position that appellate consideration of nonrecord material would not violate petitioners' rights. The majority presumes that the Florida court did not engage in such practice because in its view to do otherwise would offend the Florida court. Under the Florida court's own interpretation of the governing legal principles, however, there is no impropriety in examining nonrecord information. See text supra at 850-851. Principles of federalism and comity are not violated by inquiring whether a state court has followed a procedure that it has declared to be legally sound.
 
 
 224
 As a final rationalization for the presumption in which it engages, the majority flashes the spectre of calling the state supreme court justices to the witness stand to testify about their mental processes. There is no question that such procedure, though it may be the only means of obtaining direct evidence to support petitioner's allegations, is barred by prior precedents. See Fayerweather v. Ritch, 195 U.S. 276, 25 S.Ct. 58, 49 L.Ed. 193 (1904); United States v. Crouch, 566 F.2d 1311 (5th Cir.1978). I agree that it would be impermissible to conduct this type of factual inquiry; I disagree with the majority that we should uphold the Florida Supreme Court's practice because of a lack of direct evidence. First, because such evidence is wholly within the state's control, fairness requires that the state rather than petitioner should suffer the adverse consequences of its absence. Cf. Jencks v. United States, 353 U.S. 657, 670-71, 77 S.Ct. 1007, 1014-15, 1 L.Ed.2d 1103 (1957) (government has duty to insure justice is done and thus may invoke evidentiary privileges to suppress evidence in its possession only at price of release of defendant). Second, although we cannot ask the Florida justices directly whether and for what purpose they may have used nonrecord information in reviewing Ford's sentence, we are not faced with a record that is utterly silent on this question.[15] Petitioner proffered circumstantial evidence that the Florida court solicited and received nonrecord evidence in connection with its review of his sentence. See note 10 supra. In its opinion in Brown, the Florida court admitted requesting and receiving such material in some cases. The court did not specifically deny that it considered this information for some purpose, and the logical implication of its comment that it obtained nonrecord material in order to comply with "newly-articulated procedural standards" is that it also used the material for that purpose. Although the Florida court's opinion is ambiguous, it raises sufficient indicia that the court considered nonrecord material in reviewing capital sentences to negate any presumption to the contrary. Moreover, the material proffered by petitioner, which the district court should have admitted, together with the Brown opinion, in my view is sufficient to raise a contrary presumption: that petitioner's rights under Gardner were violated. Hence, only if the state can demonstrate that nonrecord information was not requested, received, or used by the state court in connection with Ford's case should relief be denied. Otherwise petitioner is entitled to a new appellate review of his sentence by the Florida Supreme Court with full disclosure of the materials it will consider.
 
 II.
 
 225
 Unconstitutional Limitation of Mitigating Circumstances
 
 A. Waiver
 
 226
 Ford contends the trial court's instructions to the jury on aggravating and mitigating factors violated his right under Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), to have the sentencer consider nonstatutory mitigating evidence concerning his character and the circumstances of his offense. The majority rejects this challenge purportedly on the ground that petitioner committed procedural default by failing to object to the instructions at trial and on direct appeal and because he has not established prejudice--the second component of the waiver exception recognized in Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). In reaching this conclusion, the majority confuses the issue of prejudice with the determination whether the challenged instruction was erroneous and hence decides both the procedural issue and the merits of appellant's claim. I disagree with the majority's analysis and resolution of both the waiver and substantive issues. Before discussing my disagreements with the majority, however, I will briefly state the bases for my conclusion that petitioner has established cause for his procedural default, which is the first required element of the Sykes exception to waiver.
 
 1. Cause
 
 227
 In Sykes, the Supreme Court adopted the "cause and prejudice" exception to the waiver rule[16] but left for later cases the task of more specifically defining that standard. Wainwright v. Sykes, 433 U.S. at 90-91, 97 S.Ct. at 2508-09.[17] In the recent decision of Engle v. Isaac, --- U.S. ----, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), the Court resumed the analysis left incomplete in Sykes and gave more "precise content" to the term "cause." In Engle, the Court addressed an assertion of "cause" similar to that raised by Ford. The defendants in Engle, challenging jury instructions as impermissibly shifting the burden of proof, asserted as "cause" for their failure to object to the instructions at trial that certain cases addressing the constitutionality of burden-shifting instructions had not been decided until after their trials and that therefore they could not have known at the time of trial that their constitutional rights were being violated. The Court did "not decide whether the novelty of a constitutional claim ever establishes cause for a failure to object."[18] It rejected the defendants' argument, however, because although some of the Court's relevant cases had post-dated defendants' trials, the decision in In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), which "laid the basis for their constitutional claim," had preceded all of their trials by at least four and one-half years. In the years between Winship and defendants' trials, many defendants had relied on that case to challenge burden-of-proof rules, and numerous courts had upheld such claims. The Court concluded that in light of this substantial post-Winship litigation, "we cannot say that respondents lacked the tools to construct their constitutional claim." Engle v. Isaac, --- U.S. ---- at ----, 102 S.Ct. at 1574, 71 L.Ed.2d at 804.
 
 
 228
 Ford argues his failure to challenge the mitigating circumstances instruction at this sentencing hearing is justified by "cause" under Sykes. He bases this argument on the fact that the Lockett decision on which his constitutional challenge is founded was not decided until four years after his trial.[19] Under the analysis developed in Engle we must consider whether, even in the absence of the specific holding of Lockett entitling capital defendants to sentencer consideration of nonstatutory mitigating evidence, there were sufficient precedential tools available at the time of petitioner's trial on which he reasonably could have constructed his eighth amendment claim.
 
 
 229
 At the district court habeas hearing, the state urged that petitioner had committed procedural default by failing to object to the instructions at trial or to raise the issue on direct appeal. The district judge, although stating Wainwright v. Sykes controlled, without further elaboration proceeded to rule on the merits of the claim. This can be interpreted as an implicit finding that the cause and prejudice standard was satisfied.19a
 
 
 230
 The constitutional status of the death penalty has undergone substantial evolution in the last decade, beginning with Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Furman signaled an important change in the law governing sentencing in capital cases.[20] In Furman, a majority of the Court reversed a death sentence imposed under a discretionary sentencing statute that provided no standards for determining whether a defendant would be sentenced to life imprisonment or death. The five members of the Furman majority issued separate opinions all concurring in the per curiam holding but each stating different reasoning. As noted subsequently by Chief Justice Burger in Lockett v. Ohio, 438 U.S. 586, 599-600, 98 S.Ct. 2954, 2961-62, 57 L.Ed.2d 973 (1978):
 
 
 231
 Predictably, the variety of opinions supporting the judgment in Furman engendered confusion as to what was required in order to impose the death penalty in accord with the Eighth Amendment. Some States responded to what was thought to be the command of Furman by adopting mandatory death penalties for a limited category of specific crimes thus eliminating all discretion from the sentencing process in capital cases. Other States attempted to continue the practice of individually assessing the culpability of each individual defendant convicted of a capital offense and, at the same time, to comply with Furman, by providing standards to guide the sentencing decision.
 
 
 232
 In a series of cases decided in 1976 the Supreme Court substantially clarified Furman. Addressing the constitutionality of five states' post-Furman capital-sentencing statutes, the Court upheld those statutes that provided for individualized sentencing but channelled sentencer discretion by means of legislatively defined sentencing criteria, see Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (opinion of Powell, Stewart & Stevens, JJ.); id. at 260-61, 96 S.Ct. at 2970 (White & Rehnquist, JJ. & Burger, C.J., concurring); Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Powell, Stewart & Stevens, JJ.); id. at 220-22, 96 S.Ct. at 2947-48 (White & Rehnquist, JJ. & Burger, C.J., concurring); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (opinion of Powell, Stewart & Stevens, JJ., concurring); id. at 279, 96 S.Ct. at 2959 (White & Rehnquist, JJ. & Burger, C.J., concurring), and invalidated those that eliminated sentencer discretion entirely by making the death penalty mandatory in certain classes of cases, see Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); and Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). Although the opinions in Furman had focused on limiting the discretion of judges and jurors deciding whether to impose the death penalty, see Furman v. Georgia, 408 U.S. at 248-49 & n. 11, 253-57, 92 S.Ct. at 2731 & n. 11, 2733-36 (Douglas, J., concurring); id. at 309-10, 92 S.Ct. at 2762 (Stewart, J., concurring); id. at 313-14, 92 S.Ct. at 2764 (White, J., concurring); id. at 365, 92 S.Ct. at 2790 (Marshall, J., concurring); see also id. at 398-99, 92 S.Ct. at 2808-09 (Burger, C.J., dissenting), the 1976 cases rejected an interpretation of Furman as rejecting all discretion in sentencing and reaffirmed the practice of individualized decisionmaking at the sentencing stage. See Woodson v. North Carolina, 428 U.S. at 303-05, 96 S.Ct. at 2990-91 (plurality opinion); Roberts v. Louisiana, 428 U.S. at 333-36, 96 S.Ct. at 3006-3007 (plurality opinion). In Lockett v. Ohio, supra, the Court further extended the requirement of individualized sentencing, establishing a constitutional requirement in capital cases that the sentencing authority consider all mitigating evidence proffered by the defendant relating to his character, record, and the circumstances of the particular offense.
 
 
 233
 Lockett, which had its roots in the Woodson and Roberts cases, unambiguously states that the Constitution compels the sentencer to consider all relevant mitigating evidence proffered by the defendant. That rule was in no way foreshadowed by Furman, however, which is the only one of the Supreme Court's contemporary death-penalty cases that had been decided at the time of petitioner's trial.[21] Because Furman was a major reversal of the principles articulated in previous cases challenging the death penalty and because no two of the concurring justices agreed on a rationale for the ruling in that case, the state of the constitutional law governing capital sentencing at the time of petitioner's trial can only be characterized as one of uncertainty and confusion. More importantly, the focus of the concurring opinions in Furman and the one aspect of its holding as to which everyone agreed was its condemnation of unlimited discretion in capital sentencing.[22] Probably the most logical, albeit incorrect, inference to be drawn from this unifying theme in the Furman opinions was that the decision required sentencers' consideration of both aggravating and mitigating evidence in capital cases to be based on narrowly defined statutory criteria.[23] The subsequent contrary holding of the Supreme Court in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) does not undermine this assessment of the state of the law before that case was decided; even the plurality in Lockett recognized its decision was not foreshadowed by Furman. See note 23 supra. See also Lockett v. Ohio, 438 U.S. at 622, 98 S.Ct. at 2973 (White, J., concurring in part and dissenting in part) (Court in Lockett has "completed [an] about-face since Furman v. Georgia "); id. at 628-29, 631-32, 98 S.Ct. at 2973-74, 2975 (Rehnquist, J., concurring in part and dissenting in part) ("it can scarcely be maintained that today's decision is the logical application of a coherent doctrine first espoused by the opinions leading to the Court's judgment in Furman"); Murchison, Toward a Perspective on the Death Penalty Cases, 27 Emory L.J. 469, 545 (1978); Recent Development, New Direction for Capital Sentencing or an About-Face for the Supreme Court?--Lockett v. Ohio, 16 Am.Crim.L.Rev. 317, 318, 328-30 & n. 148 (1979); The Supreme Court, 1977 Term, 92 Harv.L.Rev. 57, 99-100, 105-08 (1978); Recent Cases, Sentencer Must Have Some Discretion in Imposing Capital Punishment: Another Retreat from Furman v. Georgia, 44 Mo.L.Rev. 359, 365 (1979).[24] Nor, for that matter, was the Lockett holding anticipated by decisions of the Florida Supreme Court rendered prior to appellant's trial. Although the Florida Legislature's enactment in 1972 of a new capital sentencing statute went far in clarifying the meaning of Furman, at least as that decision was to be interpreted under Florida law,[25] the statute itself was barely a year old at the time of appellant's trial, and few cases had yet interpreted it or considered its constitutionality. If one can glean from the law existing at the time of appellant's trial any suggestion as to the scope of admissible mitigating evidence, it is that the Florida statute limited such evidence to that relevant to the enumerated mitigating factors.[26] Indeed the Florida Supreme Court's opinion affirming appellant's sentence reflects the view that the sentencer's role is limited by the statutory criteria.[27]
 
 
 234
 In short, review of the case law existing at the time of Ford's trial leads to the inescapable conclusion not only that the Lockett decision was not presaged by the precedents but that a rule contrary to that eventually established in Lockett was strongly suggested by those decisions. Indeed, in 1974 counsel would have to have been blessed with "extraordinary vision" to have anticipated that the Supreme Court would establish the broad right to sentencer consideration of mitigating evidence sanctioned in Lockett. Engle indicates that counsel is not expected to possess such prophetic powers.[28] Because at the time of Ford's trial the "tools to construct [his] constitutional claim" were unavailable, see Engle v. Isaac, --- U.S. at ----, 102 S.Ct. at 1575, 71 L.Ed.2d at 804, his failure to object to the mitigating circumstances instructions at the sentencing hearing was justified by cause within the meaning of Wainwright v. Sykes, supra. Further, as established in Lockett and discussed infra under 'Prejudice,' the preclusion of consideration of mitigating evidence "render[s] the [sentencing proceeding] fundamentally unfair." Engle v. Isaac, --- U.S. at ----, 102 S.Ct. at 1573, 71 L.Ed. at 802.
 
 2. Prejudice
 
 235
 The majority holds that Ford was not prejudiced by the jury instructions on mitigating circumstances. It states four bases for this conclusion. Three of these bases concern whether the instruction operated to preclude the jury from considering nonstatutory mitigating evidence and thus directly address the merits of petitioner's claim. To the extent the majority subsumes its analysis of the merits within its discussion of prejudice, it confuses two issues that should be treated separately. The notion of prejudice under the Sykes exception to waiver refers to the harm, if any, stemming from a constitutional violation. Because prejudice is thus defined as a product of constitutional error, determining the existence of prejudice might seem to require a preliminary inquiry into whether the error asserted has been committed. Logical though this approach might seem, however, it is not the correct analysis. For prejudice, in this context, is a component of the procedural question whether a habeas petitioner has waived his right to raise a constitutional issue in federal court. As such, prejudice is an issue that, along with the other components of the waiver analysis, must be determined prerequisite to deciding the merits of the substantive constitutional claim. If the federal court determines that the petitioner has waived his claim and either the cause or prejudice element of the exception to waiver is lacking, it must, in the interests of finality and deference to the state courts, decline to adjudicate the merits of the constitutional claim. Wainwright v. Sykes, supra. In order to decide whether prejudice exists before deciding the merits of the claim in question, the court must assume, for purposes of resolving the prejudice issue, that constitutional error has been committed.[29] Approaching the prejudice issue from this perspective narrows the inquiry. The court need not resolve at this juncture whether the petitioner has shown a deprivation of constitutional right that has in turn caused him harm; rather the court should assume that a constitutional violation occurred and decide only whether such violation worked to "[the petitioner's] actual and substantial disadvantage," United States v. Frady, --- U.S. ----, ----, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816, 832 (1982) (emphasis the Court's).[30] If the record reveals actual prejudice, then, and only then, should the court decide whether constitutional error occurred. As the Supreme Court has stated, this approach, which avoids deciding issues not fairly presented to the state courts, minimizes federal intrusion into the states' criminal adjudication systems and encourages state courts to take seriously their federal constitutional responsibilities. Engle v. Isaac, --- U.S. at ----, 102 S.Ct. at 1571, 1572, 71 L.Ed.2d at 800, 801.
 
 
 236
 Applying this approach to the instant case, we must assume for the moment that petitioner has established a constitutional violation, i.e., that the jury instructions reasonably could have been interpreted to limit consideration of mitigating evidence to that falling within the statutory mitigating factors. See Washington v. Watkins, 655 F.2d 1346, 1369 (5th Cir.1981). Assuming such error did occur, we must determine whether actual prejudice resulted.
 
 
 237
 The majority cites two factors in support of its conclusion that petitioner was not prejudiced by the mitigating circumstances instructions: (1) that the trial judge did not prevent the defense attorney from introducing evidence of nonstatutory mitigating factors, and (2) that defense counsel referred to such evidence in his closing argument.[31] In Washington v. Watkins, supra, the former Fifth Circuit rejected both of these factors as bases for holding a Lockett error harmless.[32] Addressing the contention that admission of nonstatutory mitigating evidence averted the harm from an erroneous mitigating circumstances instruction, the Washington court stated:
 
 
 238
 [This argument] completely miss[es] the point of the Supreme Court's holding in Lockett. Sandra Lockett also introduced evidence of nonstatutory mitigating factors, and also argued their relevance to the sentencer. The fatal flaw in Lockett was not the exclusion of evidence relating to nonstatutory mitigating factors, but the limitation on the sentencer's consideration of that evidence except as it related to the statutory mitigating factors.
 
 
 239
 Id. at 1375. Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) further refutes the majority's position. In that case the defense attorney had introduced extensive nonstatutory mitigating evidence at the sentencing hearing. See id. at 108 & n.2, 102 S.Ct. at 873 & n.2, 71 L.Ed.2d at 6 & n.2. The trial judge in sentencing the defendant refused to consider that evidence, however, because he interpreted the sentencing statute as precluding consideration of nonstatutory factors. Id. at 108, 112-115, 102 S.Ct. at 873, 875-876, 71 L.Ed.2d at 7, 9-10. The Supreme Court reversed the sentence despite the fact that the Oklahoma statute permitted the defendant to present any mitigating evidence and that the judge had in fact admitted nonstatutory evidence. Id. at 106, 115 & n.10, 102 S.Ct. at 872, 876 & n.10, 71 L.Ed.2d at 6, 11 & n.10. The Court held that the trial court's refusal to consider the evidence violated Lockett, reasoning:
 
 
 240
 Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer, refuse to consider, as a matter of law, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.
 
 
 241
 Id. at 113-115, 102 S.Ct. at 875-876, 71 L.Ed. at 10-11. The argument advanced by the majority that admission of nonstatutory evidence renders a Lockett violation harmless cannot be reconciled with the holdings in Lockett, Eddings and Washington.
 
 
 242
 The majority's reliance on the fact that defense counsel referred to the nonstatutory mitigating evidence in his arguments before the jury also conflicts with Washington.
 
 
 243
 As the Supreme Court has noted in a related context, "arguments of counsel cannot substitute for instructions by the court." Taylor v. Kentucky, 436 U.S. 478, 488-89, 98 S.Ct. 1930, 1936-37, 56 L.Ed.2d 468 (1978) (concluding that trial court's omission of instruction on presumption of innocence was not remedied by defense counsel's explanation of the presumption in opening and closing argument). Only an instruction from the trial court can invest a particular concept--here the jury's ability to consider nonstatutory mitigating factors--with the authority of the court. See id. at 489, 98 S.Ct. at 1936-37. Indeed, were a jury to consider nonstatutory mitigating factors despite instructions by the court to the effect that it was duty-bound to consider only the two statutory mitigating circumstances, it would be acting "lawlessly," see Woodson v. North Carolina, 428 U.S. at 303, 96 S.Ct. at 2990 (opinion of Stewart, Powell, and Stevens). "There is an element of capriciousness in making the jurors' power to avoid the death penalty dependent on their willingness to accept [an] invitation to disregard the trial judge's instructions." Roberts v. Louisiana, 428 U.S. 325, 335, 96 S.Ct. 3001, 3007, 49 L.Ed.2d 974 (1976) (opinion of Stewart, Powell, and Stevens).
 
 
 244
 Washington v. Watkins, 655 F.2d at 1375 (emphasis added). See also Bell v. Ohio, 438 U.S. 637, 641-43, 98 S.Ct. 2977, 2980-81, 57 L.Ed.2d 1010 (1978) (reversing death sentence even though defendant had argued nonstatutory mitigating factors justified penalty less than death where sentencing judges believed they were limited to statutory mitigating factors).
 
 
 245
 Lastly, no contention can be made that petitioner failed to present any significant nonstatutory mitigating evidence. Several witnesses testified on his behalf at the sentencing hearing. Ford's mother testified that his father had been a belligerent alcoholic during his childhood. She described petitioner's efforts, as a boy, to assume paternal responsibilities toward his younger siblings, including working during high school and after graduation to provide financial support for the family. A psychiatrist testified that Ford was bright and an overachiever but that he suffered from a type of brain damage known as Dyslexia, which results in a difficulty working with numbers. The psychiatrist described Ford's generally successful endeavors in his employment, which were subsequently thwarted when a promotion placed him in a position requiring mathematical computations. In the psychiatrist's view, Ford's actions in committing the robbery and murder stemmed from intense depression and frustration related to his disability rather than from a lack of moral standards. The psychiatrist stated that he believed petitioner could be rehabilitated. Because petitioner has demonstrated a substantial likelihood that the jury's misunderstanding of its responsibility to consider nonstatutory mitigating evidence critically affected its sentencing decision, I would hold that he has established actual prejudice under Frady and Sykes entitling him to an adjudication of the merits of his Lockett claim.
 
 B. Merits
 
 246
 The majority states three reasons for holding that the mitigating circumstances instructions did not violate the rule of Lockett, none of which are persuasive. The majority recognizes that the standard of review governing constitutional challenges to jury instructions requires the court to determine "the way in which a reasonable juror could have interpreted the instruction." Sandstrom v. Montana, 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979) (emphasis added). Yet it relies on a "narrow parsing of language"[33]--the omission of the word "only" from the mitigating factors instruction, as compared with its inclusion in the aggravating factors instruction--in concluding that the jurors could not have believed they were limited to the statutory mitigating factors.[34] I am aware that a plurality of the United States Supreme Court interpreted the similar language of Florida's sentencing statute[35] as not precluding consideration of nonstatutory mitigating factors. See Proffitt v. Florida, 428 U.S. at 250 n. 8, 96 S.Ct. at 2965 n.8. See also Lockett v. Ohio, 438 U.S. at 606, 98 S.Ct. at 2965. The Florida Supreme Court, interpreting the same statutory provision, arrived at the opposite conclusion, however. See Cooper v. State, 336 So.2d 1133, 1139 & n.7 (Fla.1976), cert. denied, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977). See also notes 26-27 and accompanying text supra. If judges reasonably differed on the meaning of the provision, surely rational jurors likewise could have arrived at opposing interpretations. Moreover, even had the courts agreed on the meaning of the statute, the subtle nuances of statutory language on which judicial construction of legislative enactments so often turns are simply inadequate bases for discerning the possible understanding of jurors, who are less familiar with such legal niceties. Moreover, the former Fifth Circuit, in Washington v. Watkins, 655 F.2d at 1370 & nn.45-46, rejected an argument identical to that now espoused by the majority.[36] Although the majority purports to distinguish Washington on other grounds, its reasoning directly contravenes that of the Washington court.
 
 
 247
 The instructions given to the jury in this case were identical in most critical respects to those held invalid in Washington v. Watkins, 655 F.2d 1346 (5th Cir.1981). See notes 34 and 36 supra. The majority attempts to distinguish Washington on the basis of (1) the concluding reference by the trial judge in Washington to "the preceding elements of mitigation" and (2) the fact that the charge here listed all the statutory elements of mitigation whereas in Washington the judge listed only two of the statutory factors. The majority's reliance on the "preceding elements" language is misplaced. While it is true that the Washington court found that language "further supported" the inference that the enumerated factors were the sole factors to be considered by the jury, id. at 1370, the court concluded that "a reasonable juror might well infer" the listed factors were exclusive from the judge's use of the term "only" with respect to aggravating factors and from the immediately following "almost exactly parallel[ ]" language pertaining to mitigating circumstances. These two features of the judge's instruction alone would have supported such inference. See id. The "preceding elements" language present in Washington was supportive, but clearly not the decisive factor in the court's decision. Id. Nor does the trial judge's enumeration of all the statutory mitigating factors here in comparison with two listed in Washington provide a basis for distinguishing the two cases. We are concerned solely with whether the jury reasonably may have believed it was limited to considering mitigating evidence that fit within the statutorily enumerated factors. Whether the instructions set forth two, five, or a dozen statutory factors has no bearing on the jury's understanding of the defendant's right under Lockett to have it consider nonstatutory factors as well. At petitioner's sentencing hearing, as in Washington's and Lockett's, his attorney presented evidence concerning his character and background. "[N]owhere in the trial court's charge to the jury in the sentencing phase of [petitioner's] trial is there any explicit instruction that the jury was free to consider mitigating factors other than [those enumerated in the statute]," however. Washington v. Watkins, 655 F.2d at 1365. In Washington, the court found that no language in the charge rectified the absence of such an instruction by indicating to a reasonable jury that it was not limited to the statutory factors. The court reached this conclusion despite the trial judge's prefatory instruction that in reaching its decision the jury "must obviously consider the detailed circumstances of the offense for which the defendant was convicted and the defendant himself." Id. at 1369-70. Here there was lacking even the vague reference to the defendant's character and circumstances that was present in the Washington case. See note 34 supra. Thus, the instructions given in petitioner's sentencing hearing were even less likely to effectuate petitioner's right to have the jury consider evidence of his character and background than the instructions invalidated in Washington.[37]
 
 
 248
 Finally, the majority ascribes great significance to the sentencing judge's finding that "[t]here are no mitigating circumstances existing--either statutory or otherwise--which outweigh any aggravating circumstances." Majority Opinion, supra at 813 (quoting Trial Court Findings on Sentencing, reprinted in Ford v. State, 374 So.2d 496, 500-02 n.1 (Fla.1979)). From this four-word phrase buried in the middle of the trial judge's detailed findings concerning the statutory mitigating and aggravating factors, the majority discerns not only an understanding on the part of the judge that nonstatutory mitigating evidence was relevant; the majority additionally "conclude[s]" from these words that the "judge's perception of what could be considered was conveyed to the jury." Majority Opinion, supra at 813 (emphasis added). With all due respect, I am unable to follow the majority's reasoning. It has always been my understanding that jury instructions, not trial court findings, serve the function of informing the jury of the law. For the reasons stated above, I do not believe the instructions in this case adequately informed the jury of its duty to consider nonstatutory mitigating evidence.
 
 III.
 
 249
 Effect of Florida Supreme Court's Overruling of Aggravating
 
 Circumstances Found by Trial Court
 
 250
 Under Florida's capital sentencing statute, Fla.Stat.Ann. Sec. 921.141 (West Supp.1982), the judge's task in deciding whether to impose the death sentence entails several steps. The judge must first determine whether any of the statutory aggravating factors exist. Id. Sec. 921.141(3), (5). He must "weigh" any aggravating factors found to exist and determine whether they are "sufficient" to impose the death penalty. See id. Sec. 921.141(3). If he finds there are "sufficient aggravating factors," he must then inquire whether sufficient mitigating factors exist to outweigh the aggravating factors. Id.
 
 
 251
 In Ford's case, the trial judge found that all eight of the statutory aggravating factors[38] and none of the mitigating ones were present and sentenced appellant to death. In his written findings the judge stated that aggravating factor (a) (defendant under sentence of imprisonment at time capital felony committed) was established because "[a]lthough the defendant was not imprisoned at the time of the murder, he did actually prevent arrest, prosecution and imprisonment for his other crime, at least temporarily, by the very murder for which he has been convicted." Trial Court's Findings on Sentence, reprinted in Ford v. State, 374 So.2d at 499-501 n.1. He specifically concluded that this aggravating circumstance "justifies a sentence of death." Id. The judge found that aggravating factor (b) (defendant previously convicted of another capital felony or felony involving violence to person) was present because
 
 
 252
 [T]he defendant has been found guilty of breaking and entering to commit a felony, which would obviously involve the threat of violence to the person of anyone whom he might have confronted on the premises. Further, he has admitted the unlawful sale of narcotic drugs, which likewise involves a threat to the safety of members of the public.
 
 
 253
 Id. He concluded that this factor also "justifies the imposition of the sentence of death." Id. Of the six other aggravating factors the judge found, he did not specifically state that any one of them justified the death sentence.[39]
 
 
 254
 On appeal, the Florida Supreme Court held the trial court incorrectly found that aggravating factors (a) and (b) were established. Ford v. State, 374 So.2d at 502. The Florida Supreme Court stated only that the trial court had "erred," but its basis for so holding was obviously the fact that the evidence cited by the trial court in support of factors (a) and (b) did not conform to the terms of the statute. See Peek v. State, 395 So.2d 492, 499 (Fla.1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981) (factor (a) requires that defendant have been incarcerated pursuant to prison sentence at time of offense); Provence v. State, 337 So.2d 783, 786 (Fla.1976) (factor (b) requires actual prior conviction). The Florida Supreme Court also rejected the trial court's findings that aggravating factors (d) (homicide committed while defendant engaged in attempted robbery) and (f) (homicide committed for pecuniary gain) were both present because the evidence used to support each was the same. The court held that these should have been viewed as a single aggravating factor. Ford v. State, 374 So.2d at 502-03. Although the Florida Supreme Court thus eliminated three of the aggravating factors relied on by the trial judge, it affirmed Ford's sentence on the ground that "five aggravating circumstances may properly be said to exist in this case" and, "there being no mitigating factors present death is presumed to be the appropriate penalty." Id. at 503.
 
 
 255
 As the majority notes, in Henry v. Wainwright, 661 F.2d 56 (5th Cir.1981), vacated on other grounds, --- U.S. ----, 102 S.Ct. 2922, 73 L.Ed.2d 1326 (1982), judgment reinstated on remand, 686 F.2d 311 (5th Cir.1982)[40] and Stephens v. Zant, 631 F.2d 397 (5th Cir.1980), reh. denied and modified, 648 F.2d 446 (5th Cir.1981), certified to Supreme Court of Georgia, --- U.S. ----, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982),[41] the former Fifth Circuit held that resentencing was required where the sentencer had considered, respectively, nonstatutory aggravating factors and aggravating factors determined to be unconstitutionally vague. The majority distinguishes those cases, however, on the ground that the trial judge's errors in this case, which it characterizes as evidentiary insufficiency and multiple consideration of one aspect of Ford's offense, do not involve "consider[ation] [of] any extraneous or improper evidence." Majority Opinion, supra at 814. I disagree with the majority's position for two reasons.
 
 
 256
 First, the majority's premise--that the trial judge did not consider any improper evidence in deciding what sentence to impose--is incorrect. The evidence cited by the trial judge in support of aggravating factors (a) and (b) was irrelevant to those criteria. Moreover, at least some of that evidence was irrelevant to any of the aggravating circumstances enumerated in Sec. 921.141(5).[42] The fact that such evidence may have been properly admitted at the guilt phase of trial did not give the judge license to consider it as a basis for imposing the death sentence. Only those factors specifically delineated in the statute may be considered in the sentencing process, and reliance on information irrelevant to those factors, whether or not properly before the sentencer for other purposes, violates the defendant's right to channelled sentencer discretion under Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Nor does the trial judge's attempt to fit these square pegs of fact into the round holes of the statutory criteria rectify his error. His consideration of these facts was no less a departure from the legislative guidelines than the complete disregard for the limits imposed by the statutory factors committed by the sentencer in Henry.
 
 
 257
 Second, even if all the evidence considered by the trial judge in imposing sentence was relevant to some of the statutory aggravating criteria, the judge's reliance on an incorrect legal theory in determining petitioner's sentence renders the sentence invalid. The cases are legion that have reversed criminal convictions where the jury was permitted to consider an improper legal theory. Even where a general verdict renders impossible the determination whether the jury in fact relied on the improper theory, a conviction possibly predicated on such mistaken interpretation of the law will not stand. Bachellar v. Maryland, 397 U.S. 564, 570-71, 90 S.Ct. 1312, 1315-16, 25 L.Ed.2d 570 (1970); Street v. New York, 394 U.S. 576, 585-88, 89 S.Ct. 1354, 1362-64, 22 L.Ed.2d 572 (1969); Yates v. United States, 354 U.S. 298, 311-12, 77 S.Ct. 1064, 1072-73, 1 L.Ed.2d 1356 (1957); Terminiello v. Chicago, 337 U.S. 1, 6, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949); Cramer v. United States, 325 U.S. 1, 36 n.45, 65 S.Ct. 918, 935 n.45, 89 L.Ed. 1441 (1945); Ashcraft v. Tennessee, 322 U.S. 143, 155-56, 64 S.Ct. 921, 927, 88 L.Ed. 1192 (1944); Williams v. North Carolina, 317 U.S. 287, 291-92, 63 S.Ct. 207, 209-10, 87 L.Ed. 279 (1942); Stromberg v. California, 283 U.S. 359, 369-70, 51 S.Ct. 532, 535-36, 75 L.Ed. 1117 (1931). Here there is no uncertainty. It is clear from the trial judge's findings that he based his sentence at least in part on (1) evidence that did not comprise two of the aggravating factors he cited and (2) two aggravating circumstances that were based on the same facts and were therefore cumulative. Had these factors constituted the sole aggravating circumstances found by the judge, there is little question that the sentence would have been invalid under both state and federal law.[43] Hence, the only remaining question is whether the judge's partial reliance on improper aggravating factors can be viewed as harmless in view of the five valid aggravating factors he found. The Florida Supreme Court answered this question in the affirmative, stating that where some aggravating factors and no mitigating factors[44] are found death is "presumed to be the appropriate penalty." This statement, which the majority adopts, is susceptible of either of two interpretations. Neither in my view provides a constitutional basis for affirming a sentence partly predicated on improper aggravating factors.
 
 
 258
 The state court's remark that where some aggravating and no mitigating factors are present "death is presumed appropriate" could be understood to mean that the initial sentencer must impose the death penalty if it finds any aggravating and no mitigating factors. An alternative interpretation is that the appellate court is engaging in a presumption, for review purposes, that when the initial sentencer has found some aggravating factors and no mitigating ones it would have imposed the death sentence even if it had not considered the erroneous aggravating factors. See Zant v. Stephens, --- U.S. ----, ----, 102 S.Ct. 1856, 1859, 72 L.Ed.2d 222, 227 (1982). I would be hesitant to attribute to the Florida court the first interpretation of the statute, which would make the death penalty mandatory in all cases in which some aggravating and no mitigating factors are found. The statutory language does not support this interpretation. It requires both the advisory jury and the sentencing judge initially to determine "[w]hether sufficient aggravating circumstances exist as enumerated in subsection (5) [of the statute]." Fla.Stat.Ann. Sec. 921.141(2), (3) (West Supp.1982). Only after finding that there are "sufficient" aggravating factors are the jury and judge instructed to address mitigating factors. Id. The statutory language thus suggests that death is appropriate only where the sentencers make an individualized judgment that the aggravating factors they have identified are sufficiently grave to justify that punishment. Another reason I would not attribute this interpretation of the statute to the Florida Court is that the statute as so interpreted would pose significant constitutional questions. The Supreme Court has held that capital sentencing schemes may not, consistently with eighth amendment principles, eliminate all sentencer discretion by making the death sentence mandatory for certain statutorily defined categories of offenses. See Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). Moreover, the Court has recently reaffirmed the importance of individualized sentencing by holding that the scope of mitigating evidence a defendant may proffer on his own behalf may not be unduly curtailed by statute. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). See also Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Making the death sentence mandatory in all cases where some aggravating and no mitigating factors are present would not curtail sentencer discretion to the same degree as the statutes condemned in Woodson and Roberts, nor in the same manner as the statute invalidated in Lockett. Nonetheless such a law would prevent sentencers from declining to impose the death sentence in many cases where the particular facts, though technically within the statutory aggravating criteria, do not in the sentencer's judgment present sufficient indicia of malice, dangerousness, or other evil to justify the ultimate punishment. Whether such a restriction on sentencer discretion is constitutional may soon be decided by the Supreme Court. See Zant v. Stephens, supra. I will not attempt to predict the holding of the Court on this issue. Suffice it to say that the constitutional difficulties presented by this interpretation of the Florida statute are significant enough that we should not attribute such interpretation to the state court without a clear statement to that effect on its part.[45] Cf. id. (certifying case to Supreme Court of Georgia for description of state law premises of similar statement by Georgia court).
 
 
 259
 If the Florida court's statement is interpreted as a presumption to be applied at the review stage that death is appropriate whenever the sentencer has found some aggravating and no mitigating factors, such state law rule also suffers a constitutional infirmity. As I have already noted, see text supra at 848, meaningful appellate review is a constitutionally required element of capital sentencing schemes. Engaging in the presumption just described falls far short of the type of review that will ensure rationality and consistency in sentencing. Where a judge or jury disregards or misinterprets the procedures or criteria established by the state's sentencing scheme, the regularity and objectivity in sentencing that the statute is designed to accomplish is defeated. Once such an error has been made, however, there are different possible approaches to correcting it. As the former Fifth Circuit recognized in Henry v. Wainwright, supra and Stephens v. Zant, supra, not all such approaches meet the requirements of the eighth amendment. Superimposing on defective sentencing a review procedure under which the appellate court, having identified the sentencer's error, then speculates or presumes what the sentencer would have done had the error not been made compounds rather than resolves the problem and is clearly inconsistent with Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The Supreme Court also has recognized the infirmity of such a review process. Presnell v. Georgia, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978) (per curiam) (imposition of death sentence violated due process where state supreme court rejected jury's grounds for sentence but affirmed sentence on ground that evidence supported theory not relied on by jury); Cole v. Arkansas, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948) (state supreme court's affirmance of convictions on basis of statutory provision other than that to which proof was directed at trial deprived defendant of due process). Cf. Eddings v. Oklahoma, 455 U.S. 104, 117-19, 102 S.Ct. 869, 877-79, 71 L.Ed.2d 1, 13-14 (1982) (O'Connor, J., concurring) (where it appears trial judge believed he could not consider mitigating evidence, Court will not speculate as to whether he did consider it but found it insufficient; "Woodson [v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) ] and Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ] require us to remove any legitimate basis for finding ambiguity concerning the factors actually considered by the court").
 
 
 260
 Presnell v. Georgia establishes that a fundamental element of due process of law is the right to be sentenced by the trial level trier of fact who has heard the proof. " 'To conform to due process of law, petitioner[ ] [was] entitled to have the validity of [his] [sentence] appraised on consideration of the case as it was tried and as the issues were determined in the trial court.' " Presnell, 439 U.S. at 16, 99 S.Ct. at 236, quoting Cole v. Arkansas, 333 U.S. 196, 202, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948). Indeed, the law has appeared clear that "only the trier of fact may impose a death sentence." Willis v. Balkcom, 451 U.S. 926, 101 S.Ct. 2003, 68 L.Ed.2d 315 (1981) (Marshall, Brennan & Stewart, JJ., dissenting from denial of certiorari). If the trial court declines to impose the death penalty, the appellate court constitutionally could not impose the death sentence on its own initiative on appeal. The same logic requires that the death penalty be affirmed only for the reasons on which the trial court relied in imposing the sentence. Presnell v. Georgia, 439 U.S. at 15-16, 99 S.Ct. at 235-36. Whether or not the appellate court perceives that the ultimate penalty could have been imposed on less than all the circumstances presented to the lower court, the appellate court is not empowered to impose the death sentence on the basis of those lesser circumstances. The crucial question in reviewing a death sentence when some of the circumstances relied on by the lower court are invalidated is not whether the trier of fact constitutionally could have, but whether it would have imposed the death penalty on the basis of those lesser circumstances. Because the question of what the trier of fact would have done can not be answered by an appellate body in any consistent and reliable manner but only through pure speculation, in these circumstances affirmance of the death penalty by the appellate court violates the reliability and consistency requirements of the eighth amendment. See, e.g., Eddings v. Oklahoma, 455 U.S. at 117-19, 102 S.Ct. at 877-879, 71 L.Ed.2d at 12, 13-14 (O'Connor, J., concurring); Lockett v. Ohio, 438 U.S. at 604, 98 S.Ct. at 2964 (plurality opinion); Gardner v. Florida, 430 U.S. at 359-60, 97 S.Ct. at 1205-06 (opinion of Powell, Stewart & Stevens, JJ.); id. at 363-64, 97 S.Ct. at 1207 (White, J., concurring); Woodson v. North Carolina, 428 U.S. at 305, 96 S.Ct. at 2991 (opinion of Powell, Stewart & Stevens, JJ.); Gregg v. Georgia, 428 U.S. at 188, 96 S.Ct. at 2932 (opinion of Powell, Stewart & Stevens, JJ.); id. at 207, 220-24, 96 S.Ct. at 2941, 2947-49 (White & Rehnquist, JJ. & Burger, C.J., concurring); Jurek v. Texas, 428 U.S. at 276, 96 S.Ct. at 2958 (opinion of Powell, Stewart & Stevens, JJ.); id. at 277, 278-79, 96 S.Ct. at 2958, 2959-60 (White & Rehnquist, JJ. & Burger, C.J., concurring); Proffitt v. Florida, 428 U.S. at 252-53, 258-59, 96 S.Ct. at 2966-67, 2969-70 (opinion of Powell, Stewart & Stevens, JJ.); id. at 260-61, 96 S.Ct. at 2970 (White & Rehnquist, JJ. & Burger, C.J., concurring); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
 
 
 261
 When it is found on appellate review that any of the aggravating factors on which the trial court relied in initially imposing the death sentence are invalid, the appellate court has no method by which to determine whether those factors were the ones to tip the initial sentencer's decision in favor of the death penalty. Even when only one circumstance is invalidated on appeal a reviewing court is not equipped to judge the actual significance to a trial judge or jury of that one, now invalid, factor. To speculate as to the degree of significance violates not only the mandate of the eighth amendment as interpreted in Furman and its progeny but also the due process right actually to be sentenced by the trial level judge or jury. Presnell v. Georgia, 439 U.S. at 16, 99 S.Ct. at 236.
 
 
 262
 The posture of this case is identical to, and therefore poses the same problem raised by, Henry and Stephens. As the majority points out, the trial courts' errors with respect to aggravating factors in Henry and Stephens were different than those involved here. In my view the difference is not significant. See text supra at 865-866. Moreover, the decisions in Henry and Stephens to remand for resentencing were not predicated on the nature of the trial courts' errors. Rather, the courts in those cases were concerned with the procedural regularity in capital sentencing that Furman held is mandated by the eighth amendment. The Fifth Circuit's resolution of the Henry and Stephens cases was based directly on the requirement of Furman that juries' discretion in capital sentencing be guided by objective and rationally reviewable standards. In both of those cases the state appellate courts had found valid aggravating circumstances in addition to unconstitutional ones, and no mitigating factors were present. The Fifth Circuit refused to affirm the death sentences on the basis of the valid aggravating factors, however. It reasoned that even though the juries could rationally have recommended the death sentence on the basis of the permissible factors they had considered, there was no way for the court retrospectively to determine whether they would in fact have done so had they been properly instructed. An attempt to second-guess the jury, in the court's view, was not the proper role of the reviewing court but was "the antithesis of the rational review of the jury's application of clear and objective standards contemplated by Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and its progeny."[46]
 
 
 263
 By attempting to distinguish this case from Henry and Stephens the majority confuses the requirement of Furman that capital sentencing be structured by procedures and criteria that are rationally reviewable with the requirements of other cases imposing substantive constitutional limitations on such criteria.[47] I do not suggest that every question of statutory interpretation involving capital sentencing criteria necessarily implicates the Federal Constitution. On the contrary, it is the procedure here employed by the state court, and not its substantive decision, that in my view raises a constitutional issue.
 
 
 264
 The Supreme Court recently has granted certiorari in Barclay v. Florida, 411 So.2d 1310 (Fla.1982), cert. granted, --- U.S. ----, 103 S.Ct. 340, 74 L.Ed.2d --- (1982), on the question of whether consideration of a nonstatutory aggravating circumstance and aggravating factors allegedly unsupported by the evidence requires resentencing. In my view this court should defer decision of petitioner's aggravating circumstances claim pending the Supreme Court decisions in Stephens and in Barclay. Barring a contrary ruling by the Court in these cases, I would hold that the rational review requirement of Furman compels resentencing in instances, such as this one, in which the sentencer has misapplied the state's capital sentencing criteria.
 
 Conclusion
 
 265
 Petitioner's eighth and fourteenth amendment rights have been violated by the Florida Supreme Court's consideration of nonrecord information and the trial court's erroneous instructions on mitigating circumstances. The trial court's reliance on improper evidence and legal theories in support of aggravating circumstances also violated his constitutional rights and may compel resentencing. See note 41 supra. Accordingly, subject only to the Supreme Court's decisions in Stephens and Barclay, I would remand this case to the district court with instructions to issue the writ of habeas corpus unless the state court grants petitioner a new sentencing proceeding followed by meaningful review in the state supreme court based solely on evidence in the record.
 
 
 266
 JOHNSON, Circuit Judge, concurring in part and dissenting in part:
 
 
 267
 While Judge Kravitch has analyzed and critiqued Sections I and III of the majority opinion in a most comprehensive manner, I write separately to emphasize the bases for my objections to these portions of the majority opinion.
 
 
 268
 The petition before us presents undenied allegations that the Florida Supreme Court considered nonrecord psychiatric, psychological, and post sentence reports on the direct appeal of petitioner's conviction and sentence. The Florida Supreme Court has admitted the practice but has attempted to justify its actions by drawing a fine distinction between capital sentence "review" as defined by state law and constitutionally required "supervisory standards" imposed by the United States Supreme Court. Brown v. Wainwright, 392 So.2d 1327, 1333 & n. 17 (Fla.), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981). In Brown the Florida court asserted that "non-record information we may have seen, even though never presented to or considered by the judge, the jury, or counsel, plays no role in capital sentence 'review.' " 392 So.2d at 1332-33. Yet at the same time the court, citing Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), stated that "[t]he 'tainted' information we are charged with reviewing was ... in every instance obtained to deal with newly-articulated procedural standards." Id. at 1333 n. 17. These "procedural standards," the court admitted, "... are required to make the statute operate in a constitutional manner." Id. It is clear, therefore, from the Brown opinion that the Florida Supreme Court has considered nonrecord material on direct appeal in capital cases for the purpose of complying with requirements of the United States Constitution. The court's failure to make the appellants aware of the use of this information, and to afford them a reasonable opportunity to challenge or explain any portion of it, however, is a clear abrogation of its duty under the Constitution.
 
 
 269
 The majority simply cannot avoid the direct implication of Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), in which the Supreme Court invalidated a death sentence imposed in part on information contained in an undisclosed presentence report. A majority of the Justices in Gardner agreed that a trial court's reliance on unrevealed information clearly violates the constitutional standards required for capital sentencing. The plurality opinion concluded that "the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause." 430 U.S. at 358, 97 S.Ct. at 1204 (Stevens, J.). Thus, the Florida Supreme Court's practice of reviewing nonrecord materials on direct appeal runs afoul of the Due Process Clause--viewed either independently or as "the vehicle by which the strictures of the Eighth Amendment are triggered...." Id. at 364, 97 S.Ct. at 1207 (White, J., concurring). The same conclusion applies to direct review of death sentences by the Florida Supreme Court.
 
 
 270
 Direct review of capital sentences to safeguard against arbitrary and capricious sentencing is an essential element in the constitutional imposition of the death sentence. See, e.g., Gregg v. Georgia, 428 U.S. 153, 198, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1976) (plurality) (The provision for appellate review in the Georgia capital sentencing system serves as a check against the random or arbitrary imposition of the death penalty.); Proffitt v. Florida, 428 U.S. 242, 253, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976); Jurek v. Texas, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976); Woodson v. North Carolina, 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976); Roberts v. Louisiana, 428 U.S. 325, 335 n. 11, 96 S.Ct. 3001, 3007 n. 11, 49 L.Ed.2d 974 (plurality) (striking down the death statute in part because it did not provide for "judicial review to safeguard against capricious sentencing determinations"). Direct capital sentence review by the Florida Supreme Court is even more integral to the capital sentencing process of Florida than it is in other states. In upholding the facial constitutionality of the Florida death penalty in Proffitt, the Supreme Court emphasized the Florida Supreme Court's role as independent evaluator of the evidence in a system that attempted "to assure that the death penalty will not be imposed in an arbitrary or capricious manner." 428 U.S. at 252-53, 96 S.Ct. at 2966. "[T]o the extent that any risk ... [of arbitrary or capricious sentencing] exists, it is minimized by Florida's appellate review system, under which the evidence of the aggravating and mitigating circumstances is reviewed and reweighed by the Supreme Court of Florida 'to determine independently whether the imposition of the ultimate penalty is warranted.' " 428 U.S. at 253, 96 S.Ct. at 2967 (quoting Songer v. State, 322 So.2d 481, 484 (Fla.1975), vacated on other grounds, 430 U.S. 952, 97 S.Ct. 1594, 51 L.Ed.2d 801 (1977)). In performing its review function the Florida Supreme Court "evaluate[s] anew the aggravating and mitigating circumstances of the case to determine whether the punishment is appropriate." Harvard v. State, 375 So.2d 833, 834 (Fla.1977), cert. denied, 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979).
 
 
 271
 The statute contemplates that the trial jury, the trial judge and this Court will exercise reasoned judgment as to what factual situations require the imposition of death and which factual situations can be satisfied by life imprisonment in light of the totality of the circumstances present in the evidence. Certain factual situations may warrant the infliction of capital punishment, but, nevertheless, would not prevent either the trial jury, the trial judge, or this Court from exercising reasoned judgment in reducing the sentence to life imprisonment.
 
 
 272
 Alvord v. State, 322 So.2d 533, 540 (Fla.1975) (emphasis added). The Florida Supreme Court regularly reevaluates the evidence in death penalty cases either to sustain the sentence or to reverse it on a factual basis overlooked by the trial court. See, e.g., Mines v. State, 390 So.2d 332 (Fla.1980), cert. denied, 451 U.S. 916, 101 S.Ct. 1994, 68 L.Ed.2d 308 (1981); Kampff v. State, 371 So.2d 1007, 1010 (Fla.1979); Shue v. State, 366 So.2d 387, 389-90 (Fla.1978); Huckaby v. State, 343 So.2d 29, 33-34 (Fla.), cert. denied, 434 U.S. 920, 98 S.Ct. 393, 54 L.Ed.2d 276 (1977); Harvard v. State, supra; Jones v. State, 332 So.2d 615, 619 (Fla.1976); Songer v. State, supra; Taylor v. State, 294 So.2d 648, 651 (Fla.1974).
 
 
 273
 Death sentence review by the Florida Supreme Court, therefore, affects the "substantial rights" of the defendant, who is entitled to at least a minimum of due process protection. Mempa v. Rhay, 389 U.S. 128, 134, 88 S.Ct. 254, 256, 19 L.Ed.2d 336 (1967). In order for the Florida Supreme Court to review the imposition of the death sentence with "rationality and consistency," Proffitt, supra, 428 U.S. at 259, 96 S.Ct. at 2969, defendants and their counsel must be aware of all the material under consideration by the court. Not only is the defendant's right to counsel implicated, Anders v. California, 386 U.S. 738, 742, 87 S.Ct. 1396, 1399, 18 L.Ed.2d 493 (1967), but so is the right of confrontation. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). The receipt of psychiatric and psychological reports from the Department of Corrections also implicates a defendant's Fifth Amendment rights. Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (recognizing Fifth Amendment right to be informed of right to remain silent, to have questions cease, and to consult with an attorney before being subjected to psychiatric examination that may be used against defendant in capital sentencing proceedings). By considering nonrecord information without these safeguards the Florida Supreme Court has jeopardized the "degree of reliability" and rationality required in the administration of the death penalty. Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978); Woodson v. North Carolina, 428 U.S. 280, 303-04, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976).
 
 
 274
 It does not matter that the Florida Supreme Court may have sought the nonrecord material for the purpose of complying with "newly-articulated [constitutional] procedural standards," such as those announced in Lockett v. Ohio, supra, and Gardner v. Florida, supra. The Florida Supreme Court itself recognized that these "procedural standards" are "required to make the statute operate in a constitutional manner." Brown v. Wainwright, supra, 392 So.2d at 1333 n. 17. Even this explanation for soliciting the information, however, is not fully satisfactory. The petitioner contends, and the state has not denied, that the Florida Supreme Court began soliciting nonrecord material as early as 1975. Gardner and Lockett were decided by the United States Supreme Court in 1977 and 1978.
 
 
 275
 It is important to note that the Florida Supreme Court has never denied considering nonrecord material of the kind alleged in this case. Instead, the court merely attempted to draw a legal distinction between the statutory "review" process and constitutionally required "supervisory standards." The majority's acceptance of this distinction, in my opinion, is nothing more than the adoption of a legal conclusion expressed by the Florida Supreme Court. Even when the court in Brown stated that "non-record information we may have seen, even though never presented to or considered by the judge, the jury, or counsel plays no role in capital sentence 'review,' " 392 So.2d at 1332-33, the court was only articulating its statutorily imposed duty. It was not stating its actual practice. For this reason I find it unnecessary to discuss the "presumption of regularity" relied on in part by the majority.
 
 
 276
 I do not wish to imply that the Florida Supreme Court has been dishonest or has attempted to "cover-up" the facts. The point of this dissent is that it is constitutionally unacceptable for this Court to affirm the denial of a writ of habeas corpus when the Florida Supreme Court has admitted considering nonrecord material for the purpose of complying with the United States Constitution. In addition, the risk is great that information requested for one purpose will even unintentionally be used in connection with another. That risk, in the context of the death penalty, and in the face of an ambiguous explanation, is constitutionally unacceptable. See Lockett v. Ohio, supra at 604, 98 S.Ct. at 2964. (The "difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."); Gardner v. Florida, supra, 430 U.S. at 364, 97 S.Ct. at 1207 (White, J., concurring) ("A procedure for selecting people for the death penalty which permits consideration of ... secret information relevant to the 'character and record of the individual offender,' ... fails to meet the 'need for reliability in the determination that death is the appropriate punishment' ..." (quoting Woodson v. North Carolina, supra, 428 U.S. at 304, 305, 96 S.Ct. at 2991)). The Florida Supreme Court's role in the direct review of death sentences is of such importance that it may not choose to solicit psychiatric, psychological, and other reports without the knowledge of the defendant, and without giving defendant or his counsel an opportunity to comment on or challenge the information in the reports. Because the alleged violations in this case have gone undenied, and because the Florida Supreme Court has admitted soliciting nonrecord material as a matter of practice, in my judgment the only way to remedy this violation would be to direct the district court to grant the writ conditionally. The writ would become final in the event that the Florida Supreme Court does not grant petitioner a new direct review of his conviction and sentence. Either the new review must be undertaken completely without the benefit of nonrecord material, or, if the court decides to continue its practice, the new review must give petitioner and his counsel adequate notice of the use of nonrecord information, with adequate opportunity to comment on and challenge the material.
 
 
 277
 However, in my judgment the majority commits a more serious error than that of stamping its approval on the review given this case by the Florida Supreme Court. The majority has grievously erred by not requiring the full resentencing of petitioner as a result of the invalidity of three statutory aggravating factors considered by the jury and relied on by the judge. The petitioner is entitled to a full resentencing procedure in this case because the consideration of and reliance on invalid aggravating factors in the face of substantial evidence of mitigating factors resulted in a situation in which the presence of the invalid factors could have tipped the scales against the petitioner. By adding three impermissible "weights" to the weighing process, the sentencing discretion of the jury and the judge was not properly channeled to eliminate the risk of arbitrary, capricious, or disproportionate results. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). In addition, the petitioner's right to have the jury and judge fully consider all mitigating evidence in his behalf, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), was substantially diminished by the presence of "overloaded" aggravating factors. Not only was the sentencing process significantly affected by the presence of invalid factors, but the sentence itself was not "rationally reviewable" by the Florida Supreme Court. Woodson v. North Carolina, 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976). Moreover, after an error of this kind has been made, it is completely impermissible for the Florida Supreme Court, and now this Court, to usurp the role of sentencer by guessing as to how the jury and the judge would have decided the case in the absence of the invalid aggravating factors.
 
 
 278
 The Florida Supreme Court's original rationale for upholding a death sentence which rests partially on invalid aggravating factors was that, in the presence of at least one valid aggravating factor and in the absence of any mitigating factors, "death is presumed to be the appropriate penalty." Ford v. State, 374 So.2d 496, 503 (Fla.1979), cert. denied, 445 U.S. 972, 100 S.Ct. 1666, 64 L.Ed.2d 249 (1980); Elledge v. State, 346 So.2d 998 (Fla.1977); State v. Dixon, 283 So.2d 1 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). The rationale was apparently modified to some extent in Brown v. State, 381 So.2d 690 (Fla.1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981), which held that the presence of a mitigating factor, characterized by the trial judge as of " 'some minor significance,' " was not sufficient to require resentencing in the face of the invalidity of an aggravating factor, when sufficient aggravating factors remained so that the court could know that the weighing process had not been compromised by the consideration of the invalid aggravating factors. Id. at 696.
 
 
 279
 The danger of the Brown approach becomes evident in this case, however, in that the Florida Supreme Court has essentially taken over the role of sentencer. At the sentencing hearing the petitioner not only presented the statutory mitigating factor of his age (20), but also presented substantial evidence of prior good character and loyal family commitment. The petitioner argues that he had only recently become involved in crime as a result of losing his last job, and a recent involvement with drugs. Instead of remanding the case so that the jury could properly reconsider and reweigh this mitigating evidence against the valid aggravating factors, the Florida Supreme Court took it upon itself to conclude that "the proper sentence is the death penalty." 374 So.2d at 503 (emphasis added). The Florida Court clearly imposed its own view of the proper outcome over that of the sentencing authority. Even if the jury and judge were to reach the same result on remand, it is error to substitute an appellate court decision for that of the trial court sentencing authority. Otherwise, there would have been no need ever to have empaneled the jury, or to submit the jury's recommendation to the judge for findings.
 
 
 280
 By substituting its own view of the evidence for that of the jury and the judge, the Florida Supreme Court disregards the fundamental premise of Proffitt, supra, that it is first of all the jury's, and then the judge's duty to consider "[w]hether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist; and ... [b]ased on these considerations, whether the defendant should be sentenced to life or death." Fla.Stat.Ann. Secs. 921.141(2)(b), (c), quoted in Proffitt v. Florida, supra, 428 U.S. at 248, 96 S.Ct. at 2964. Only after the jury and the judge have properly considered the evidence may the state supreme court "review" and "reweigh" the evidence. Proffitt, supra at 253, 96 S.Ct. at 2967. The initial jury decision, even though it is advisory, substantially affects the burden of proof to be applied by the trial judge and standard of review on appeal. "In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d 908, 910 (Fla.1975); quoted in Proffitt v. Florida, supra, 428 U.S. at 249, 96 S.Ct. at 2965. Thus it is essential that the weighing process be first undertaken by the jury, then by the judge, and only later by the Florida Supreme Court. To do otherwise is not only to introduce elements of unreliability, but to upset the "rationality and consistency" of death sentence administration. Proffitt, supra, 428 U.S. at 259, 96 S.Ct. at 2969.
 
 
 281
 In addition, the failure to require full resentencing after invalidating three aggravating factors abrogates the substance of petitioner's rights under Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In Lockett the Supreme Court held that the Eighth Amendment requires that the sentencer "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 98 S.Ct. at 2964 (emphasis in original). In Eddings the Court held that "Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer, refuse to consider, as a matter of law, any relevant mitigating evidence." 455 U.S. at 113, 102 S.Ct. at 875 (emphasis in original). The Supreme Court concluded that "... state courts must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances." Id. The jury and judge in this case could not have effectively weighed the evidence of petitioner's character and personal record when the state had improperly placed three invalid "weights" on the same set of scales. See Enmund v. Florida, --- U.S. ----, ----, 102 S.Ct. 3368, 3394, 73 L.Ed.2d 1140 (1982) (O'Connor, J., dissenting) ("Although the state statutory procedures did not prevent the trial judge from considering any mitigating circumstances, the trial judge's view of the facts, in part rejected by the state supreme court, effectively prevented such consideration."). Accordingly, the proper disposition of this case would require resentencing by both jury and judge.
 
 
 282
 For these reasons I dissent from Sections I and III of the majority opinion.
 
 
 283
 R. LANIER ANDERSON, Circuit Judge, concurring in part and dissenting in part, joined by CLARK, Circuit Judge, concurring as to Section B:
 
 A.
 
 284
 I concur in Part VI (Florida Supreme Court's Standard of Review) and Part VII (Assistance of Counsel at Sentencing) of Judge Roney's opinion for the majority. I concur in the result only in Part II (Instruction on Mitigating Circumstances) and Part IV (Admission of Ford's Oral Confession). I join the dissenting opinions of Chief Judge Godbold, Judge Johnson and Judge Kravitch with respect to Part I (Brown Issue). With respect to Part III (Failure to Require Resentencing When Evidence Insufficient on Some Aggravating Circumstances), I would certify this issue to the Florida Supreme Court, agreeing with most of what Judge Tjoflat has written in this regard.
 
 B.
 
 285
 I respectfully dissent from Part V of the majority opinion, relating to the appropriate standard of proof. I find merit in Ford's argument that the sentencing body must be convinced beyond a reasonable doubt that the mitigating circumstances are insufficient to outweigh aggravating circumstances.[1]
 
 
 286
 It is important to note at the outset that the reasonable doubt standard has been recognized in the context of the ordinary criminal trial as a matter of fundamental fairness, In Re Winship, 397 U.S. 358, 363, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), the absence of which "substantially impairs the truth-finding function." Ivan V. v. City of New York, 407 U.S. 203, 205, 92 S.Ct. 1951, 1952, 32 L.Ed.2d 659 (1972).
 
 
 287
 Ford's argument, that the factfinder must be convinced beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, presents a novel question. The most forceful reason[2] given by the majority in rejecting the argument is its assertion that the process of weighing is not "susceptible to proof by either party." The majority suggests that the sentencing body is required only to consider and weigh the several aggravating and mitigating factors, which thus guide and channel the sentencing function. The majority makes an implicit comparison to the traditional sentencing function where the trial judge weighs numerous factors and selects a sentence from among a wide range of options, e.g., a ten year sentence selected from a permissible range of zero to fifteen years. No one would suggest that the trial judge, in such traditional sentencing, can consider only subsidiary facts which are proven beyond a reasonable doubt, nor that the specific sentence selected, as opposed to one of several years more or several years less, must be justified beyond a reasonable doubt.
 
 
 288
 However, I respectfully suggest that the sentencing process in a death case is qualitatively different from traditional sentencing. Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion); Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (plurality opinion). As a result, the Supreme Court has made it clear that special procedures must govern the sentencing process in a death case. Among those special procedures, Florida has provided for a bifurcated hearing on sentencing which resembles the original trial in many respects, including the requirement that certain findings of fact must be made if the death sentence is to be imposed. See Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). Thus, the Florida sentencing phase is significantly different from the majority's conception of a mere consideration of enumerated aggravating and mitigating factors. The Florida statute expressly requires that certain prerequisite findings of fact be made:
 
 
 289
 Findings in support of sentence of death.--... the court ... shall set forth its findings upon which the sentence of death is based as to the facts:
 
 
 290
 (a) That sufficient aggravating circumstances exist ... and
 
 
 291
 (b) That there are insufficient mitigating circumstances to outweigh the aggravating circumstances.
 
 
 292
 Fla.Stat. Sec. 921.141(3) (emphasis added). The statutory scheme expressly provides that the determination of whether aggravating circumstances outweigh mitigating circumstances is a finding of fact.
 
 
 293
 This construction of the Florida statute is supported by Bullington v. Missouri, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). There the Supreme Court, in another context, recognized the significant difference between the sentencing process in a death case and traditional sentencing:
 
 
 294
 The procedure that resulted in the imposition of the sentence of life imprisonment upon petitioner Bullington at his first trial, however, differs significantly from those employed in any of the Court's cases where the Double Jeopardy Clause has been held inapplicable to sentencing. The jury in this case was not given unbounded discretion to select an appropriate punishment from a wide range authorized by statute. Rather, a separate hearing was required and was held, and the jury was presented both a choice between two alternatives and standards to guide the making of that choice. Nor did the prosecution simply recommend what it felt to be an appropriate punishment. It undertook the burden of establishing certain facts beyond a reasonable doubt in its quest to obtain the harsher of the two alternative verdicts. The presentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence. It was itself a trial on the issue of punishment so precisely defined by the Missouri statutes.
 
 
 295
 In contrast, the sentencing procedures considered in the Court's previous cases did not have the hallmarks of the trial on guilt or innocence. In Pearce,[3] Chaffin,[4] and Stroud,[5] there was no separate sentencing proceeding at which the prosecution was required to prove--beyond a reasonable doubt or otherwise--additional facts in order to justify the particular sentence. In each of the cases, moreover, the sentencer's discretion was essentially unfettered. In Stroud, no standards had been enacted to guide the jury's discretion. In Pearce, the judge had a wide range of punishments from which to choose with no explicit standards imposed to guide him. And in Chaffin, the discretion given to the jury was extremely broad.
 
 
 296
 451 U.S. at 438-39, 101 S.Ct. at 1858 (footnotes in original omitted) (emphasis added). See also Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).
 
 
 297
 Bullington demonstrates that the sentencing phase of a death case is significantly different from traditional sentencing, because the fact finder must choose between only two alternative penalties and because additional findings must be made to justify the death sentence. I submit that the majority has erred in perceiving the Florida scheme as a mere consideration of aggravating and mitigating factors, analogous to traditional sentencing; the Florida statute expressly requires two crucial findings of fact,[6] that sufficient aggravating circumstances exist and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances.
 
 
 298
 Implicit in the majority position is a further argument to the effect that even though the issue involves a finding, nevertheless it is a finding which results from the process of weighing subsidiary facts and it is a finding which involves a large measure of subjective judgment on the part of the fact finder. Such a finding, the majority apparently reasons, is not susceptible to proof under any objective standard. The fallacy of the argument, however, lies in the failure to perceive the standard of proof in terms of the level of confidence which the fact finder should have in the accuracy of his finding:
 
 
 299
 The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."
 
 
 300
 Addington v. Texas, 441 U.S. 418 at 423, 99 S.Ct. 1804 at 1807, 60 L.Ed.2d 323 (1979) (emphasis added) (quoting from In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring at 370, 90 S.Ct. at 1075)). The crux of my dissent is that it is both possible and necessary that the judge and jury have a high degree of confidence in the accuracy of the finding that the death penalty is warranted. The crucial difference between the majority and me is that the majority assumes that it is not possible or appropriate to apply any standard. I respectfully submit that the above quotation from Addington demonstrates that the Supreme Court has applied a standard of confidence in an analogous context. Accord, Santosky v. Kramer, --- U.S. ----, ----, 102 S.Ct. 1388, 1393, 71 L.Ed.2d 599 (1982).
 
 
 301
 I see no logical obstacle to a jury instruction--or a legal requirement upon the trial judge--to the effect that the instant finding must be made beyond a reasonable doubt, i.e., that the fact finder must have a high degree of confidence in the accuracy of the finding. To the contrary, many findings involve weighing of subsidiary facts and judgment similar to the instant finding. Indeed, the reasonable doubt standard is applied to comparable findings in the death penalty sentencing phase by numerous states as a matter of state law.[7] On the other hand, my research has disclosed no case, other than Judge Roney's opinion in this case, which has addressed the finding at issue here and held that it is not "susceptible to proof under any standard."
 
 
 302
 In Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the Supreme Court applied the clear and convincing evidence standard to a similar finding, thus implicitly rejecting the majority's assumption that such findings are not susceptible to proof under any objective standard. At issue there was the proper standard of proof applicable to the findings required for involuntary commitment of mentally ill persons. One of the prerequisite findings was whether the person was dangerous to himself or others such that he required hospitalization. Addington is instructive in the instant case because the nature of the finding there is very similar to the finding required in this case. In gauging a mentally ill person's danger to himself or others, the fact finder must weigh subsidiary facts. For example, past instances of dangerous behavior would be considered, as well as expert testimony concerning the nature of the person's illness, the possibilities that the illness could be controlled by drugs, the possibilities of recurrent episodes of the illness, and the likelihood of future instances of violence. The fact finder has to come to some conclusion as to the degree of dangerousness, and then weigh the danger to the person and society against the deprivation of liberty which involuntary commitment would entail; both require a large measure of judgment. The Supreme Court did not hesitate to require, as a matter of due process, that the fact finder have a high degree of confidence in the accuracy of its findings, i.e., the clear and convincing standard.
 
 
 303
 The instant finding--that aggravating circumstances sufficiently outweigh mitigating circumstances to justify the death sentence--is one similar in nature to that in Addington.
 
 
 304
 I acknowledge the complexity of the findings which are preconditions to the imposition of a sentence of death. This concession, however, relates not to whether to apply a standard of proof, but instead is relevant to which standard to apply. In Addington, for example, the Supreme Court expressed grave concern over the "uncertainties of psychiatric diagnosis," 441 U.S. at 432, 99 S.Ct. at 1812, remarking that such diagnosis is "to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician." 441 U.S. at 430, 99 S.Ct. at 1811. Nonetheless, the Addington court acknowledged that the finding was susceptible to proof pursuant to a standard; rather the concern for the difficulty of the decision facing the fact finder was viewed as but one of several criteria to be considered by a court in determining which standard of proof satisfies the dictates of due process. In fact in its most recent case, Santosky v. Kramer, --- U.S. ----, ----, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599 (1982), the Supreme Court relied upon the complexity of a finding as support for imposing a standard of proof higher than preponderance of the evidence. There the Court addressed the issue of what standard of proof is constitutionally required to support a finding of permanent neglect necessary to terminate parental rights. The "judgmental" and imprecise nature of the finding was deemed to magnify the chance of error, and therefore was a factor influencing the Court to require the clear and convincing standard of proof.
 
 
 305
 At such a proceeding, numerous factors combine to magnify the risk of erroneous factfinding. Permanent neglect proceedings employ imprecise subjective standards that leave determinations unusually open to the subjective values of the judge.
 
 
 306
 --- U.S. at ----, 102 S.Ct. at 1399 (emphasis added).
 
 
 307
 I respectfully submit that the majority is in error in its assumption that the instant finding is not susceptible to a standard of proof. Addington compels this conclusion.
 
 
 308
 Having concluded that some standard of proof is applicable to the instant finding, I turn to well established principles to determine which standard of proof is appropriate. Santosky v. Kramer, --- U.S. at ----, 102 S.Ct. at 1398; Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The function of the standard of proof is to allocate as between the parties the risk of error. Addington v. Texas, 441 U.S. at 423, 99 S.Ct. at 1807; In Re Winship, 397 U.S. at 363-64, 90 S.Ct. at 1072. The determination of which standard to apply involves assessing interests which the individual has at stake and weighing those against the State's interests. Addington v. Texas, 441 U.S. at 425, 99 S.Ct. at 1808. These interests have been weighed in the ordinary criminal case as follows:
 
 
 309
 "Where one party has at stake an interest of transcending value--as a criminal defendant his liberty--this margin of error is reduced as to him by the process of placing on the other party the burden of ... persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of ... convincing the factfinder of his guilt."
 
 
 310
 In Re Winship, 441 U.S. at 364, 90 S.Ct. at 1072 (quoting from Speiser v. Randall, 357 U.S. 513, 525-26, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460 (1958).
 
 
 311
 When the interest which the individual has at stake is life itself, and when it is recognized that an erroneously imposed death sentence is ultimately final precluding any correction of the error, and when Supreme Court precedent establishes the reasonable doubt standard as appropriate in ordinary criminal cases, little discussion should be necessary to conclude that the death penalty should be imposed only when the fact finder is convinced beyond a reasonable doubt. Although I submit that the propriety of the reasonable doubt standard is near obvious, the importance of the issue requires that I belabor the discussion.
 
 
 312
 The analysis required by Addington weighs the interests which the defendant has at stake against those of the State. The defendant's interests are obvious. Life is more precious than liberty, and of course due process requires the reasonable doubt standard in the ordinary criminal case involving the mere deprivation of liberty. Death is final; an erroneously-imposed death sentence is irretrievable. No one can dispute the transcendent value of the defendant's interests in avoiding an erroneously-imposed death sentence.
 
 
 313
 To suggest a lesser standard (or no standard) is to argue that the State has a legitimate interest in imposing the death penalty when there is a reasonable doubt as to its propriety. The bare statement of the argument reveals that it is unacceptable. The State's interests involve the protection of society against the dangerous propensities of the particular defendant, deterrence and vengence. Although the State's interests are legitimate and strong, they are satisfied in large measure whether or not the death penalty is imposed, because a life sentence is automatic if the death sentence is rejected. The State's interest in protecting society against this defendant could be discharged in full measure by providing for a life sentence without parole. While a finding which erroneously denies the death penalty may infringe to some degree on the State's interests in deterrence and revenge, the substituted life sentence serves these purposes in substantial degree. For example, those who contemplate committing capital crimes would face substantial deterrence in the knowledge that a sentencing body will impose the death penalty upon finding beyond a reasonable doubt that it is warranted, and in lieu thereof will impose a life sentence.
 
 
 314
 As noted earlier in this opinion, Addington recognizes that the complexity and difficulty of a particular finding sometimes operates as a practical consideration which weighs against using the highest, reasonable doubt standard of proof. I doubt that the finding at issue here is riddled with "subtleties and nuances" and "fallibility" to quite the same degree as the psychiatric diagnosis at issue in Addington. Indeed the reasonable doubt standard has apparently worked in the instant context as a practical matter, as evidenced by the fact that the standard is used in numerous states. See footnote 7, supra. In any event, this practical consideration is only one factor in the Addington analysis, and in the instant context is overbalanced by the transcending value of the interests which a defendant has in avoiding the erroneous imposition of the death sentence.
 
 Indeed, the Supreme Court has said:
 
 315
 [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.
 
 
 316
 Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion by Stewart, Powell, and Stevens, JJ.) (footnote omitted) (emphasis added).[8] Although the Supreme Court has not yet addressed the precise question of whether due process requires that the reasonable doubt standard be applied to the prerequisite findings in the sentencing phase of a death case, the Court has, in Woodson and numerous other cases, made clear its insistence on a high degree of reliability. Because the standard of proof is the prime instrument in allocating the risk of error and insuring reliability, the Supreme Court cases insisting on a high degree of reliability provide strong support for my position that the reasonable doubt standard is required.
 
 
 317
 In addition to the above discussed function of the standard of proof--i.e., allocation of the risk of error--Addington states another function: "to indicate the relative importance attached to the ultimate decision." 441 U.S. at 423, 99 S.Ct. at 1808. The Court alluded to this symbolic value in reference to cases involving individual rights where the standard of proof reflects the value society places on individual liberty. Id. at 425, 99 S.Ct. at 1808. Accord Santosky v. Kramer, --- U.S. at ----, 102 S.Ct. at 1397. Surely no other finding in the history of litigation is comparable in importance to the life or death issue in death cases. Accordingly, I submit that the reasonable doubt standard must apply.
 
 
 318
 For the foregoing reasons, I conclude that due process requires that the death penalty be imposed only when the fact finder is convinced beyond a reasonable doubt of the propriety of that penalty.[9]
 
 
 
 *
 Judge Joseph W. Hatchett was disqualified because of his participation in the case while a Justice of the Supreme Court of Florida
 
 
 [1]
 The petition for writ of habeas corpus alleged essentially seven contentions: (1) improper admission of an oral confession; (2) failure of the Florida Supreme Court to require resentencing when it found three of the statutory aggravating circumstances unsupported by the evidence; (3) improper state trial court instructions on mitigating circumstances; (4) failure of the Florida death law to require a finding that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt; (5) failure of the Florida Supreme Court to apply a consistent standard of reviewing the aggravating and mitigating circumstances in the case; (6) ineffective assistance of counsel at sentencing; and (7) review by the Florida Supreme Court of nonrecord materials in death cases, the so-called Brown issue
 
 
 [2]
 At least three bases of unconstitutionality are asserted: first, the practice would be inconsistent with the United States Supreme Court's past insistence on strict procedural regularity in the imposition and review of capital sentences; second, much of the alleged information may be inadmissible and unreliable hearsay, which petitioners should have the opportunity to cross-examine; and third, some of the material may be inadmissible under Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (psychiatrist's testimony concerning court ordered examination for competency to stand trial inadmissible at capital sentencing phase under Fifth and Sixth Amendments). See Brown v. Wainwright, 454 U.S. 1000, 1001, 102 S.Ct. 542, 543, 70 L.Ed.2d 407, 408 (1981) (J. Marshall, dissenting.) To some extent the decision turns on whether the Florida Supreme Court is "imposing" sentence or doing something qualitatively different. See Brown v. Wainwright, 392 So.2d at 1331
 
 
 [3]
 The Eleventh Circuit, in the en banc decision of Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981), adopted as precedent the decisions of the former Fifth Circuit decided prior to October 1, 1981
 
 
 [4]
 It is worth noting here that the members of the court who reviewed Ford's sentence on direct appeal, Justices England, Adkins, Boyd, Overton, Sundberg, and Hatchett, Ford v. State, 374 So.2d 496 (Fla.1979), were, but for one, all members of the court which considered the petition for writ of habeas corpus. Brown v. Wainwright, 392 So.2d at 1334
 
 
 [5]
 We note that this case is not binding precedent for the Eleventh Circuit since it is a decision by Unit A of the Former Fifth Circuit made after October 1, 1981. Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir.1982)
 
 
 [1]
 I generally agree, however, with the reservations about Part V that are expressed in footnote 2 of Judge Kravitch's dissent
 
 
 [2]
 In Gardner, the court decided that a trial judge may not to any extent impose a death sentence on the basis of nonrecord information. While Gardner failed to produce a majority opinion, a coherent rationale emerges from the case. The rationale, based either on the due process clause, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (plurality opinion), or the Eighth Amendment, 430 U.S. at 362, 97 S.Ct. at 1206 (White, J., concurring), holds that in death cases there is a heightened need for reliable factual determinations. See also Eddings v. Oklahoma, 455 U.S. 104, 117, 102 S.Ct. 869, 877, 71 L.Ed.2d 1, 12 (1982) (O'Connor, J., concurring); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976) (opinion of Stewart, Powell & Stevens, JJ.) ("there is a [special] ... need for reliability in the determination that death is the appropriate punishment"). Because "debate between adversaries is often essential to the truthseeking function", 430 U.S. at 360, 97 S.Ct. at 1205 (plurality opinion), reliance on nonrecord information creates an unacceptable danger that death will be wrongly imposed. 430 U.S. at 359-62, 97 S.Ct. at 1205-1206 (plurality opinion); 430 U.S. at 364, 97 S.Ct. at 1207 (White, J., concurring)
 The Florida Supreme Court held that Gardner does not apply to an appellate court because an appellate court does not "impose" a death sentence. Brown v. Wainwright, 392 So.2d 1327, 1332-33 (Fla.1981). Majority op. at 810 n. 2. The distinction between "imposition" and "review" of a death sentence ignores both Gardner's rationale and the integral role that the Supreme Court has envisaged for appellate review in death cases. See Gregg v. Georgia, 428 U.S. 153, 198, 205-06, 96 S.Ct. 2909, 2936, 2940, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell & Stevens, JJ.); Id. at 207, 223-24, 96 S.Ct. at 2941, 2948 (White & Rehnquist, JJ., & Burger, C.J., concurring).
 
 
 [3]
 But even if members of the court solicited the material with the thought it should, would or might be used in the review of capital sentences, the decision of the Florida court that it should not be so used, the statement that it was not used, and the rejection of the notion that it affected the judgment of the reviewing judges of the court ends the matter when addressed at the constitutional level
 Majority op. at 811 (emphasis added).
 
 
 [4]
 Appellate courts routinely accept a trial judge's assurances that, although he has seen evidence, he has not relied upon it. The most common situation occurs where, in a bench trial, a judge examines evidence and then rules it inadmissible. See Harris v. Rivera, 454 U.S. 339, 346, 102 S.Ct. 460, 465, 70 L.Ed.2d 530, 536 (1981) ("in bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions"). Judge Tjoflat develops this point more fully at p. 833 of his separate opinion
 
 
 [5]
 Relying in part on a sentence buried in the trial judge's findings written well after the jury had completed its deliberations, the majority asserts that the jury did not feel bound to consider only those mitigating factors explicitly listed in the Florida statute. Except in the situation where the overall jury charge explains or corrects an erroneous instruction, not applicable here, neither trial judge nor appellate court can "know" that a jury did not consider itself bound by any particular erroneous or misleading instruction
 
 
 [6]
 In Stephens, the Court was confronted with an issue closely related to the one presently before us. There the jury found three aggravating and no mitigating circumstances and sentenced the defendant to death. The Supreme Court of Georgia held one of the aggravating circumstances invalid under the federal constitution but nevertheless affirmed the sentence. The Supreme Court certified the following question to the Supreme Court of Georgia: "What are the premises of state law that support the conclusion that the death sentence in this case is not impaired by the invalidity of one of the statutory aggravating circumstances found by the jury?" --- U.S. at ---- - ----, 102 S.Ct. at 1859, 72 L.Ed.2d at 227-28
 
 
 [7]
 Use of a harmless error rule might also be unconstitutional where the appellate court affirms a death sentence based on a theory not considered at trial. Due process would seem to require that the defendant have an opportunity to advance legal arguments and introduce evidence on the sentencing theory used. See Presnell v. Georgia, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978). Here the Florida Supreme Court affirmed the sentence based only on factors that were considered by the trial judge and jury
 
 
 [1]
 Furthermore, I note that petitioner does not contend that he received an improper hearing either before the state circuit court on his motion for post-conviction relief or before the federal district court, on his claim of ineffective assistance of counsel. On the contrary, the state circuit court conducted an exhaustive hearing on this claim. The federal district court would have been well within its discretion merely to adopt the findings of the state court and deny petitioner the opportunity to present further evidence. In an abundance of caution, the federal district court did entertain such evidence. Petitioner asserts no reason for this court to question the findings and conclusions of the federal district court or of the state circuit court, both of which were able to judge the credibility of the witnesses who testified for petitioner regarding his claim of ineffective assistance of counsel
 
 
 [2]
 I note that petitioner never presented his proportionality claim to the state courts and therefore never exhausted it. Because the state has not raised the exhaustion issue, however, it has waived it. Lamb v. Jernigan, 683 F.2d 1332, 1335 n. 1 (11th Cir.1982). See note 23 infra
 
 
 [3]
 The Florida death penalty statute in force at the time of petitioner's offense and sentence provided:
 
 
 [921]
 141 Sentence of death or life imprisonment for capital felonies; further proceedings to determine sentence.--
 (1) SEPARATE PROCEEDINGS ON ISSUE OF PENALTY.--Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment as authorized by s. 775.082. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a special juror or jurors as provided in chapter 913 to determine the issue of the imposition of the penalty. If the trial jury has been waived, or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose, unless waived by the defendant. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections and . Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Florida. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.
 (2) ADVISORY SENTENCE BY THE JURY.--After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:
 (a) Whether sufficient aggravating circumstances exist as enumerated in subsection ;
 (b) Whether sufficient mitigating circumstances exist as enumerated in subsection , which outweigh the aggravating circumstances found to exist; and
 (c) Based on these considerations, whether the defendant should be sentenced to life [imprisonment] or death.
 (3) FINDINGS IN SUPPORT OF SENTENCE OF DEATH.--Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:
 (a) That sufficient aggravating circumstances exist as enumerated in subsection , and
 (b) That there are insufficient mitigating circumstances, as enumerated in subsection , to outweigh the aggravating circumstances.
 In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in subsections and and upon the records of the trial and the sentencing proceedings. If the court does not make the findings requiring the death sentence, the court shall impose sentence of life imprisonment in accordance with s. 775.082.
 (4) REVIEW OF JUDGMENT AND SENTENCE.--The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida within 60 days after certification by the sentencing court of the entire record, unless the time is extended for an additional period not to exceed 30 days by the Supreme Court for good cause shown. Such review by the Supreme Court shall have priority over all other cases and shall be heard in accordance with rules promulgated by the Supreme Court.
 (5) AGGRAVATING CIRCUMSTANCES.--Aggravating circumstances shall be limited to the following:
 (a) The capital felony was committed by a person under sentence of imprisonment.
 (b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.
 (c) The defendant knowingly created a great risk of death to many persons.
 (d) The capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.
 (e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
 (f) The capital felony was committed for pecuniary gain.
 (g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
 (h) The capital felony was especially heinous, atrocious, or cruel.
 (6) MITIGATING CIRCUMSTANCES.--Mitigating circumstances shall be the following:
 (a) The defendant has no significant history of prior criminal activity.
 (b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.
 (c) The victim was a participant in the defendant's conduct or consented to the act.
 (d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.
 (e) The defendant acted under extreme duress or under the substantial domination of another person.
 (f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
 (g) The age of the defendant at the time of the crime.
 Fla.Stat. Sec. 921.141 (1975).
 
 
 [4]
 See note 21 infra
 
 
 [5]
 In his motion for post-conviction relief before the circuit court, the petitioner also claimed that his trial counsel was ineffective. See note 1 supra. Petitioner did not raise the claim that the Florida Supreme Court impermissibly failed to require resentencing despite the invalidity of three out of eight aggravating circumstances, i.e., the Stephens claim; he never raised this claim in any state proceeding. See note 23 infra
 
 
 [6]
 The court also affirmed the circuit court's holding that petitioner did not prove ineffective assistance of his trial counsel
 
 
 [7]
 Petitioner raised the Stephens claim despite his failure to exhaust his state remedies. See note 23 infra
 
 
 [8]
 The district court did not apply Sykes to bar petitioner's claim that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt because petitioner did not raise this claim in district court as an attack on the state court jury instructions. As discussed in Part IV infra, the district court erred in failing to apply Sykes to this claim
 
 
 [9]
 The state did not raise petitioner's failure to exhaust the lattermost claim in state court. See note 23 infra
 
 
 [10]
 The panel did not reach the merits, however, of the constitutionality of petitioner's oral confession because petitioner had committed a procedural default and because he did not satisfy the Sykes cause and prejudice standard
 In addition, before the panel, the petitioner argued only that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt. He did not argue, at least in his initial brief, that aggravating circumstances must be proved beyond a reasonable doubt. The panel opinion does not address the latter claim. Technically, therefore, this claim is not properly before this en banc court.
 
 
 [11]
 See note 3 supra
 
 
 [12]
 My resolution of the cause issue makes it unnecessary for me to decide the question of prejudice. Nevertheless, I note that petitioner's introduction of evidence on nonstatutory mitigating factors, and the trial court's allowance of argument on such evidence, strongly suggests that petitioner could not have been prejudiced by the challenged instruction, which at worst was merely an ambiguous instruction to an advisory jury. The state never even attempted to exploit this ambiguity. Petitioner's claim that this perhaps ambiguous instruction, which enabled his attorney to present his case to the jury in the best light possible, resulted in a "miscarriage of justice," Supplemental Brief for Petitioner-Appellant on Rehearing En Banc at 24 n. 11, borders on the frivolous
 
 
 [13]
 Also supporting this conclusion is petitioner's failure ever to ask his trial attorney why he had failed to object to the challenged instruction. At petitioner's state hearing on his motion for post-conviction relief, he called other attorneys to testify about his former counsel's incompetence but he never called his former counsel, who was present at the hearing. At his federal habeas hearing, petitioner did call his state trial counsel, but still avoided questioning him about his failure to object to the Lockett instruction. Thus, petitioner's failures at both the state and federal levels to question his former counsel about counsel's reasons for not objecting further support the conclusion that counsel's failure to object was a deliberate trial stratagem
 
 
 [14]
 Because of the importance of applying the proper analysis to determine "cause" under Sykes, I must comment on Judge Kravitch's dissenting opinion. We have stated: "One of the major concerns expressed by the Court [in Sykes ] was to eliminate 'sandbagging' by defense lawyers who consciously chose to raise constitutional claims for the first time in a federal habeas proceeding." Huffman v. Wainwright, 651 F.2d 347, 351 (5th Cir.1981) (citation omitted). Judge Kravitch's opinion, however, actually would encourage sandbagging. Judge Kravitch decides that petitioner need not have objected to an instruction that he now challenges, because state law was unfavorable to the merits of his claim and no authoritative, federal pronouncement on the constitutional basis for the challenge existed, at the time of trial. Opinion of Kravitch, Circuit Judge, at 858. This approach would relieve the defense lawyer of any obligation to object to the law the trial court has determined to apply, although such law is unfavorable to his client, and although an objection at trial is the only way the issue can properly be preserved for appeal to the state appellate courts. Indeed, Judge Kravitch's approach, by allowing counsel to forego an objection in state court and later to raise it in federal court, would implicitly instruct counsel not to object unless the federal constitutional right is already well established. This interpretation of "cause" would render a state's contemporaneous objection rule wholly inapplicable when there was no authoritative constitutional pronouncement from a federal court to tell the lawyer he has a basis for an objection. It also would discard the lawyer's traditional obligation to object when he thinks error detrimental to his client is being committed. Moreover, it would ensure that the state courts would be precluded from interpreting the Federal Constitution because such courts would be confronted only with those constitutional claims on which a federal court has spoken authoritatively. This result would fly in the face not only of Sykes, but of every case ever to recognize that in our federal system, it is a basic notion that state judges are obligated to, and do, uphold the Constitution in the same manner as do their federal counterparts
 
 
 [15]
 See note 10 supra. I note that petitioner could have raised these claims in state court either on state grounds, State v. Dixon, 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974), or on federal grounds. This court is concerned, however, only with petitioner's federal grounds. Whether petitioner's claims are supported by state law is irrelevant to whether the Federal Constitution compels the result for which petitioner contends
 
 
 [16]
 The district court's failure to apply Sykes to the claim that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt does not excuse the majority's failure to do so
 
 
 [17]
 Because of the majority's resolution on the merits of the question whether aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt, and in response to the dissent of my brother Anderson, I am compelled to state my own preliminary views on this issue
 I believe Judge Anderson's characterization of the process of weighing aggravating circumstances against mitigating circumstances as a "finding of fact," Opinion of Anderson, Circuit Judge, at 878, is "clearly erroneous." In determining whether aggravating circumstances outweigh mitigating circumstances, the sentencer makes no finding of fact, but rather engages in a normative determination whether the circumstances of the case are such that the death penalty may properly be imposed. By determining that one set of circumstances outweighs the other, the sentencer makes a normative, policy decision. The sentencer in effect determines state sentencing policy by formulating a norm, based on the facts of the case before it, to be followed by other sentencers in similar cases. The sentencer, therefore, acts not as factfinder, but as policymaker.
 The Supreme Court has made it clear that such decisions as whether aggravating circumstances outweigh mitigating circumstances are normative determinations that must be consistent with each other. For example, in upholding the constitutionality of the Florida capital punishment scheme, the Court stated:
 Under Florida's capital-sentencing procedures, in sum, trial judges are given specific and detailed guidance to assist them in deciding whether to impose a death penalty or imprisonment for life. Moreover, their decisions are reviewed to ensure that they are consistent with other sentences imposed in similar circumstances. Thus, in Florida, as in Georgia, it is no longer true that there is " 'no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' "
 Proffitt v. Florida, 428 U.S. 242, 253, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976) (quoting prior decisions). And in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Court stated:
 [O]ne of the most important functions any jury can perform in making such a selection [as whether to impose capital punishment] is to maintain a link between contemporary community values and the penal system--a link without which the determination of punishment could hardly reflect "the evolving standards of decency that mark the progress of a maturing society."
 Id. at 519 n. 15, 88 S.Ct. at 1775-76 n. 15, quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).
 The inquiry does not end, however, with a determination that whether aggravating circumstances outweigh mitigating circumstances is a normative, policy decision rather than a finding of fact. The majority states: "The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party." Majority Opinion at 818. The majority seems to believe that this statement ends the inquiry. Although I believe the court's statement that one does not apply a standard of proof to a weighing process is correct, it is possible to apply a standard of confidence to such a process. Therefore, the court does not adequately address my brother Anderson's argument that there is no logical obstacle to requiring the jury to have "a high degree of confidence" in its determination that aggravating circumstances outweigh mitigating circumstances. Opinion of Anderson, Circuit Judge, at 879.
 Having determined that one could impose a high standard of conviction on a sentencing, policy decision, the question becomes whether there is any constitutional requirement that this court do so in this case. It is this question which I do not answer because of my disposition of this claim on Sykes grounds. Preliminarily, I am inclined to believe that relevant to this inquiry would be the significant due process protections already embedded in the Florida capital punishment scheme, many of which the Supreme Court recognized in holding in Proffitt, 428 U.S. at 259, 96 S.Ct. at 2970, that the Florida scheme "passes constitutional muster." These protections include: a separate evidentiary hearing before an advisory jury and the sentencing judge to determine the appropriate sentence, Fla.Stat. Sec. 921.141(1); a recommended sentence by an advisory jury, id. Sec. 921.141(2); the requirement that the trial court, in imposing the death sentence, "set forth in writing its findings upon which the sentence ... is based," including the existence of aggravating and mitigating circumstances and the determination that aggravating circumstances outweigh mitigating circumstances, id. Sec. 921.141(3); and independent appellate review to determine that the capital sentence is warranted and is not disproportionate, id. Sec. 921.141(4). See note 3 supra.
 
 
 [18]
 This material allegedly included "pre-sentence investigations, psychiatric evaluations or contact notes made in the corrections system after conviction, and psychological screening reports made after conviction by corrections personnel." Brown, 392 So.2d at 1330 (footnote omitted)
 
 
 [19]
 I cannot agree with Judge Kravitch that the Florida Supreme Court's discussion of Gardner implies that the court believed there was "no state law barrier" to its reliance on nonrecord material. Opinion of Kravitch, Circuit Judge, at 851. This statement ignores all of the language quoted above. Rather, the court clearly held that under state law it did not rely on nonrecord material. I do not believe the court's obligatory reference to Gardner alters that holding
 
 
 [20]
 I note now that although the Florida Supreme Court explained its sentence review function in Brown, this court, to decide petitioner's Stephens claim, still needs further clarification of that court's role in reviewing capital sentences. See Part VI infra
 
 
 [21]
 The court held that the evidence did not support the following circumstances: "[t]he capital felony was committed by a person under sentence of imprisonment," Fla.Stat. Sec. 921.141(5)(a); and "[t]he defendant was previously convicted of another capital felony involving the use or threat of violence to the person," id. Sec. 921.141(5)(b). The court held that the following two aggravating circumstances were in fact only one such circumstance: "[t]he capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of ... any [robbery or certain other enumerated crimes], id. Sec. 921.141(5)(d); and "[t]he capital felony was committed for pecuniary gain," id. Sec. 921.141(5)(f)
 
 
 [22]
 See note 3 supra
 
 
 [23]
 Initially, I note that petitioner never raised this claim in state court. I assume the state provided this court with all of petitioner's "briefs on appeal," as mandated by 28 U.S.C. Sec. 2254, Federal Habeas Rule 5, including any briefs filed in support of petitioner's motion for rehearing in the Florida Supreme Court. I can discern no Stephens claim from any of these materials
 Petitioner could have raised his Stephens claim in state court by petitioning the Florida Supreme Court for rehearing, Fla.R.App.P. 9.330, or by filing a petition for a writ of habeas corpus invoking the Florida Supreme Court's original jurisdiction, Fla.R.App.P. 9.100. Had the state opposed petitioner's claim in the district court for want of exhaustion, we would be required to dismiss the claim. See Rose v. Lundy, --- U.S. ----, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Under Lamb v. Jernigan, 683 F.2d 1332, 1335 n. 1 (11th Cir.1982), the state waives the exhaustion requirement by failing to raise it, which is what occurred here. Therefore, under Lamb this court should consider petitioner's Stephens claim.
 Moreover, the Stephens case itself implicitly compels this court to reach the merits of petitioner's claim despite petitioner's failure to exhaust. As discussed in the text, Stephens controls this case because it presented the same issue to the Supreme Court that now faces this court. In Stephens, Stephens attempted to exhaust his state remedies by filing a petition for writ of habeas corpus in the Georgia Supreme Court. Stephens v. Hopper, 241 Ga. 596, 247 S.E.2d 92, cert. denied, 439 U.S. 991, 99 S.Ct. 593, 55 L.Ed.2d 667 (1978). In that petition, Stephens' complaint was that that court's affirmance of his sentence despite the invalidity of one aggravating circumstance was impermissible "because presenting evidence to the jury to support that invalid aggravating circumstance was prejudicial error." 241 Ga. at 603, 247 S.E.2d at 97. Stephens did not argue, however, that the Georgia Supreme Court's earlier action in affirming his sentence "create[d] such potential for the intrusion of arbitrary influences into his sentence as to violate his constitutional rights ...." Stephens v. Zant, 631 F.2d 397, 405 (5th Cir.1980), modified, 648 F.2d 446 (5th Cir.1981). Instead, this amorphous claim was first raised in federal court on Stephens' application for a writ of habeas corpus. Although these claims are related, they are very different; the Georgia Supreme Court could not have been apprised of petitioner's federal constitutional claim by his invocation of his state evidentiary claim. Therefore, Stephens also involved a case of failure to exhaust state remedies.
 Despite Stephens' failure to exhaust the claim he presented to the federal courts, and, as I discuss in the text at 842-843 infra, although the Supreme Court could not decipher petitioner's claim because such claim had not been exhausted, the Supreme Court noted that Stephens had "exhaust[ed] his state post-conviction remedies," --- U.S. at ----, 102 S.Ct. at 1855 (emphasis added), and proceeded to address the merits of his claim. Apparently, the Court believed it was enough that Stephens had exhausted his state post-conviction remedies, and that he did not have to exhaust each of his claims. The following considerations negate any suggestion that the Court believed that Stephens had exhausted his claim: first, the Court's failure to say so explicitly; second, both this court's and the Supreme Court's failure to mention, in discussing the merits of his claim, the Georgia Supreme Court's opinion in Stephens v. Hopper, the only case in which Stephens may have exhausted his claim. Presumably, if petitioner had exhausted his claim before the Georgia Supreme Court, that court's decision would have been relevant to this court and to the Supreme Court; and third, the Supreme Court's need to invoke the Georgia certification procedure to obtain clarification on a state law question. As discussed below, such clarification probably would have been unnecessary had the Georgia Supreme Court had a chance to rule on petitioner's claim. In sum, one must conclude that the Supreme Court did not believe that petitioner had exhausted his claim.
 Because Stephens did not exhaust his claim, and because the Court reached the merits of that claim, Stephens compels this court also to reach the merits of petitioner's claim, despite his failure to exhaust. If Stephens did not require this court to reach the merits of petitioner's claim, I would be inclined to dismiss the petition without prejudice to petitioner exhausting his claim in state court, despite the state's failure to raise the exhaustion issue. Had petitioner in this case, and respondent in Stephens, properly exhausted their claims, this court, and the Supreme Court, might have had the benefit of a much clearer presentation of the constitutional issue. Indeed, in Stephens the Court was compelled to invoke the Georgia certification procedure in order to seek clarification on a state law question. --- U.S. at ----, 102 S.Ct. at 1859. Had the Georgia Supreme Court initially had a chance to rule on the claim, and in so ruling, the chance to explain its rationale, the United States Supreme Court may have found it unnecessary to invoke the state certification procedure. This court is now faced with the same problem. Because of unclear state law, which might have been clarified had petitioner properly exhausted his claim, I believe it is necessary to invoke the Florida certification procedure, which this court is compelled to do under Zant v. Stephens.
 
 
 [24]
 See note 23 supra
 
 
 [25]
 In Stephens, the jury imposed the death sentence. In this case the jury was only advisory, and the trial court imposed the sentence. This difference is not a basis for distinguishing Stephens, and the majority makes no attempt to state otherwise. The issue in both Stephens and in this case involves the function of the reviewing court. On this issue, it makes no difference whether the sentence is imposed by a judge or by a jury
 
 
 [26]
 Although I believe that Stephens is indistinguishable from this case, I do not agree with Judge Kravitch's reasoning that the two cases are indistinguishable because in both cases the sentencing court considered improper evidence. Opinion of Kravitch, Circuit Judge, slip op. at 866. Judge Kravitch states, in connection with petitioner's sentencing, that "the defendant's 'admi[ssion] [of] the unlawful sale of narcotics drugs,' is irrelevant to any [proper statutory aggravating factors]." Id. at 866 n. 42. First, as I state in the text, I believe that neither this court nor the Supreme Court was concerned with the admission of improper evidence in Stephens. Second, I believe that Judge Kravitch overlooks that the sentencing court in this case considered the above evidence not only in support of the improper aggravating circumstance that "defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person," Fla.Stat. Sec. 921.141(5)(b), but also to rebut the mitigating circumstance petitioner sought to prove, that "defendant has no significant history of prior criminal activity," Fla.Stat. Sec. 921.141(6)(a). Ford v. State, 374 So.2d at 500 n. 1. Therefore, this evidence was properly before the sentencing judge, despite the invalidity of the above aggravating circumstance
 
 
 [27]
 The reason the rule amounts to a conclusive rather than a rebuttable presumption is that it is employed on review and, therefore, the defendant has no opportunity to meet the presumption. The fact that a presumption employed on review must be conclusive highlights that presumptions were meant to be used as an evidentiary tool at trial, and not on review. See Fed.R.Evid. 301
 
 
 [28]
 As I discuss in the text at 843 infra, Justice Sundberg of the Florida Supreme Court foresaw this problem in Elledge v. State, 346 So.2d 998 (Fla.1977)
 
 
 [29]
 The Florida Supreme Court has invoked the rule at issue in the following cases: Enmund v. State, 399 So.2d 1362, 1373 (Fla.1981); Armstrong v. State, 399 So.2d 953, 962-63 (Fla.1981); Sireci v. State, 399 So.2d 964, 971 (Fla.1981); Demps v. State, 395 So.2d 501, 506 (Fla.), cert. denied, 454 U.S. 933, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981); Brown v. State, 381 So.2d 690, 696 (Fla.1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981); Dobbert v. State, 375 So.2d 1069, 1071 (Fla.1979), cert. denied, 447 U.S. 912, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980); Hargrave v. State, 366 So.2d 1 (Fla.1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979); LeDuc v. State, 365 So.2d 149, 152 (Fla.1978), cert. denied, 444 U.S. 885, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979)
 
 
 [30]
 Florida Rule of Appellate Procedure 9.150(a) provides: "Upon either its own motion or that of a party, the Supreme Court of the United States or the United States Court of Appeals may certify a question of law to the Supreme Court of Florida whenever the answer is determinative of the cause and there is no controlling precedent of the Supreme Court of Florida."
 
 
 [31]
 I use the word "usually" because the sentencer clearly has the discretion to impose a sentence of life imprisonment even if it finds many aggravating circumstances and no mitigating circumstances. Fla.Stat. Sec. 921.141(2)(c) & (3)
 
 
 [32]
 I note that although petitioner introduced mitigating evidence at his sentencing trial, apparently this evidence did not rise to the level of any mitigating circumstances, statutory or otherwise, because the Florida Supreme Court, in applying its presumption rule in Ford, explicitly stated that there were "no mitigating factors present." 374 So.2d at 503. It is not clear to me from the sentencing court's order whether this was in fact the case. The sentencing court concluded: "There are no mitigating circumstances existing--either statutory or otherwise--which outweighs any aggravating circumstances, to justify a sentence of life imprisonment rather than a sentence of death." Id. at 501 n. 1. This statement is ambiguous. It may mean that no mitigating circumstances existed at all, or that those that did exist did not outweigh the aggravating circumstances present. Nevertheless, the Florida Supreme Court adopted the former interpretation, and I accept that interpretation for purposes of adjudicating petitioner's claim
 
 
 [33]
 Although the supreme court's statement of its role in Brown v. Wainwright, 392 So.2d 1327 (Fla.), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981), tends to negate that it acts as a pure resentencing court, I do not believe that Brown, in which the court was faced with a claim totally different from the one here, see Part V supra, eliminates this possibility. The court may in some instances act as a resentencing court, yet still have no discretion, under state law, to consider nonrecord material in performing its resentencing function
 
 
 [34]
 Similarly, I read Chief Judge Godbold also as embracing the third possibility. He suggests that the Florida Supreme Court in Ford applied a rule of "harmless error." If the Florida Court acted as a resentencer, the second possibility I have posed, it would probably not apply a rule of harmless error because the error most likely would be irrelevant, rather than harmless. The term "harmless" connotes harmless to the trial court's sentence. If the court used a harmless error rule as a resentencer in Ford, it would have had to explain what relevance the trial court's original sentence had to its resentence. Because no such explanation exists, it is unlikely that the court applied a rule of harmless error as a resentencing court. The first possibility I have posed, that the court, as a reviewing court, knew what the sentencer would have done is so at odds with reality, as discussed in the text at 840 supra, that I cannot read the Chief Judge's opinion as embracing it. Therefore, he must be embracing the third possibility, as does the majority. Although the Chief Judge recognizes the seriousness of the petitioner's claim as framed by the third rationale, which the majority does not, he fails, as does the majority, to recognize that the rationale he imputes to the Florida Supreme Court is only one of many possibilities and that until we can determine conclusively the proper rationale, we cannot decipher petitioner's constitutional claim, and, therefore, cannot decide this case
 
 
 [35]
 See note 23 supra
 
 
 [36]
 At this point, a petition for a writ of habeas corpus would probably be the only way in which petitioner could present this claim directly to the Florida Supreme Court. A rehearing would almost certainly not be available. See Fla.R.App.P. 9.330(a) & (b)
 
 
 [37]
 As I describe at note 23 supra, the notion of finality would best be served if courts were careful to dismiss unexhausted claims. This case is the ultimate example of a claim the form of which no one can determine because of petitioner's failure to exhaust his state remedies. The courts should not, however, accept total blame for the quandary we are in today. The state, which is often heard to complain that federal courts are not sensitive enough to the finality of state proceedings, must share some of the blame because of its failure to raise in federal court the petitioner's failure to exhaust
 
 
 [1]
 Additionally, I have reservations that Fed.R.App.P. 42(b) can be interpreted to preclude appellant's effort to dismiss his appeal. Rule 42(b) can be interpreted as giving an appellant the right to dismiss an appeal subject only to terms properly fixed by the court or the parties. In my view, no such terms are in force here. I question whether a timeliness restriction is a term that can be "fixed by the court," particularly subsequent to the filing of the motion to dismiss. Furthermore, there is a possible Article III case or controversy problem, going to the heart of our power to issue this opinion, which is raised by appellant's effort to dismiss his appeal. See, e.g., United States Parole Commission v. Geraghty, 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980), quoting Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973) (" 'requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)' "). This issue deserves more thorough consideration
 1a In Part VI, the majority addresses petitioner's claim that the Florida Supreme Court failed to apply a consistent standard of review in affirming the trial court's findings on aggravating and mitigating factors. Having reviewed petitioner's claim, I agree with the majority that the Florida Supreme Court's affirmance of these findings was consistent with its prior decisions and was not arbitrary, capricious, or otherwise in violation of petitioner's eighth amendment rights. Although I am in basic agreement with the majority's reasoning on this issue, one point needs clarification. The majority's statement that federal courts "will not undertake a case-by-case comparison of the facts in a given case with the decisions of the state supreme court," Majority Opinion, supra at 819 (citing Spinkellink v. Wainwright, 578 F.2d 582, 604-05 (5th Cir.1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979)), correctly articulates the fundamental principle that federal courts do not sit to review state courts' decisions on matters of state law. This statement should not be understood to deny the federal courts authority to review state courts' application of capital sentencing criteria for compliance with federal constitutional requirements, however. Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) demonstrates that such review is proper and that federal courts will reverse death sentences that--though based on proper statutory criteria--reflect an interpretation of such criteria so vague or broad as to violate the eighth amendment requirement of channelled sentencer discretion. Comparison of the case in which such federal challenge is being made to other cases in which the state court has applied the statutory criteria, albeit not conclusive, is relevant to the determination whether the criteria are being constitutionally applied. See id. at 429-33, 100 S.Ct. at 1765-67. The language in the Spinkellink opinion reflecting a contrary view is no longer valid after Godfrey.
 
 
 [2]
 In Part V of its opinion, the majority states three reasons for rejecting petitioner's argument that his rights under In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) were violated by the state courts' failure to require that the sentencer find beyond a reasonable doubt that there were insufficient mitigating factors to outweigh the aggravating factors. I join in the majority's conclusion that petitioner's claim must be rejected for the third reason stated in the opinion: Ford's argument confuses the process of finding facts, to which the Winship case was addressed, with the altogether different process of weighing circumstances. The weighing process, which occurs only after the relevant facts have been found, necessarily involves subjective, normative judgments on the part of the sentencing tribunal. To apply the standard that was designed to govern the quantum of proof to the process of normative judgment simply does not make sense. For this reason only, I concur in the majority's rejection of petitioner's fifth claim
 I do not agree with the other reasons articulated by the majority for rejecting this claim, however. The first reason the majority states is that the due process standard established in Winship governing burden of proof in criminal cases has no bearing on the sentencing phase of a capital trial. Such statement in effect decides petitioner's alternative argument--that proof of the existence of aggravating and mitigating factors must be sufficient to meet the Winship beyond-a-reasonable-doubt standard. As the majority notes, Majority Opinion, supra at 819, this latter assertion was not made before the panel and is not properly before the en banc court. For this reason, and because the extent of due process protection to which capital defendants are entitled at sentencing is an open and difficult question that should not be reached without full briefing and argument, see Gardner v. Florida, 430 U.S. 349, 358 & n. 9, 97 S.Ct. 1197, 1204 & n. 9, 51 L.Ed.2d 393 (1977), I would not dispose of petitioner's claim on such broad grounds. Nor do I agree with the majority's reliance on Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), in which the Supreme Court upheld Florida's capital sentencing statute on its face, as a basis for rejecting petitioner's Winship claim. The Supreme Court in Proffitt was not asked to decide the issue raised by petitioner here; nor did it decide that issue gratuitously. It held only that the statutory aggravating and mitigating factors, as related in the trial court's instructions in that case, were sufficiently narrow and well-defined to overcome the problems of arbitrary and unguided sentencing identified in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). An approach to constitutional decisionmaking that construes the Supreme Court's approval of a statute on certain constitutional grounds as validating the enactment against any other constitutional challenge, though an easy method of avoiding difficult questions, in my view constitutes a serious abdication of judicial responsibility. Hence, I do not join in that part of the majority's reasoning.
 
 
 [3]
 This court is bound by prior decisions of the former Fifth and Eleventh Circuits unless the en banc court expressly overrules them. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc)
 
 
 [4]
 The argument that Gardner is inapplicable originated in the Florida Supreme Court, Brown v. Wainwright, 392 So.2d at 1331-33, and was adopted in toto by the panel majority, Ford v. Strickland, 676 F.2d at 444. The en banc majority refers to it approvingly. See Majority Opinion, supra at 810 & n. 2 (emphasizing Gardner's holding that "death sentence may not be imposed ... on nonrecord, unchallengeable information" and noting that determination whether use of nonrecord information in this case was unconstitutional "[t]o some extent ... turns on whether the Florida Supreme Court is 'imposing' sentence or doing something qualitatively different. See Brown v. Wainwright, 392 So.2d at 1331")
 
 
 [5]
 See Gardner v. Florida, 430 U.S. at 357, 97 S.Ct. at 1204 (citing various concurring and dissenting opinions in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)). See also Eddings v. Oklahoma, 455 U.S. 104, 118, 102 S.Ct. 869, 878, 71 L.Ed.2d 1, 13 (1982) (O'Connor, J., concurring); Lockett v. Ohio, 438 U.S. at 604, 98 S.Ct. at 2964 (Burger, C.J., joined by Stewart, Powell, and Stevens, JJ.) ("qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed")
 
 
 [6]
 In 1976 the Court considered constitutional challenges to five states' post-Furman capital sentencing statutes. See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976)
 
 
 [7]
 In Gardner, the trial judge had ordered a presentence investigation after the jury had returned an advisory verdict recommending a life sentence. The judge had then disclosed part, but not all, of the presentence investigation report to the defendant's counsel and, apparently on the basis of the report, had rejected the jury's advisory verdict and sentenced the defendant to death. Gardner v. Florida, 430 U.S. at 352-53, 97 S.Ct. at 1201-02
 
 
 [8]
 The plurality opinion in Gardner expressly held that the sentencing procedure at issue violated the due process clause of the fourteenth amendment. Gardner v. Florida, 430 U.S. at 351, 358, 97 S.Ct. at 1201, 1204. The opinion's emphasis on the difference in kind between the death penalty and other punishments, id. at 357-58, 97 S.Ct. at 1204-05, rejection of some arguments that it conceded might have merit in noncapital cases, id. at 360, 97 S.Ct. at 1205-06, and heavy reliance on Furman and other death penalty decisions, id. at 360-61, 97 S.Ct. at 1205-06, however, indicate that the plurality's reasoning involved a cross-section of eighth amendment and due process concerns. Justice White's concurring opinion expressed the view that the procedure at issue clearly violated the eighth amendment and thus that there was no need to address the due process issue. Id. at 362-64, 97 S.Ct. at 1207 (White, J., concurring). Justice Blackmun concurred in the judgment on the basis of Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) and Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976)--decisions based on the eighth amendment. Gardner v. Florida, 430 U.S. at 364, 97 S.Ct. at 1207 (Blackmun, J., concurring). Justice Brennan agreed with the plurality that the procedure at issue violated the due process clause but adhered to his prior opinions stating that the death penalty violates the eighth amendment in all circumstances. Id. at 364-65, 97 S.Ct. at 1207-08 (Brennan, J., concurring)
 
 
 [9]
 The other requirement established in the 1976 cases, having been preordained by Furman, was the provision of standards and procedures to limit and direct sentencer discretion. E.g., Woodson v. North Carolina, 428 U.S. at 303, 96 S.Ct. at 2990; Gregg v. Georgia, 428 U.S. at 196-98, 199, 206-07, 96 S.Ct. at 2936, 2937, 2940-41; Proffitt v. Florida, 428 U.S. at 253, 258, 96 S.Ct. at 2967, 2969
 
 
 [10]
 As noted above, the Florida Supreme Court in deciding the Brown issue assumed arguendo that the petitioners' factual allegations were true. In the district court, petitioner proffered evidence indicating that at the time of his appeal to the Florida Supreme Court that court was engaged in the regular practice of soliciting, receiving, and reviewing extra-record materials of this type--without notifying the parties involved--in connection with its review of capital sentences. Petitioner alleged that much of this material, along with the court's letters requesting it in particular cases, was purged from the court's files, rendering verification that the practice was engaged in in particular cases very difficult. He offered proof that materials of the type routinely solicited by the Florida Supreme Court were contained in his prison files, however, and sought discovery to obtain evidence that the state court had requested nonrecord information in his case. The district court refused to admit the evidence petitioner proffered and denied his request for discovery. It then rejected his claim on the merits because of the absence of direct evidence that the Florida court had viewed any nonrecord information in reviewing Ford's sentence
 
 
 [11]
 The court described its role as limited merely to "determin[ing] if the jury and judge acted with procedural rectitude" and "compar[ing] the case under review with all past capital cases to determine whether or not the punishment is too great." Brown v. Wainwright, 392 So.2d at 1331-33
 
 
 [12]
 The Florida court did
 not find it possible to believe that in Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Supreme Court of the United States meant to lay down a principle so pervasive as to require an appellate court to lay out for inspection by the appellant, even in a capital case, all of the information in its hands from which it may seek perspective and guidance in reviewing the propriety of his sentence.
 Brown v. Wainwright, 392 So.2d at 1332 (quoting Ex Parte Farley, 570 S.W.2d 617, 625-27 (Ky.1978)).
 
 
 [13]
 See Brown v. Wainwright, 454 U.S. 1000, 1002-03, 102 S.Ct. 542, 544, 70 L.Ed.2d 407, 409 (1981) (Marshall, J., dissenting from denial of certiorari):
 When reviewing a sentence for procedural regularity, the court might uphold or vacate the sentence in part on grounds not considered by the trial court, or on factually erroneous grounds, because it has viewed ex parte unreliable, nonrecord information concerning the appellant. And when reviewing sentences for proportionality, the court's comparison of the sentences of other capital defendants with that of the appellant is rendered meaningless if the court has upheld or vacated the death sentences of other individuals after viewing this kind of information, or if the court used possibly erroneous information only as background data for its proportionality determination. The more systematic the practice of reviewing such information, the greater the danger of this second form of distortion.
 
 
 [14]
 Section 2254(d) requires federal courts addressing collateral attacks on state court judgments to defer to determinations of fact made by a state court "after a hearing on the merits of the factual issue." The Brown court neither received evidence nor held a hearing; instead, it decided the case on the basis of the petitioners' allegations. The Florida court thus rendered no factual finding to which the presumption of correctness under Sec. 2254 applies. Nor does anything in the Sumner decision suggest that Sec. 2254 is broader in scope than its terms or encompasses aspects of state court decision other than factual determinations made on the basis of evidence
 
 
 [15]
 Compare this case with Harris v. Rivera, 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) (mere inconsistency in verdicts insufficient basis for inferring that judge relied on impermissible evidence or nonrecord information)
 
 
 [16]
 The cause and prejudice standard was first enunciated in Davis v. United States, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), in which it was applied to bar a challenge to the makeup of a federal grand jury asserted for the first time on collateral attack. In Francis v. Henderson, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), the Supreme Court extended the cause and prejudice standard to bar a similar challenge to a state's grand-jury composition. Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), which applied the standard in a case challenging admission of inculpatory statements, was the first case to state that the standard is a generally applicable limitation on federal habeas review where defendants fail to comply with states' contemporaneous objection rules
 
 
 [17]
 In Sykes the respondent had "advanced no explanation whatever for his failure to object at trial" thus precluding a finding of cause, and the Court found that evidence at respondent's trial other than the allegedly unconstitutional evidence "negate[d] any possibility of actual prejudice." Wainwright v. Sykes, 433 U.S. at 91, 97 S.Ct. at 2509
 
 
 [18]
 Prior to the Supreme Court decision in Engle, two circuits had addressed whether unforeseeability of a change in constitutional law occurring after trial may constitute cause under Sykes. In Cole v. Stevenson, 620 F.2d 1055 (4th Cir.) (en banc), cert. denied, 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980), the Fourth Circuit held that a change in the constitutional law governing burden of proof did not constitute cause under Sykes for failure to raise a constitutional objection to burden-of-proof instructions in accordance with state procedural requirements. In Isaac v. Engle, 646 F.2d 1129 (6th Cir.1980) (en banc), rev'd, --- U.S. ----, 102 S.Ct. 1558, 71 L.Ed. 783 (1982), the Sixth Circuit reached the opposite conclusion. The only former Fifth Circuit case addressing whether a change in law constitutes cause is Dumont v. Estelle, 513 F.2d 793 (5th Cir.1975). (Although Dumont preceded the Supreme Court decision in Sykes, it applied the waiver standard on the basis of Davis v. United States, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973). See note 17 supra.) Dumont held that unawareness of constitutional precedent supporting an assertion of error is not cause for failure to raise such error in the state courts where the defendant seeks through his collateral challenge to establish the doctrine vindicating the constitutional right he claims. Dumont did not "present an appropriate context for determining the circumstances, if any, under which the supervening declaration of a right not previously known to exist might warrant relief from a [ ] procedural waiver ...." Dumont v. Estelle, 513 F.2d at 800
 The Supreme Court, in reversing the Engle decision, did not resolve when unforeseeability of a post-trial constitutional development is sufficient cause to justify a procedural default because it found the development at issue was foreseeable. See Engle v. Isaac, --- U.S. at ----, 102 S.Ct. at 1572-75, 71 L.Ed.2d at 802-04. The Court noted, however, that it "might hesitate to adopt a rule that would require trial counsel either to exercise extraordinary vision or to object to every aspect of the proceedings in the hope that some aspect might mask a latent constitutional claim." Id. --- U.S. at ----, 102 S.Ct. at 1572, 71 L.Ed.2d at 802.
 
 
 [19]
 Appellant's trial took place in December 1974. The Supreme Court decided Lockett in December 1978
 19a In his separate concurrence and dissent Judge Tjoflat states that because "[p]etitioner never introduced any evidence, other than the record of the state court prosecution, to prove cause before the district court ... it cannot be seriously contended that the trial court erred in holding that Sykes bars petitioner's claim." (Tjoflat, J., concurring and dissenting at 828). The district judge's findings of fact and conclusions of law reveal that he did not hold that petitioner's claim was barred by Sykes. To the contrary, he stated that "Wainwright v. Sykes controls" and then directly proceeded to the merits of petitioner's challenges to the sentencing phase instructions and rejected them on the merits. Findings of Fact and Conclusions of Law at 4, Record Excerpts at 113-18. While the district judge did not give highly individualized consideration to each of the subparts of the petitioner's claim raised in the habeas petition under the general heading "E. Sentencing Phase Instructions to the Jury: Permitting the Arbitrary, Unguided Imposition of the Death Penalty," I construe his rejection on the merits as applying to all aspects of the claim, including the Lockett claim. See Record Excerpts 113-18.
 
 
 [20]
 Lockett v. Ohio, 438 U.S. at 598, 98 S.Ct. at 2961. See id. at 597-99, 98 S.Ct. at 2960-62; Comment, First Degree Murder Statutes and Capital Sentencing Procedures: An Analysis and Comparison of Statutory Systems for the Imposition of the Death Penalty in Georgia, Florida, Texas, and Louisiana, 24 Loyola L.Rev. 709, 710-15 (1978)
 
 
 [21]
 The 1976 cases were the first decisions by the Supreme Court interpreting Furman. Appellant's trial preceded these decisions by two years
 
 
 [22]
 Hertz & Weisberg, In Mitigation of the Penalty of Death: Lockett v. Ohio and the Capital Defendant's Right to Consideration of Mitigating Circumstances, 69 Calif.L.Rev. 317, 319 & nn. 7-8 (1981); Note, Discretion and the Constitutionality of the New Death Penalty Statutes, 87 Harv.L.Rev. 1690, 1690-91, 1692-99 (1974)
 
 
 [23]
 Indeed, the provisions of the Ohio death penalty statute invalidated in Lockett as unconstitutionally limiting consideration of mitigating factors were enacted in direct response to Furman. As the Supreme Court noted, the Ohio legislature was debating death penalty legislation that would have permitted broader consideration of mitigating evidence at the time of the Furman adjudication. Lockett v. Ohio, 438 U.S. at 599 n. 7, 98 S.Ct. at 2962 n. 7. Once Furman was decided Ohio's legislators, "[c]onfronted with what reasonably would have appeared to be the questionable constitutionality of permitting discretionary weighing of mitigating factors after Furman," amended the pending legislation to restrict consideration of mitigating criteria from "any circumstance 'tending to mitigate the offense' " to three specific statutory mitigating circumstances. Id. (emphasis added)
 
 
 [24]
 In addition to post-Lockett commentary such as that cited in the text, pre-Lockett analyses of the impact of Furman reflect an interpretation that would preclude the wide discretion in consideration of mitigating factors subsequently held to be required in Lockett. See, e.g., Note, supra note 23, at 1702, 1703-04, 1707; Note, Furman to Gregg: The Judicial and Legislative History, 22 How.L.J. 53, 91-93 (1979) (article completed before Lockett though published thereafter)
 
 
 [25]
 Prior to Furman, Florida's death penalty statutes provided that defendants convicted of capital felonies would be punished by death unless the verdict included a recommendation of mercy concurred in by a majority of the jury. See Fla.Stat.Ann. Sec. 921.141 Note (West 1973); Dobbert v. Florida, 432 U.S. 282, 288 & n. 3, 97 S.Ct. 2290, 2296 & n. 3, 53 L.Ed.2d 344 (1977). The recommendation of leniency was held within the exclusive province of the jury to be determined on the facts of the particular case, Whitney v. Cochran, 152 So.2d 727 (Fla.), cert. denied, 375 U.S. 888, 84 S.Ct. 166, 11 L.Ed.2d 118 (1963), and the jury decision, whether it recommended mercy or not, was binding on the trial judge. State v. Miller, 231 So.2d 260 (1970). The statutes provided no guidance concerning what evidence could be considered by the jury nor otherwise indicated in what circumstances a recommendation of mercy would be appropriate. Cf. North v. State, 65 So.2d 77, 100 (Fla.1952) (en banc), affirmed per curiam, 346 U.S. 932, 74 S.Ct. 322, 98 L.Ed. 423 (1954) (jury may recommend mercy when any extenuating facts or circumstances appeal to them as justifying such recommendation)
 Shortly after Furman was decided, the Florida Supreme Court held these statutes unconstitutional under Furman. Donaldson v. Sack, 265 So.2d 499 (Fla.1972). The new Florida death penalty statute enacted in late 1972 set forth procedures under which the jury was to make its (now advisory) sentence and specific aggravating and mitigating criteria it could consider in sentencing. See Fla.Stat.Ann. Sec. 775.082 (West 1976); id. Sec. 921.141 (West 1973 & Supp.1982). It thus appears that the Florida Legislature read Furman as requiring standards or guidelines to confine the jury's discretion in capital sentencing. See also Proffitt v. Florida, 428 U.S. at 247-53, 96 S.Ct. at 2964-2967 (describing how Florida procedures meet constitutional deficiencies identified in Furman ).
 
 
 [26]
 The first case considering the constitutionality of the new Florida statute was decided prior to Proffitt's trial. State v. Dixon, 283 So.2d 1 (1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974). The majority interpreted Furman as not abolishing discretion in capital sentencing entirely but as concerned with "the quality of discretion and the manner in which it [is] applied." State v. Dixon, 283 So.2d at 6. The opinion discusses the specific provisions of the new Florida death penalty statute and the extent to which they control sentencing discretion but does not expressly state whether the state's mitigating circumstances provision is an exclusive list of the factors juries may consider in mitigation. The opinion's focus on the issue of control over sentencer discretion, however, coupled with its statement that "the propounding of aggravating and mitigating circumstances" is the "most important safeguard" the statute employs to restrain and guide such discretion, id. at 8-9, would have supported an interpretation of Sec. 921.141 as limiting sentencer consideration of both aggravating and mitigating circumstances to the factors expressly described in the statute. The dissenting opinion of Justice Ervin, which argues that the statute allows the jury too much discretion to satisfy the dictates of Furman, see id. at 13-14 (Ervin, J., dissenting), expressly interprets the statute to limit the aggravating and mitigating circumstances judges and juries may consider to those enumerated in the statute. Id. at 17
 In Cooper v. State, 336 So.2d 1133, 1139 (1976), the Florida Supreme Court strongly suggested that the only factors relevant to sentencing under the Florida scheme are the statutory aggravating and mitigating circumstances. This holding was followed until, after the Supreme Court's decision in Lockett, the Florida court reassessed its prior decisions and held that all mitigating evidence, statutory or nonstatutory, is admissible. Songer v. State, 365 So.2d 696, 700 (1978) (on rehearing). Although the Songer court attempted to reconcile Cooper, see id. at 700, it has recognized that Cooper was interpreted as precluding consideration of nonstatutory mitigating evidence. See Perry v. State, 395 So.2d 170, 174 (1980).
 
 
 [27]
 The opinion states:
 We have not overlooked the testimony favorable to appellant's character and prior behavior presented by the defense in mitigation during the sentencing trial. We do not pretend to know what motivated Alvin Bernard Ford to take the life of Dimitri Walter Ilyankoff. Our duty under section 921.141, Florida Statutes (1975), as upheld by the United States Supreme Court in Proffitt v. State, supra, is to apply fairly the aggravating and mitigating circumstances duly enacted by the representatives of our citizenry to the facts of the capital cases which come before us.
 Ford v. State, 374 So.2d at 503 (emphasis added). A comparison of the Florida court's opinion in Ford with its opinion in Songer v. State, supra suggests that it considers the Lockett holding as narrowly confined to the question of admissibility of evidence and not as affecting the sentencers' or reviewing court's roles. Washington v. Watkins, 655 F.2d at 1375 and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) repudiate this view. See text infra at 859-860.
 
 
 [28]
 Engle v. Isaac, --- U.S. at ----, 102 S.Ct. at 1573, 71 L.Ed.2d at 802. See note 18 supra
 
 
 [29]
 In cases where the constitutional claim raised by the petitioner is obviously lacking in merit it may be appropriate to dispose of the substantive claim without first addressing waiver, particularly where the latter issue involves legal or factual questions that will be difficult to resolve. Because this approach undercuts the interests served by the waiver rule, however, it should be used sparingly
 
 
 [30]
 In United States v. Frady, the petitioner had asserted that the state trial court violated his constitutional rights by instructing the jury incorrectly on malice. --- U.S. at ----, 102 S.Ct. at 1589, 1592, 71 L.Ed.2d at 824, 827. Frady had waived his claim by failing to raise it at trial or on direct appeal, id. at ----, 102 S.Ct. at 1589, 71 L.Ed.2d at 824, and the Court declined to recognize an exception to the waiver rule under Sykes because it held petitioner had not established that he was actually prejudiced by the allegedly erroneous instruction. Id. at ----, 102 S.Ct. at 1594, 71 L.Ed.2d at 830. The harm asserted by Frady--that the instructions relieved the government of its burden of proving malice and thus discouraged the jury from considering the lesser included offense of manslaughter--the Court found was neutralized by the "overwhelming" evidence of malice "coupled with Frady's utter failure to come forward with a colorable claim that he acted without malice." Id. at ----, 102 S.Ct. at 1596, 1597, 71 L.Ed.2d at 832, 833. Moreover, the fact that the jury had convicted Frady not merely of second degree murder, which required only malice, but of first degree murder, which required a finding of premeditation and deliberation, showed that the jury's view of the facts was inconsistent with the mitigating factors that would have reduced the offense to manslaughter and with an absence of malice. Id. at ---- & n. 19, 102 S.Ct. at 1597-98 & n. 19, 71 L.Ed.2d at 833-34 & n. 19. See also Wainwright v. Sykes, 433 U.S. at 91, 97 S.Ct. at 2508 (other evidence of guilt negated possibility that admission of petitioner's inculpatory statement prejudiced him)
 
 
 [31]
 As noted above, the majority opinion presents four reasons for denying petitioner relief on the mitigating circumstances claim, three of which address the merits. I will address the majority's third reason, which pertains to the prejudice issue, at this juncture. The majority's first, second, and fourth bases will be treated in my discussion of the merits of petitioner's Lockett claim. See section II.B infra
 
 
 [32]
 Washington was decided by a Unit A panel of the former Fifth Circuit on September 14, 1981, prior to the division of that Circuit into the new Fifth and Eleventh Circuits. Thus the decision in Washington is binding on the Eleventh Circuit until expressly overruled by the en banc court. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc). Compare id. with Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir.1981) (decisions by Unit A panels of former Fifth Circuit after October 1, 1981 not binding on Eleventh Circuit)
 
 
 [33]
 Washington v. Watkins, 655 F.2d at 1370
 
 
 [34]
 The jury instructions given by the trial judge at Ford's trial provided:
 Ladies and gentlemen, you have heard the evidence and argument of counsel necessary to enable you to render an advisory sentence to the Court as to whether the defendant should be sentenced to death or to life imprisonment.
 * * *
 Your advisory sentence will have three parts.
 First: Whether sufficient aggravating circumstances exist to justify a sentence of death.
 Second: Whether sufficient mitigating circumstances exist which outweigh any aggravating circumstances to justify a sentence of life imprisonment rather than a sentence of death.
 Third: Based on those considerations whether the defendant should be sentenced to life imprisonment or to death.
 * * *
 As to aggravating circumstances, in considering whether sufficient aggravating circumstances exist to justify a sentence of death, you shall consider only the following:
 A, whether the defendant was under sentence of imprisonment when the defendant committed the murder of which he has just been convicted by you;
 B, whether the defendant has previously been convicted of another capital felony or of a felony involving the use of or threat of violence to the person;
 C, whether in committing the murder of which the defendant has just been convicted by you, the defendant knowingly created a great risk of death to many persons;
 D, whether the murder of which you have convicted the defendant was committed while the defendant was engaged in the commission of or attempt to commit, or flight after committing, or attempting to commit any robbery, rape, arson, burglary, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb;
 E, whether the murder of which the defendant has just been convicted by you was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
 F, whether the murder of which the defendant has just been convicted by you was committed for pecuniary gain;
 G, whether the murder of which the defendant has just been convicted by you was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws;
 H, whether the murder of which the defendant has just been convicted by you was especially heinous, atrocious, or cruel.
 As to mitigating circumstances, in considering whether sufficient mitigating circumstances exist which outweigh any aggravating circumstances to justify a sentence of life imprisonment rather than a sentence of death, you shall consider the following:
 A, whether the defendant has no significant history of prior criminal activity;
 B, whether the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;
 C, whether the victim was a participant in the defendant's conduct or consented to the act;
 D, whether the defendant was an accomplice in the murder committed by another person and the defendant's participation was relatively minor;
 E, whether the defendant acted under extreme duress or under the substantial domination of another person;
 F, whether the capacity of the defendant to appreciate the criminality of his conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired;
 G, the age of the defendant at the time of the crime.
 
 
 [35]
 The Florida statute provides that "Aggravating circumstances shall be limited to the following: [listing nine criteria]," Fla.Stat.Ann. Sec. 921.141(5) (West Supp.1982), and that "Mitigating circumstances shall be the following: [listing seven criteria]," id. Sec. 921.141(6)
 
 
 [36]
 The instructions invalidated in Washington were as follows:
 Members of the jury, as the court explained to you in the beginning of the trial, you have heard some evidence in aggravation put on by the State and you have heard evidence in mitigation put on by the defendant. You must in your sentencing find at least one item present of aggravation before you could impose the death penalty. If you find an item in aggravation present beyond a reasonable doubt, then you must consider any evidence in mitigation. And unless the evidence in mitigation could overcome the aggravation, of course, then you could return the death penalty ....
 You have found the defendant guilty of the crime of capital murder. You must now decide whether the defendant will be sentenced to death or to life imprisonment. In reaching your decision you must obviously consider the detailed circumstances of the offense for which the defendant was convicted and the defendant himself. To return the death penalty you must find that the aggravating circumstances, those which tend to warrant the death penalty, outweigh the mitigating circumstances, which are those which tend to warrant the lesser [sic] severe penalty. Now consider only the following elements of aggravation in determining whether the death penalty should be imposed: One, the capital murder was committed while the defendant Johnny Lewis Washington was engaged in the commission of the crime of robbery. Two, the defendant Johnny Lewis Washington committed this capital murder in an especially heinous, atrocious, or cruel manner. Those are your elements of aggravation.
 You must unanimously find beyond a reasonable doubt that one or more of these existed in order to return the death penalty .... Now if one or more of those elements of aggravation is found to exist, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstances. Now consider the following elements of mitigation in determining whether the death penalty should not be imposed: One, that the defendant has no significant history of prior criminal activity and two, the defendant's age at the time of the capital murder.
 If you unanimously find from the testimony that one or more of the preceding elements of mitigation exist[s], then you must consider whether it outweighs the aggravating circumstances you previously found and you must return one of the following verdicts ...
 Washington v. Watkins, 655 F.2d at 1367-68. Compare above with note 34 supra.
 
 
 [37]
 Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), applied in the context of a Lockett -based challenge to jury instructions, requires remand for resentencing if the trial court's instructions, taken in their entirety, could have led a reasonable juror to believe he could consider only the statutory mitigating circumstances. See Washington v. Watkins, 655 F.2d at 1369, 1370-71. Our inquiry is thus an objective one that focuses on the judge's instructions, and petitioner is not required to prove actual subjective misunderstanding of the law by the jurors. Although petitioner need not establish the actual state of mind of the jurors, evidence of their subjective understanding if available may support a conclusion that the instructions could reasonably have engendered their misunderstanding of the law. In this case, there is evidence in addition to the judge's instructions suggesting that the jurors actually considered themselves limited to the statutory mitigating circumstances. At the sentencing hearing, the judge read to the jury the charge concerning aggravating and mitigating circumstances. See note 34 supra. He did not give the jury a copy of that portion of the charge, however, because petitioner's attorney requested that he not do so. Shortly after the jury began its sentencing deliberations, the foreman submitted a request to the judge, which stated: "Judge Lee, we would like the list of charges regarding the definitions of aggravating circumstances and mitigating circumstances. Signed L. Pati, foreman." The defense attorney objected to the judge's reinstructing the jury on this point, but stated that if the court was to do so he would prefer the instruction be given orally rather than in writing. The judge informed the foreman that he would not provide the jury with a written charge but would again read it if the jury wished. The foreman then said to the other jurors: "You want to hear them again; what they consider the aggravating circumstances; what they consider the mitigating circumstances. They can't give us the things to take in. He will read them again for us; okay?" The judge then repeated the instruction previously given concerning aggravating and mitigating factors. The foreman's request for reinstruction concerning "what [the court] consider[s] the mitigating circumstances" indicates that he understood the circumstances enumerated by the court to be exclusive
 
 
 [38]
 The current version of the statute lists nine aggravating factors. See Fla.Stat.Ann. Sec. 921.141(5)(a)-(i) (West Supp.1982). The ninth aggravating factor was added by amendment in 1979. 1979 Fla.Laws, c. 79-353, Sec. 1
 
 
 [39]
 The concluding paragraph of the judge's findings indicates that the judge may have considered factor (h) (murder especially heinous, atrocious, and cruel) alone sufficient to support the death penalty. The finding pertaining specifically to that factor does not, in contrast to the findings on factors (a) and (b), state that it justifies the death sentence, however. Whether the judge would have imposed the death sentence absent his error in applying the statutory aggravating factors thus cannot be determined from the findings, and any attempt to answer that question would be sheer speculation
 
 
 [40]
 In our first opinion in Henry, we indicated that the petitioner had failed to object at trial to the jury instructions that were the subject of his habeas challenge. Henry v. Wainwright, 661 F.2d at 57. The state argued that by violating Florida's contemporaneous objection rule Henry had waived his claim of error in the instructions under Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The Henry court rejected this argument, however, on the ground that an objection would have been futile
 The Supreme Court vacated the former Fifth Circuit decision in Henry for reconsideration in light of Engle v. Isaac, --- U.S. ----, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Henry v. Wainwright, --- U.S. ----, 102 S.Ct. 2976, 73 L.Ed.2d 1361 (1982). In Engle, the Supreme Court held that "the futility of presenting an objection to the state courts cannot alone constitute cause for a failure to object at trial." Engle v. Isaac, --- U.S. at ----, 102 S.Ct. at 1572, 71 L.Ed.2d at 802. The Supreme Court's decision to vacate Henry presumably was based on the Henry court's articulation of a standard for cause that may conflict with that adopted in Engle.
 After remand from the Supreme Court, this court clarified the earlier opinion and concluded that defendant had objected to the instructions at trial, but simply had not belabored the objection. Henry v. Wainwright, 686 F.2d 311 at 313. Alternatively, because the Florida courts "must have excused any default in order to reach the merits" of Henry's claim, any default was forgiven. Id. at 314. Thus, there was no waiver under Engle or Wainwright v. Sykes. Consequently, the panel reinstated the prior judgment, holding that consideration of nonstatutory aggravating circumstances rendered the sentence constitutionally infirm and mandated vacation of the sentence. Henry v. Wainwright, 686 F.2d 311 at 314.
 The waiver issue involved in Henry is not present with respect to Ford's aggravating circumstances claims, which are aimed not at the jury instructions but rather at the trial judge's findings on aggravating circumstances. Obviously no objection to the findings could have been raised at trial because the judge did not make the findings until after the trial. On his direct appeal to the Florida Supreme Court, petitioner objected to the findings concerning aggravating circumstances, and that court ruled on the merits of such challenge.
 
 
 [41]
 The Supreme Court's order certifying the Stephens case to the state supreme court for clarification of the state law premises for that court's decision does not address the appropriateness of the relief ordered by the Fifth Circuit. The three dissenting justices were clearly of the view that resentencing was constitutionally required. See Zant v. Stephens, --- U.S. ----, ----, 102 S.Ct. 1856, 1860, 72 L.Ed.2d 222, 228 (1982) (Marshall, J., joined by Brennan, J., dissenting); id. at ----, 102 S.Ct. at 1864, 72 L.Ed.2d at 235 (Powell, J., dissenting). The Supreme Court has received an answer to its certification to the state supreme court, Zant v. Stephens, 250 Ga. 97, 297 S.E.2d 1 (1982), but has not yet issued a final decision in the case. Thus, the issue is still pending before the Court. Even more significant is the Court's recent grant of certiorari in Barclay v. Florida, 411 So.2d 1310 (Fla.1982), cert. granted, --- U.S. ----, 103 S.Ct. 340, 74 L.Ed.2d --- (1982), which appears to present virtually the identical issue as is raised in this case. There, in addition to considering aggravating factors allegedly unsupported by the evidence, a nonstatutory aggravating circumstance was considered. Because in my opinion Ford's case cannot, on a principled basis, be distinguished from Stephens, or Barclay, the Supreme Court's decision in either of these cases will probably affect the outcome of this case. For this reason, decision of the aggravating circumstances issue should be deferred until the Supreme Court has decided the merits of Stephens and Barclay
 
 
 [42]
 The evidence cited in support of factor (a), see text supra at 864, is relevant to, and indeed was relied on by the judge in support of, aggravating factor (e) (murder committed for purpose of avoiding lawful arrest or effecting escape from custody). Trial Court Findings on Sentence, reprinted in Ford v. State, 374 So.2d at 501-02 n. 1. The evidence cited in support of factor (b), however, particularly the defendant's "admi[ssion] [of] the unlawful sale of narcotics drugs," is irrelevant to any of the other statutory factors
 
 
 [43]
 The Florida Supreme Court has reversed death sentences in cases in which it has invalidated the only aggravating factor(s) found by the sentencing judge. E.g., Perry v. State, 395 So.2d 170, 172, 174-75 (Fla.1981); Purdy v. State, 343 So.2d 4 (Fla.1977). Moreover, it has reversed death sentences partially predicated on improper aggravating circumstances when any mitigating factors were established. E.g., Gafford v. State, 387 So.2d 333, 337 (Fla.1980); Lewis v. State, 377 So.2d 640, 646-47 (Fla.1980); Fleming v. State, 374 So.2d 954, 957-59 (Fla.1979)
 The United States Supreme Court has reversed a death sentence on federal constitutional grounds where the state supreme court rejected all three of the theories relied on by the sentencing jury in support of an aggravating factor. Presnell v. Georgia, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978) (per curiam). The Court held the defendant's right to due process was violated by the state supreme court's affirmance of his sentence on the basis of a theory that the sentencing jury had not been instructed to consider. Id. at 16-17, 99 S.Ct. at 236-237. See also Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (holding sentencer's application of "outrageously or wantonly vile, horrible and inhuman" aggravating factor to particular case unconstitutional and invalidating death sentence based solely on that factor).
 
 
 [44]
 An essential premise of the Majority's and the Florida court's harmless-error analysis--that there are no mitigating factors--cannot, in my view, be established in this case because the trial judge and jury erroneously believed they could not consider nonstatutory mitigating evidence. See Section II.B. supra. In the following section of this opinion I will assume that no mitigating circumstances could have been established, however, because the outcome of petitioner's aggravating factors claim, correctly analyzed, does not depend on the existence of mitigating circumstances
 
 
 [45]
 The Florida cases do not make clear which of these two interpretations underlie the rule. The state cites Elledge v. State, 346 So.2d 998 (Fla.1977), as the seminal Florida Supreme Court case discussing the application of the harmless error rule to erroneously considered aggravating factors. The Elledge court reasoned that improper aggravating factors could have affected the initial sentencing decision only if the sentencer found some mitigating factor(s). Id. at 1002-03. The court's suggestion that the "weighing process" takes place only if the sentencer finds both aggravating and mitigating factors, see id. at 1003, implies that the statute does not allow the sentencer to evaluate the sufficiency of aggravating factors in cases where it finds no mitigating factors. But cf. Williams v. State, 386 So.2d 538, 543 (Fla.1980) (reversing death sentence predicated partially on invalid aggravating factors despite presence of one valid aggravating factor and no mitigating factors because jury recommended life sentence). The court's holding in Williams indicates that the advisory jury may, consistently with the Florida sentencing statute, decline to impose the death penalty if it views the aggravating factors as insufficient to justify such sentence. See id. at 543. See also Demps v. State, 395 So.2d 501, 506 (Fla.1981) (trial judge may "tak[e] into consideration the quality of aggravating circumstances applicable to each defendant")
 
 
 [46]
 Henry v. Wainwright, supra, 661 F.2d at 60 n. 8 (citing Woodson v. North Carolina, 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976)). The Henry panel rejected the reasoning of the Florida court that the sentence would be affirmed as long as no mitigating circumstances were found because "there is no danger that the unauthorized [aggravating] factor tipped the scale in favor of death." Henry v. Wainwright, 661 F.2d at 59. Henry held that the reviewing court's role in capital sentencing was not to second-guess the motives of the jury in recommending the death penalty:
 Guarding against the arbitrary and discriminatory imposition of the death penalty must not become simply a guessing game played by a reviewing court in which it tries to discern whether the nonstatutory aggravating factors exerted a decisive influence on the sentence determination. The guarantee against cruel and unusual punishment demands more.
 Id. at 60.
 Similarly, in Stephens the court held the sentence unconstitutional because it was "impossible for a reviewing court to determine satisfactorily that the verdict in this case was not decisively affected by an unconstitutional statutory aggravating circumstance." Stephens v. Zant, 631 F.2d at 406. The constitutional deficiency in the sentence was not only that "the jury's discretion here was not sufficiently channelled," but also "that the process in which the death penalty was imposed in this case was not 'rationally reviewable.' " Id. at 406. See also id. (as modified by 648 F.2d 446).
 
 
 [47]
 E.g., Enmund v. Florida, --- U.S. ----, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (eighth amendment prohibits imposition of death penalty on defendants who aid and abet felony during which murder occurs but do not themselves kill or intend that killing take place); Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (aggravating criterion that offense was "outrageously or wantonly vile, horrible, or inhuman" unconstitutional as applied to crime reflecting no more "depravity" of mind than that of anyone guilty of murder); Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (aggravating circumstances will not justify death sentence where such penalty is disproportionate to offense)
 
 
 [1]
 Ford also argues that the existence of the statutory aggravating circumstances themselves must be proved beyond a reasonable doubt. I agree with Judge Roney that state law does require proof beyond a reasonable doubt of the existence of such aggravating circumstances. State v. Dixon, 283 So.2d 1, 9 (Fla.1973). In my opinion, the reasoning developed in the text below also compels the same result as a matter of constitutional due process. However, I agree with Judge Roney that the facts of this case, with respect to the existence of the aggravating circumstances, are undisputed, and therefore that we can conclude that the failure to apply the proper reasonable doubt standard to those undisputed facts is harmless beyond a reasonable doubt
 I also agree with Judge Tjoflat that Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), would bar Ford's reliance on the principle that the existence of aggravating circumstances must be proved beyond a reasonable doubt. There was a procedural default because Ford did not object at trial. Because the facts relating to the aggravating circumstances were largely undisputed, there was no actual prejudice to Ford, and therefore the Sykes cause and prejudice standard is not satisfied.
 
 
 [2]
 The majority opinion also asserts, as a reason for rejecting Ford's argument, the fact that the Supreme Court has declared the Florida Statute constitutional on its face. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion). I respectfully point out that Proffitt did not address the issue now before this court, i.e., whether due process requires the reasonable doubt standard of proof. Proffitt expressly addressed only "whether the imposition of the death sentence in this case constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." Id., at 247, 96 S.Ct. at 2964
 
 
 [3]
 North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)
 
 
 [4]
 Chaffin v. Stynchcombe, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973)
 
 
 [5]
 Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919)
 
 
 [6]
 I agree with Judge Tjoflat, Opinion of Tjoflat, Circuit Judge, at 831 n. 17, that the process of weighing aggravating circumstances should more properly be labeled a normative, policy decision based on findings of subsidiary facts and the exercise of a large measure of judgment. Thus, I agree that the Florida statute is less than precise when it expressly labels this finding as one of fact. However, I also agree with Judge Tjoflat that the label is not significant and that it is appropriate to apply a standard of confidence, i.e., to require that the judge or jury have a high degree of confidence in the accuracy of their conclusion. The importance of the above discussion of the Florida statute and Bullington is not that findings of fact are required in the sentencing phase, but rather that certain articulated findings (whatever the label) are prerequisites. As demonstrated in the text below, it is both possible and necessary to apply a standard of confidence to this finding, whether it is called a finding of fact or a finding which involves a large measure of judgment or policy
 
 
 [7]
 In fact, in Florida itself the reasonable doubt standard has been applied to weigh aggravating and mitigating circumstances. Jackson v. State, 366 So.2d 752, 757 (Fla.1978) (per curiam) (quoting from the trial judge's findings of fact: "The aggravating circumstances in this case purely outweigh beyond and to the exclusion of every reasonable doubt in the Court's mind the mitigating circumstances"), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979). Cf. Tedder v. State, 322 So.2d 908, 910 (Fla.1975) (following a jury recommendation of life a trial judge can override the advisory jury and impose a sentence of death only upon facts suggesting a sentence of death so clear and convincing that virtually no reasonable person could differ)
 In addition, several state legislatures, courts, and juries have used the reasonable doubt standard to determine whether the aggravating circumstances outweigh the mitigating circumstances. Ark.Stat.Ann. Sec. 41-1302(2) (1977) (authorizes the jury to "impose a sentence of life imprisonment without parole if it finds that ... (b) aggravating circumstances do not outweight [sic] beyond a reasonable doubt all mitigating circumstances found to exist"); Ohio Rev.Code Ann. Sec. 2929.03(D)(1) (Page 1982) ("The prosecution shall have the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the sentence of death"); Wash.Rev.Code Sec. 10.95.060(4) (Supp.1981) ("Upon conclusion of the evidence and argument at the special sentencing proceeding, the jury shall retire to deliberate upon the following question: 'Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?' "); State v. Wood, 648 P.2d 71, 83-84 (Utah 1982) ("The sentencing body, in making the judgment that aggravating factors 'outweigh,' or are more compelling than, the mitigating factors, must have no reasonable doubt as to that conclusion, and as to the additional conclusion that the death penalty is justified and appropriate after considering all the circumstances"); Reddix v. State, 381 So.2d 999, 1013 (Miss.1980) (quoting from the jury's verdict signed by the foreman: "We further find unanimously from the evidence and beyond a reasonable doubt that after weighing mitigating circumstances and the aggravating circumstances, one against the other, that the mitigating circumstances do not outweigh the aggravating circumstances and that the defendant should suffer the penalty of death"), cert. denied, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980); Woodard v. State, 261 Ark. 895, 553 S.W.2d 259, 266-67 (1977) ("The court in accordance with our statutes instructed the jury as follows: ... You may not return a verdict imposing the sentence of death unless you make written findings and conclusions ... that beyond a reasonable doubt no mitigating circumstance or circumstances which you may find to exist outweigh or equals in weight the aggravated circumstance or circumstances"), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979); Edwards v. State, --- So.2d ---- (Ala.Cr.App., June 29, 1982) (available on LEXIS, States library, Omni file) (quoting from the trial court's order: "The court, having thoroughly considered the aggravating circumstances and mitigating circumstances and having carefully weighed both, is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances far outweigh the mitigating circumstances"); see Bullington v. Missouri, 451 U.S. 430, 434, 101 S.Ct. 1852, 1855, 68 L.Ed.2d 270 (1981) (under the Missouri Approved Instructions--Criminal Sec. 15.42 (1979), a jury "must be convinced beyond a reasonable doubt that any aggravating circumstance or circumstances that it finds to exist are sufficient to warrant the imposition of the death penalty").
 
 
 [8]
 Accord, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion by Burger, Ch. J., Stewart, Powell and Stevens, JJ.) ("We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." Id. at 604, 98 S.Ct. at 2964. "When the choice is between life and death, that risk [i.e., the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty] is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." Id. at 605, 98 S.Ct. at 2965); Gardner v. Florida, 430 U.S. 349, 359, 363-64, 97 S.Ct. 1197, 1205, 1207, 51 L.Ed.2d 393 (1977). See also Bullington v. Missouri, 451 U.S. 430, 445, 101 S.Ct. 1852, 1861, 68 L.Ed.2d 270 (1981) (In holding that the Double Jeopardy Clause prevented a defendant from being sentenced to death when the jury at his first trial declined to impose the death sentence, the Court said: "The 'unacceptably high risk that the [prosecution] with its superior resources would wear a defendant down' ... thereby leading to an erroneously imposed death sentence would exist if the State were to have a further opportunity to convince a jury to impose the ultimate punishment.")
 
 
 [9]
 In rejecting Ford's standard of proof arguments, the majority does not rely on Ford's apparent procedural defaults. In light of the concerns expressed in Judge Tjoflat's separate opinion, however, a brief comment is appropriate
 During the sentencing phase, Ford did not object to the failure of the trial court to instruct the jury as to the standard of proof to be used when determining whether aggravating factors outweigh mitigating factors. Thus, the state courts refused to address this claim. See Ford v. State, 407 So.2d 907, 908 (Fla.1981). Because of this procedural default, Ford may not raise this issue before a federal court absent cause for the failure to object and actual prejudice resulting from the alleged error. See Engle v. Isaac, --- U.S. ----, ----, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783, 801 (1982); Wainwright v. Sykes, 433 U.S. 72, 90-91, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). In my view, both cause and prejudice are amply demonstrated.
 In Engle v. Isaac, the Supreme Court announced a formulation of cause that holds trial counsel to a strict duty to recognize and raise potential trial errors of constitutional magnitude. The futility of raising an argument, alone, can no longer justify counsel's failure to raise it; there can be no cause when the bases for the constitutional claim are available and other attorneys have perceived and litigated that claim. Engle v. Isaac, --- U.S. at ----, 102 S.Ct. at 1574, 71 L.Ed.2d at 804; see Dietz v. Solem, 677 F.2d 672, 675 (8th Cir.1982). In Engle itself, for example, the Court could point to recent Supreme Court precedent clearly establishing the basis for the claim asserted by Engle, as well as dozens of cases in which the claim had been raised and litigated in federal and state courts. See also Dietz v. Solem, 677 F.2d at 675 (although at time of trial counsel could not anticipate subsequent Supreme Court decision striking down similar jury instruction, subsequent decision relied on precedent existing at time of defendant's trial, and cited earlier cases in federal and state courts striking down similar instructions). Unlike the situation in Engle, I have found no federal cases in which this issue has been litigated. In those state cases in which the trial court or the jury used the reasonable doubt standard, note 7 supra, there is no suggestion that this issue was litigated; instead the appellate courts merely acknowledged use of that standard. Only one state court has explored the question whether the reasonable doubt standard applies to the weighing process. State v. Wood, 648 P.2d 71, 83-84 (Utah 1982) (explaining conclusions reached by same court in State v. Wood, 648 P.2d 71 (1981) (per curiam)). Its decision was handed down after Ford's direct appeal. Indeed the position of the majority opinion in this case--that the weighing process is not susceptible to a standard of proof--reflects the understandable mindset of lawyers steeped in the experience of traditional sentencing. The novelty of the question, in my view, therefore constitutes sufficient cause for Ford's failure to raise the issue at trial. To hold otherwise would be "to adopt a rule that would require trial counsel either to exercise extraordinary vision or to object to every aspect of the proceedings in the hope that some aspect might mask a latent constitutional claim." Engle v. Isaac, --- U.S. at ----, 102 S.Ct. at 1572, 71 L.Ed.2d at 802. If the "tools" necessary to construct the constitutional claim are lacking, a defendant's procedural default should be excused.
 An examination of the Supreme Court's most recent pronouncement on "prejudice," United States v. Frady, --- U.S. ----, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), indicates that Ford was also prejudiced by the failure to raise this issue. In Frady, the petitioner, convicted of first degree murder, challenged a jury instruction that created a rebuttable presumption of malice. The Supreme Court held, however, that Frady had not been prejudiced by the erroneous instruction because (1) evidence of Frady's guilt and malice was overwhelming; (2) Frady never set up a defense of, or introduced evidence showing absence of malice, but instead claimed he had nothing to do with the crime; and (3) the same jury that necessarily found that Frady acted in a deliberate and premeditated way could not logically have found an absence of malice under the precise instructions given by the trial court. Id. at ----, 102 S.Ct. at 1596, 71 L.Ed.2d at 832-34.
 The case before us, however, is vastly different from Frady; during the sentencing phase Ford called witnesses and introduced substantial evidence of factors in mitigation of his crime. Ford's bringing before the court affirmative evidence that he was not deserving of the death penalty made the standard by which the jury evaluated that evidence of critical importance. Compare id. at ----, 102 S.Ct. at 1596, 71 L.Ed.2d at 832. Moreover, the undisputed existence of aggravating circumstances does not negate this prejudice, since the jury must also find that they outweigh the mitigating factors. In my view, the failure to instruct the jury on the appropriate degree of confidence in making this determination clearly prejudiced Ford, particularly since this failure may well have caused the jury to impose a sentence of death. See Tyler v. Phelps, 643 F.2d 1095, 1100 (5th Cir.1981) (prejudice found where instruction shifted burden of proof on critical issue that was in dispute), cert. denied, --- U.S. ----, 102 S.Ct. 1992, 72 L.Ed.2d 455 (1982).
 I conclude that there was both cause and prejudice with respect to Ford's failure to object to the absence of a jury instruction that the reasonable doubt standard applies to the "weighing" finding.